MICHAEL W. MALTER, #96533
ROBERT G. HARRIS, #124678
JULIE H. ROME-BANKS, #142364
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408) 295-1700
Facsimile: (408) 295-1531
Email: michael@bindermalter.com
Email: rob@bindermalter.com
Email: julie@bindermalter.com

Attorney for Creditor/Lessor
Cantor Fund Management dba Vine Center, LLC,
a Florida Limited Liability Company

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA , OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>FJC MANAGEMENT, INC.,<br><br>Debtor. | Case No. 23-40085-WJL<br><br>Chapter 11<br><br>Date: May 31, 2023<br>Time: 9:30 a.m.<br>Judge: Hon. William J. Lafferty<br>Courtroom: 220<br><br>R.S. No.: JHR-122 |

## DECLARATION OF JENNIFER NIELSEN IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY OR ADEQUATE <u>PROTECTION</u>

I, Jennifer Nielsen, hereby declare:

1.     I am a Property Manager employed by Colliers International, the duly appointed and acting agent of Cantor Fund Management, doing business at Vine Center, LLC, a Florida limited liability company, Movant herein.  I make this declaration in support of the MOTION FOR RELIEF FROM AUTOMATIC STAY OR ADEQUATE PROTECTION filed by Movant.

2. I have personal knowledge of the matters set forth in this Declaration and if called as a witness would testify as follows.

3. In my capacity as Property Manager to Movant, I have access to, and I am familiar with, the books and records kept by Movant regarding the Debtor FJC Management, Inc. ("Debtor"). These books and records have been generated, recorded and compiled in the ordinary course of business of the Movant. Further, these documents were prepared at the time, or near the time, that the information was received or that the events and transactions actually took place. It is the standard operating procedure of Movant to preserve these documents in a place of safekeeping on its business premises. I have personal access to these books and records and their continued safekeeping is maintained under my direction and supervision.

4. On January 25, 2023, the above-named Debtor filed a petition for relief under Chapter 11 of Title 11, United States Code. I understand that the Debtor is a Buffalo Wild Wings franchisee and operates restaurants in multiple locations in Northern California including at the Subject Premises described herein.

5. The Debtor is a tenant of Movant at the commercial premises located at 1722-1756, 1762-1776 and 1780-1790 N. First Street, Livermore, California and commonly known as 1790 N. First Street, of approximately 6,800 square feet ("Subject Premises"). Pursuant to a Retail Lease dated June 13, 2013, Movant's predecessor in interest leased to TEE IT UP 1 LLC, a California limited liability company as tenant ("Original Tenant") the Subject Premises. A true and correct copy of the Retail Lease (as amended and assigned, the "Lease") is attached hereto as Exhibit "A" and is incorporated herein by reference. The term of the Lease was for 120 months, with two options to extend the term; each option to extend being for an additional period of 60 months. The Original Tenant was obligated to pay Base Monthly Rent in the following amounts:

| Years | Base Monthly Rent |
|---|---|
| Years 1-3 | $10,200.00 |
| Years 4-6 | $10,766.67 |
| Years 6-10 | $11,441.00 |

DECLARATION OF JENNIFER NIELSEN IN SUPPORT OF MOTION FOR RELIEF FROM MOTION FOR RELIEF FROM AUTOMATIC STAY OR ADEQUATE PROTECTION
Page 2

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 2 of 113

| First Option Period | $12,789.67 |
| Second Option Period | $14,620.00 |

6.      The Original Tenant was also obligated to pay as additional rent its unliquidated share of operating expenses for the shopping center where the Subject Premises is located, along with percentage rent as set forth in the Lease. The Lease provides for any installment of rent not paid when due and payable shall bear interest at eighteen percent (18%) or the highest amount permitted by law per annum from the date due until paid. The Lease also provides for a late charge equal to 5% for any payment of Base Monthly Rent or Additional Rent not paid within 5 days of its due date, as well as provides for payment of attorneys' fees in the event the tenant defaults in the performance of any terms of the Lease.

7.      Pursuant to an Assignment and Assumption Agreement dated March 2, 2016, the Original Tenant assigned the Lease for the Subject Premises to the Debtor FJC Management, Inc. as assignee.  A true and correct copy of the Assignment and Assumption Agreement is attached hereto as Exhibit "B" and is incorporated herein by reference.  I am informed and believe and understand that Lessor's predecessor in interest did not know of, or consent to, the Assignment and Assumption Agreement at the time said agreement was made by the Debtor.

8.      Pursuant to the First Amendment to Retail Lease dated January 17, 2019 for reference purposes, the Debtor and Movant's predecessor in interest agreed to an amendment of the Lease. A true and correct copy of the First Amendment to Retail Lease is attached hereto as Exhibit "C" and is incorporated herein by reference.  The First Amendment to Retail Lease also provided that Movant's predecessor in interest consented to the assignment of the Lease to the Debtor but without waiver of rights against the original tenant and guarantors .  The Subject Premises was thereafter sold to Movant including all existing leasehold rights.

9.      Pursuant to the Second Amendment to Retail Lease effective February 12,

DECLARATION OF JENNIFER NIELSEN IN SUPPORT OF MOTION FOR RELIEF FROM MOTION FOR RELIEF FROM AUTOMATIC STAY OR ADEQUATE PROTECTION
Page 3

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 3 of 113

2021, the Debtor and Movant agreed to a second amendment to the Lease. A true and correct copy of Second Amendment to Retail Lease is attached hereto as Exhibit "D" and is incorporated herein by reference.

10. The Debtor filed a voluntary petition under Subchapter V of Chapter 11 on January 25, 2023 (the "Petition Date"). At all times pertinent hereto, the Debtor has been in possession of the Subject Premises. Movant is informed and believes that the Debtor has operated its business in the Subject Premises at all times since the Petition Date.

11. Prior to the commencement of this bankruptcy case, the Debtor defaulted on the obligation to pay rent to Movant, including bouncing checks to Movant that were intended to pay monthly rent obligations. Movant was required to engage counsel and incurred attorneys' fees as a result of the Debtor's default. Pre-petition, these attorneys' fees amounted to $4,960.57 and a redacted statement is available upon request.

12. Movant has filed a proof of claim in this case (Claim #17) on April 5, 2023. Movant has updated its accounting records since filing Claim #17 and will be amending the Proof of Claim to reflect application of all payments received to date. The accounting has been complicated by receipt of multiple NSF checks from the Debtor, including bounced checks in November 2022 and February 2023 (post-petition). According to Movant's records, the following amounts are currently owed under the Lease:

| Date | Description | Amount |
|------|-------------|--------|
| PRE-PETITION CLAIM | | |
| 11/8/22 | NSF Fee (for November bounced check) | $25.00 |
| 1/1/23 - 1/24/23 | Pre-petition attorneys' fees [1] | $4,960.57 |
| | Total Pre-Petition Claim | $4,985.57 |
| | | |
| POST-PETITION CLAIM | | |
| 2/13/23 | NSF Fee (for February rent bounced check)[2] | $25.00 |

---

[1] The pre-petition attorneys' fees included in this summary were incurred by Movant's state court counsel and a redacted copy of such statement is available upon request. Additional attorneys' fees have been incurred post-petition but are not included for purposes of this Motion.

DECLARATION OF JENNIFER NIELSEN IN SUPPORT OF MOTION FOR RELIEF FROM MOTION FOR RELIEF FROM AUTOMATIC STAY OR ADEQUATE PROTECTION
Page 4

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 4 of 113

| Date | Description | Amount |
|---|---|---|
| 3/1/23 | Base Rent | $11,441.00 |
| 3/1/23 | CAM | $3,628.91 |
| 3/1/23 | Insurance | $1,150.34 |
| 3/1/23 | Real Estate Taxes | $4,730.27 |
| 3/1/23 | Utilities | $932.00 |
| 5/1/23 | Base Rent | $11,441.00 |
| 5/1/23 | CAM | $3,628.91 |
| 5/1/23 | Insurance | $1,150.34 |
| 5/1/23 | Real Estate Taxes | $4,730.27 |
| 5/1/23 | Utilities | $932.00 |
| | Total Administrative Claim | $43,790.04 |
| TOTAL CLAIM | | $48,775.61 |

13.     The Debtor has recently filed its proposed Plan of Reorganization for a Small Business Under Chapter 11 (the "Subchapter V Plan") (docket #109).  The Subchapter V Plan in Article 6.01(a) provides as to executory contracts and lease that the Debtor will be assuming the executory contracts and lease set forth in Exhibit 3 to the Plan Compliment (found on pages 30-31 of docket #109) which does not include the lease with Movant.  The Subchapter V Plan further provides at 6.01(b) provides that,

> "Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date."

14.     Accordingly, the Debtor appears to have made a decision that the Lease with Movant will be deemed rejected under the provisions of the proposed Subchapter V Plan. However,  the Plan does not indicate when the Debtor intends to voluntarily deliver possession of the Subject Premises to Movant.

_____

(cont.)
    [2] The rent check for the month of February 2023 initially bounced. Movant received payment of January and replacement of February's payment by check and wire transfer respectively in February.  Movant has not been paid rent for the month of March. The April rent was paid by check received on May 4, 2023, but no payment has been received for May rent at this time.

1       15.     Pursuant to this Court's Order Setting Confirmation Hearing and Related

2 Deadlines, the confirmation hearing will take place on May 31, 2023 at 10:30 a.m. (i.e.,

3 one hour after this relief from stay motion is scheduled to be heard).

4       16.     Movant does not have, nor has it been offered, adequate protection for its

5 interest in the Subject Premises.  Movant holds no security deposit under the terms of the

6 Lease.

7       Executed on May 17, 2023 at Walnut Creek, California.  I declare under penalty of

8 perjury that the foregoing is true and correct.

9

10                _/s/ Jennifer Nielsen_
                Jennifer Nielsen

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JENNIFER NIELSEN IN SUPPORT OF MOTION FOR RELIEF FROM MOTION FOR RELIEF FROM
AUTOMATIC STAY OR ADEQUATE PROTECTION
Page 6

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 6
of 113

# EXHIBIT A

**RETAIL LEASE**

**FOR**

**VINE CENTER**

**GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, AS LANDLORD**

**AND**

**TEE IT UP 1 LLC, AS TENANT**

The submission of this document for examination does not constitute an option or offer to lease space at the Shopping Center. This document shall have no binding effect on the parties unless executed by the Landlord and the executed copy is delivered to the Tenant.

**RETAIL LEASE**

This Retail Lease (this "Lease") is made this 13th day of June, 2013, by and between GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, a Delaware limited partnership ("**Landlord**") and TEE IT UP 1 LLC, a California limited liability company ("**Tenant**").

**1.    BASIC LEASE PROVISIONS:**

1.1   Shopping Center Name:    Vine Center
       Address:                1722-1756, 1762-1776 and 1780-1790 N. First St.
                               Livermore, CA 94550
                               as more particularly described in **Schedule 1.**

1.2   Unit/Suite No.:          1790 N. First St.

1.3   Premises:  6,800 square feet of Net Rentable Area (defined below) as reflected on the site plan attached hereto as **Schedule 2** (the "**Site Plan**").

1.4   Commencement Date:  Upon the date which is the later of: (i) the date of the satisfaction or waiver of Tenant's Contingencies (as defined below), and (ii) delivery of the Premises to Tenant.

1.5   Rent Commencement Date:  One Hundred Twenty (120) days after the Commencement Date, provided that the Rent Commencement Date may be delayed in accordance with **Paragraph 3.1** below.

1.6   Expiration Date:  One Hundred Twenty (120) full months after the first calendar day of the month following the Commencement Date.

1.7   Tenant's Percentage Share:  Initially, Tenant's Percentage Share will be 17.84% based upon a fraction of which the numerator is the Net Rentable Area (defined below) contained within the Premises and the denominator is the total square feet of Net Rentable Area in the Shopping Center.  However, Tenant's Percentage Share shall vary each time that either the Net Rentable Area of the Premises changes and/or the Net Rentable Area of the Shopping Center changes in the same manner as determined above.

1.8   Security Deposit:  None. (See **Paragraph 23**).

1.9   Base Rent:

|                      | Monthly Base Rent: | Annual Base Rent: |
|----------------------|--------------------|-------------------|
| Years 1-3            | $10,200.00         | $122,400.00       |
| Years 4-6            | $10,766.67         | $129,200.00       |
| Years 6-10           | $11,441.00         | $137,292.00       |
|                      |                    |                   |
| First Option Period  | $12,789.67         | $153,476.00       |
| Second Option Period | $14,620.00         | $175,440.00       |

1.10  Operating Expense Rent:  Tenant's Percentage Share of Operating Expenses.

1.11  Intentionally Deleted.

1.12  Percentage Rent: Five Percent (5%) of Gross Sales (defined below) over the Breakpoint (defined in Section 5.2). (See **Paragraph 5.2**).

1.13  Permitted Trade Name(s): Buffalo Wild Wings. (See **Paragraph 7.4**).

1.14  Guarantor(s):  Tejpal Singh & Hardy Samra.  (See **Schedule 4**).

1

1.15    Address for Payment of Rent and Notices:

    **LANDLORD:**                                            **TENANT:**

    For payment and notices:                       Before the Commencement Date:



GCCFC 2005-GG5 Livermore Retail
Limited Partnership
c/o ProEquity Asset Management                 ATTN: Hardy Samra
4980 Hillsdale Circle, Suite A                   Telephone:████
El Dorado Hills, CA 95762                     Facsimile: (925) 999-8212
    Attn:  Michael Turner                     Email:████
          (916) 583-7486
    Email: mturner@proequityam.com

With copy of notices:                       After the Commencement Date:

                                          1790 N. First Ave.
GCCFC 2005-GG5 Livermore Retail      Livermore, CA 94550
Limited Partnership                        ATTN: Hardy Samra
c/o LNR Partners, LLC                     Telephone:████
1601 Washington Avenue, Suite 700     Facsimile: (925) 999-8212
Miami Beach, FL 33139                   Email:████
Attn: Director of Real Estate
Fax: (305) 695-5379

1.16    Broker:  Landlord's Broker is ProEquity Asset Management Corporation and Tenant's Broker is Terranomics.  (See **Paragraph 39**).

1.17    Permitted Use:  Tenant shall use the Premises solely as a sit-down restaurant and/or bar and incidental and related uses, and/or any other general retail use not in violation of other tenant exclusives existing as of the date of any proposed change in use by Tenant.

1.18    Minimum Hours of Operation:

    Monday - Friday:       11:00 a.m. to 9:00 p.m.
    Saturday:             11:00 a.m. to 9:00 p.m.
    Sunday:               11:00 a.m. to 9:00 p.m.

1.19    Minimum Hours of Illumination (of Exterior Windows of the Premises):

    Monday - Friday:       11:00 a.m. to 10:00 p.m.
    Saturday:              11:00 a.m. to 10:00 p.m.
    Sunday:               11:00 a.m. to 10:00 p.m.

1.20    Renewal Options:  Tenant shall have the right, subject to the terms and conditions of **Paragraph 51** below to renew its tenancy of the Premises for two (2) renewal options (each a "**Renewal Option**" and collectively the "**Renewal Options**") for a period of sixty (60) months per Renewal Option.

2.    **DEFINITIONS:**  Unless the context otherwise specifies or requires, the following terms will have the meanings set forth below:

2.1    Common Areas:  All areas and facilities outside the Premises and within the exterior boundaries of the Shopping Center that are not leased to other tenants and that are provided and designated by Landlord, in its sole discretion from time to time, for the general use and convenience of Tenant and other tenants of the Shopping Center and their authorized representatives, employees, invitees and the general public.  Common Areas include, but are not limited to, areas within and outside of the buildings in the Shopping Center, such as pedestrian walkways, patios, landscaped areas, sidewalks, service corridors, elevators, restrooms, stairways, decorative walls, plazas, mall throughways, loading areas, parking areas and roads.

2.2    Gross Sales:  The gross sum of the actual sales prices of all goods, wares and merchandise sold, leased, licensed, or delivered and the actual charges for all services performed by Tenant or by any subtenant, licensee or concessionaire in, at, from or arising out of the use of the Premises, whether for wholesale, retail, cash, credit, or trade-ins or otherwise, without reserve or deduction for inability or failure to collect.  Gross Sales shall include, without limitation, sales and services (a) where the orders therefor

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 10 of 113

originate in, at, from, or arising out of the use of the Premises, whether delivery or performance is made from the Premises or from some other place, (b) made or performed by mail, telephone, telegraph, facsimile, e-mail, computer or internet orders received at or delivered for the Premises, and (c) which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary course of its business would credit or attribute to its operations at the Premises or any part thereof. Any sums deposited with and forfeited to Tenant shall be included in Gross Sales. Each installment or credit sale or lease contract shall be treated as a sale or lease for the full price in the month during which such sale is made, regardless of whether or when Tenant receives payment therefor. No franchise or capital stock tax and no income or similar tax based on income or profits shall be deducted from Gross Sales. No deductions from Gross Sales shall be made for any amounts not originally included in Tenant's Gross Sales (including returns of internet purchases).

The following shall not be included in Gross Sales: (i) any exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made in, at, or from the Premises, or for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made in or at the Premises, (ii) returns to shippers or manufacturers, (iii) cash or credit refunds to customers on transactions (not to exceed the actual selling price of the item returned) otherwise included in Gross Sales, but only to the extent such transactions were included in Gross Sales initially, (iv) sales of trade fixtures, machinery and equipment after use thereof in the conduct of Tenant's business, (v) amounts collected and paid by Tenant to any government for any sales, use or excise tax, and (vi) the amount of any discount on sales to employees. The foregoing provisions notwithstanding, it is expressly acknowledged and agreed that no returns of merchandise ordered via computer or internet shall cause a reduction in Gross Sales unless the sale of such merchandise was previously included in Gross Sales for the Premises, and then only to the extent of the actual selling price of the item returned.

2.3     <u>Lease Year</u>: The first Lease Year will commence upon the Commencement Date and will end on the next succeeding December 31st. Thereafter, each 12-month period during the Term ending on December 31st, shall be a Lease Year, and the last Lease Year will end on the Expiration Date (unless this Lease is earlier terminated as provided for herein).

2.4     <u>Net Rentable Area</u>: All floor area within the Premises measured at floor level from the midpoint of all demising walls to the exterior surface of all exterior walls and exterior glass separating the Premises from the Common Areas (without deduction for columns or projections necessary to the Shopping Center or Premises) plus Tenant's Percentage Share of the Common Areas.

2.5     <u>Operating Expenses</u>: All costs of operating, servicing, administering, repairing and maintaining the Shopping Center (excluding costs paid directly by Tenant and other tenants in the Shopping Center or otherwise reimbursable and actually reimbursed to Landlord), the landscaping of Common Areas and the parking lot within and/or adjacent to the Shopping Center (provided such adjacent parking lot serves the Shopping Center). All costs of operating, servicing, administering, repairing and maintaining the Shopping Center including any and all reasonable and necessary costs of operation, maintenance and repairs performed by or at the direction of Landlord to maintain the Shopping Center in a condition that is consistent with similarly situated shopping centers in the metropolitan center in which the Shopping Center is located. For example, Operating Expenses shall include, but shall not be limited to: (a) wages, salaries, fringe benefits and payroll burden for employees on-site utilized in the day to day operation of the Shopping Center; (b) Landlord's Insurance (defined below), including any amounts that would be charged as premiums if Landlord self-insures any of the insurance risks; (c) liability disclaimers; (d) water, sewer, heating, air conditioning, ventilating and all other utility charges (other than with respect to utilities separately metered and paid directly by Tenant or other tenants); (e) Taxes (defined below), including, but not limited to, the good faith, reasonable cost of contesting the validity or amount of such Taxes (regardless of whether such efforts succeed or not); (f) janitorial services; (g) access control; (h) window cleaning; (i) elevator maintenance, if applicable; (j) fire detection and security services; (k) landscaping costs; (l) all costs of snow and ice removal; (m) trash, rubbish, garbage and other refuse removal; (n) pest control; (o) painting; (p) facade maintenance; (q) lighting; (r) exterior and partition (demising) wall repairs; (s) roof repairs; (t) maintenance of all steam, water and other water retention and discharging piping, lakes, culverts, fountains, pumps, weirs, lift stations, catch basins and other areas and facilities, whether or not on-site; (u) canal embankment and related maintenance;

3

(v) maintenance, repair and repainting of sidewalks and general resurfacing and maintenance of parking areas; (w) sanitary control; (x) depreciation of any and all capital items used in any of such maintenance and repair activities; (y) repair, maintenance and replacement of signage located in the Shopping Center; (z) management fees; (aa) the costs (amortized together with a reasonable finance charge) of any capital improvements that are: (i) made to the Shopping Center by Landlord primarily for the purpose of reducing Operating Expenses (regardless of whether such reduction occurs or not); or (ii) made to the Shopping Center by Landlord to comply with any Legal Requirements (defined below) that was not required of Landlord on the Commencement Date; and (bb) the costs of supplies, materials and tools used for any of the above.

Operating Expenses shall not include: (a) depreciation on the Shopping Center or any Common Areas; (b) costs of space planning, tenant improvements, marketing expenses, finder's fees and real estate broker commissions; (c) any and all expenses for which Landlord is reimbursed (either by an insurer, condemnor, tenant or other person or entity), but only to the extent of such reimbursement; (d) that portion of the salaries for on or off site personnel to the extent any of them work for other projects owned by Landlord or the Shopping Center's managing agent; (e) costs in connection with services or benefits of a type which are not otherwise Operating Expenses and are not available to Tenant, but are available to another tenant or occupant; (f) mark-ups on utilities in excess of Landlord's costs therefor; (g) Landlord's general overhead and administrative expenses not directly allocable to the operation of the Shopping Center; (h) attorneys' fees and cost related to negotiating or enforcing any tenant lease, or resolving disputes with any lender of Landlord or obtaining any financing for the Shopping Center; (i) cost of capital improvements unless expressly provided for in the foregoing paragraph; (j) interest on debt or amortization payments on any mortgage/deed of trust, or rent on any ground lease; and (k) federal and state taxes on income, death, estate or inheritance; or franchise taxes.

2.6     Intentionally Deleted.

2.7     Taxes:  All real and personal property taxes, assessments (whether they be general or special), sewer rents, rates and charges, transit taxes, taxes based upon the receipt of Rent and any other federal, state or local government charge, general, special, ordinary or extraordinary (but not including income or estate taxes), which may now or hereafter be levied or assessed against the land upon which the Shopping Center stands or the Shopping Center for such year or the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances used in connection with the Shopping Center for the operation thereof (**"Taxes"**).

2.8     Environmental Law:  shall mean any law, statute, ordinance or regulation pertaining to health, industrial hygiene or the environment including, without limitation, CERCLA (Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended), RCRA (Resources Conservation and Recovery Act of 1976) and SARA (Superfund Amendments and Reauthorization Act of 1986).

2.9     Hazardous Substance:  shall mean any substance, material or waste which is or becomes designated, classified or regulated as being "toxic" or "hazardous" or a "pollutant", which is or becomes similarly designated, classified or regulated, under any Environmental Law, including asbestos, petroleum and petroleum products, or which becomes hazardous to the health and welfare of any occupants in the Shopping Center.

2.10    Legal Requirements:  shall mean any and all statutes, ordinances and requirements of all local, municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Premises and/or the Shopping Center occasioned by or affecting the use thereof by Tenant, including, but not limited to, the Americans with Disabilities Act; as amended from time to time.

2.11    Schedules:  shall mean the Schedules attached hereto and incorporated herein by reference.  This Lease contains the following Schedules:

| | |
|---|---|
| Schedule 1 | Legal Description of Shopping Center |
| Schedule 2 | Site Plan |
| Schedule 2-A | Outdoor Seating Area |
| Schedule 3 | Construction Rider |
| Schedule 4 | Guaranty of Lease |
| Schedule 5 | Tenant Acceptance Letter |
| Schedule 6 | Rules and Regulations |

4

| Schedule 7 | Prohibited Uses/Existing Exclusives |
| Schedule 8 | Addendum |
| Schedule 9 | Sign Criteria |
| Schedule 10 | Intentionally Deleted |

2.12 <u>Term</u>: shall mean the period of Tenant's occupancy of the Premises pursuant to the terms and conditions of this Lease. It shall commence as of the Commencement Date and end as of the Expiration Date, unless sooner terminated as provided herein or extended pursuant to the terms of this Lease.

## 3. PREMISES:

3.1 <u>Lease of Premises</u>: Subject to the Tenant's Contingencies set forth below, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, for the Term and subject to the agreements, covenants, conditions and provisions set forth in this Lease, to which Landlord and Tenant hereby mutually agree, the Premises (the "**Premises**") described in **Paragraphs 1.1** and **1.2** above. The parties hereby stipulate the number of square feet of Net Rentable Area in the Premises and both parties waive the right either may have to remeasure the same. Upon occupancy of the Premises by Tenant and waiver of Tenant's Contingencies, Tenant shall within ten (10) days execute and deliver to Landlord the Tenant Acceptance Letter attached hereto as **Schedule 5**. If Landlord is unable to deliver possession of the Premises on or before September 1, 2013, Landlord shall not be liable for any damage caused thereby, nor shall this Lease be void or voidable, but Tenant shall not be liable for any Rent and the Rent Commencement Date shall be delayed for the same number of days the Commencement Date is delayed, which Commencement Date shall not occur until possession is delivered, at which time the Term shall commence and the Expiration Date shall be extended so as to give effect to the full stated Term. Notwithstanding anything contained in this **Paragraph 3.1**, if the Rent Commencement Date falls between November 15 of any calendar year and January 15 of the immediately following calendar year (the "**Blackout Period**"), then Tenant shall have the right, at Tenant's option by written notice delivered to Landlord within ten (10) business days after Landlord tenders the Premises to the Tenant, to delay the Rent Commencement Date until expiration of the Blackout Period, in which case the Rent Commencement Date shall be January 15 of such following calendar year for all purposes under this Lease; provided however, if Tenant opens to the public for business at any time during such Blackout Period, then the Rent Commencement Date shall be the date on which Tenant opened for business. By opening for business, Tenant shall be deemed to have waived its right to delay the Rent Commencement Date pursuant to the terms of this Paragraph. Furthermore, if Landlord fails to deliver the Premises to Tenant by September 15, 2013 ("**Delivery Termination Date**"), then Tenant shall have the option, as its sole and exclusive remedy if exercised, to terminate this Lease upon written notice to Landlord subsequent to the Delivery Termination Date and prior to date of possession of the Premises is delivered to the Tenant, unless the Delivery Termination Date is extended in writing. Failure to provide this written notice by Tenant to Landlord prior to the delivery of the Premises to Tenant by Landlord shall constitute a waiver of this termination right. If Tenant terminates this Lease pursuant to this Paragraph, then if Tenant has pre-paid its first month's Base Rent installment, then Landlord shall return the same to Tenant within thirty (30) days.

Tenant's obligations to Lease the Premises as provided in the Lease are subject to the satisfaction or waiver of each of the following contingencies (collectively, "**Tenant's Contingencies**") prior to the date that is ninety (90) days (except where otherwise set forth below) after the later of (i) the date of the Lease and (ii) the date of Landlord's approval of Tenant's construction and signage plans (the "**Contingency Date**"), subject to extension as provided below, or such earlier date as may be specified below as to specific contingencies:

(a) receipt by Tenant of all necessary governmental approvals for the operation of a restaurant with a full bar liquor license or assurances that Tenant requires in its sole discretion that the liquor license and other approvals will be forthcoming, to the extent permitted by applicable law (the "**Liquor License Approval**");

(b) approval of Tenant's leasehold improvement construction plans, signage and trade dress plans by Landlord, applicable government authorities and any other party with approval rights (collectively, "**Construction Approval**"); and

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 13 of 113

(c)    within sixty (60) days after the date of the Lease, Tenant shall determine, in its sole and absolute discretion, that the Premises is acceptable to Tenant in all respects, including economic and market feasibility of the development.

Tenant shall provide all information and fees needed to obtain the Liquor License Approval from the California Department of Alcoholic Beverage Control (the "**ABC**") and the Construction Approvals from the City of Livermore not later than ten (10) days from the mutual execution and delivery date of Lease, including all necessary drawings, elevations, architectural and engineering plans and renderings and other documentation regarding the site work as needed to obtain the Construction Approvals ("**Permit Documents**"). The Permit Documents shall be subject to the review and approval of Landlord and the City of Livermore. In the event that the City of Livermore requires any amendments to any of the Permit Documents, Tenant will cooperate to incorporate the comments of the City and will promptly cause any amended Permit Documents to be prepared and delivered, but in no event later than ten (10) days from the date of Tenant's receipt of the comments from the City of Livermore. Time is of the essence in regards to this **Paragraph 3.1**.

Notwithstanding any provision of this Lease to the contrary, if, after using commercially reasonable efforts in full compliance with the covenants of this **Paragraph 3.1**, Tenant shall be unable to obtain all of the Permits on or before the Contingency Date, then Tenant shall have the option to terminate this Lease upon written notice to Landlord, which notice must be received prior to the Contingency Date, or Tenant will be deemed to have waived the Tenant's contingency and the Lease will continue in full force and effect. Tenant must include evidence of its compliance and such other reasonable documentation as requested by Landlord with its notice of termination. Tenant shall give Landlord written notice of satisfaction or waiver of the foregoing conditions by the Contingency Date; provided however, if Tenant does not provide written notice, then Tenant's Contingencies will be deemed to have been satisfied and this Lease will be of full force and effect.

If Tenant has used commercially reasonable efforts to pursue the Liquor License Approval and the Construction Approvals and such approvals and permits have not been received, Tenant shall have the right to extend the Contingency Date for an additional thirty (30) days upon written notice to Landlord which notice must be received by prior to the Contingency Date.

3.2    <u>Shopping Center</u>:  The Premises are a part of the Shopping Center. Landlord may increase, reduce or change the number, dimensions or locations of the walks, buildings, mall areas, parking and other Common Areas and other improvements located in the Shopping Center in any manner that Landlord, in its sole discretion, shall deem proper. Landlord further reserves the right to make alterations and/or additions to and to build or cause to be built additional stories and to add any buildings adjoining the Premises or elsewhere in the Shopping Center. Without limiting the generality of the foregoing, Landlord reserves the right to, in its sole discretion, at all times, and from time to time throughout the Term, without incurring any liability to Tenant and without it constituting an eviction: (a) install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through the Premises and serving other parts of the Shopping Center, (b) add additional tenants, retail shops, buildings, parking facilities anywhere in the Shopping Center (as may be expanded in accordance with this subparagraph), (c) to renovate the Shopping Center (such renovation shall include, but not be limited to, the right to erect scaffolding, alter the configuration of all interior and exterior portions of the Common Areas); (d) change the size and layout of the Shopping Center; (e) build and/or demolish structures and buildings, expand and/or alter the parking facilities, relocate existing buildings and structures; and (f) and install or move columns, pipes, and utility lines. Landlord shall use reasonable efforts (which shall not include any obligation to employ labor at overtime rates) to avoid unreasonable disruption of Tenant's business during such renovation, except in the case of an emergency. Once Landlord commences any such renovation, Landlord shall diligently pursue such renovation to completion. Any addition or reduction of the Net Rentable Area of the Shopping Center resulting from Landlord's actions provided for above, shall result in recalculating Tenant's Percentage Share in accordance with **Paragraph 1** above.

Furthermore, Landlord shall have the right to change the Shopping Center's name without notice, to change the Shopping Center's street address upon ninety (90) days' prior notice, to grant to any person or entity the exclusive right to conduct any business or render any service in or to the Shopping Center, provided such exclusive right shall not operate to prohibit Tenant from using the Premises for the purpose set forth in

6

**Paragraph 7**, to retain at all times master keys or passkeys to the Premises, and to place such signs, notices or displays as Landlord reasonably deems necessary or desirable upon the roof and exterior of the Shopping Center.

3.3    <u>Outdoor Seating Area</u>:  Subject to final governmental approval of an Outdoor Seating Area (as hereinafter defined), Landlord hereby grants to Tenant a license for the term of the Lease to use and to permit its employees, invitees and customers to use that portion of the Common Area adjacent to the Premises, consisting of a concrete slab as shown on **Schedule 2-A** for the purpose of an outdoor seating area (the "**Outdoor Seating Area**"). Tenant shall provide all tables, chairs, space heaters, and trash receptacles used for the Outdoor Seating Area and must store same either within the Premises or off the Premises in a storage facility when not in seasonal use. The location and number of Tenant's tables and chairs are subject to Landlord's prior written approval (which shall not be unreasonably withheld or delayed) and, in any event, may not block or impair foot traffic, or impact another tenant's visibility, access or use of its premises, and must comply in all respects with local fire and building codes and zoning ordinances. Tenant will provide all lighting for the Outdoor Seating Area off the exterior wall of the Premises and the electrical service for the lighting (and any other electrical fixtures or equipment) shall be connected to Tenant's electrical panel in the Premises. Tenant shall submit for Landlord's prior approval, which shall not be unreasonably withheld, a schematic color drawing showing the location and design of all furniture and fixtures (including but not limited to the design and location of any awnings and umbrellas) to be utilized in the Outdoor Seating Area. It is understood that any awnings and/or umbrellas to be located in the Outdoor Seating Area may not reflect any brand, logo or advertising material other than Tenant's trade name (as permitted by code). Outdoor music will be allowed only if Tenant complies with all applicable laws and ordinances and such music is kept at reasonable noise levels and does not disturb other tenants in the Shopping Center. During the term of this license, the Outdoor Seating Area shall be considered part of the Premises for all purposes under this Lease and Tenant shall, in addition to its other responsibilities with respect to the Premises, be responsible for insuring the Outdoor Seating Area as required in **Paragraph 16** and maintaining the Outdoor Seating Area in the condition required by this Lease for the Premises; provided, however, Tenant shall have no obligation to pay Rent or any other charges, including Operating Expenses, for the Outdoor Seating Area.

## 4.    COMMON AREAS:

4.1    <u>Tenant's Right to Use Common Areas</u>:  Landlord grants Tenant and its authorized representatives and invitees the non-exclusive right to use the Common Areas with others who are entitled to use the Common Areas subject to Landlord's rights as set forth in this Lease.

4.2    <u>Landlord's Control</u>:  In addition to the rights Landlord maintains concerning the Shopping Center described in **Paragraph 3.2**, Landlord has the right to: (a) establish and enforce reasonable rules and regulations applicable to tenants of the Shopping Center concerning the maintenance, management, use and operation of the Common Areas, the initial rules and regulations are attached to the Lease as **Schedule 6**; (b) close, if necessary, any of the Common Areas to prevent dedication of any of the Common Areas or the accrual of any rights of any person or of the public to the Common Areas; (c) close temporarily any of the Common Areas for maintenance purposes or for health and safety purposes (e.g. bomb threat, hurricane); (d) select a person, firm or corporation, which may be an entity related to Landlord, to maintain and operate any of the Common Areas; and (e) designate other lands outside the exterior boundaries of the Shopping Center to become part of the Common Areas. Notwithstanding the provisions of this Paragraph, in exercising its rights hereunder, Landlord shall provide Tenant with a means of reasonable access to and from the Premises. The Rules and Regulations however, during the "construction phase" will be modified to facilitate expeditious construction and the rules for construction included in **Schedule 3** shall govern during that time.

## 5.    BASE/PERCENTAGE RENT:

5.1    <u>Base Rent</u>:  Tenant will pay to Landlord as Rent for the use and occupancy of the Premises at the times and in the manner provided below, Base Rent in the amount specified in **Paragraph 1** payable in U.S. funds, in advance starting on the Rent Commencement Date and on or before the first day of each and every successive calendar month thereafter during the Term without demand, setoff or deduction. The obligation of Tenant to pay all Rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute

7

independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is hereinabove expressly provided for and not otherwise. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or offset against any Rent and other sums provided hereunder to be paid Landlord by Tenant. Tenant waives and relinquishes any right to assert, either as a claim or as a defense, that Landlord is bound to perform or is liable for the nonperformance of any implied covenant or implied duty of Landlord not expressly herein set forth.

5.2 <u>Percentage Rent</u>: Payments of Percentage Rent shall be determined and payable within fifteen (15) days after the end of the first calendar month in which the Gross Sales of Tenant exceed the Breakpoint during each calendar year, and thereafter within 15 days after the end of each calendar month during and at the end of each calendar year. The amount payable at such times shall be the Percentage Rent rate set out in **Paragraph 1** times Gross Sales for the calendar year to the end of the calendar month being reported in excess of the Breakpoint, less any amounts of Percentage Rent for the Lease Year previously paid by Tenant to Landlord. For purposes of determining Percentage Rent, the "**Breakpoint**" shall be Five Million Dollars ($5,000,000) in Gross Sales for the applicable Lease Year.

Payments of Annual Percentage Rental during a year in which the Tenant does not lease the Premises for a complete calendar year (i.e., first and last years of the Lease) shall be calculated and payable within fifteen (15) days after the end of the first calendar month in which Gross Sales of the Tenant exceed the Interim Breakpoint (as defined below) for the then current calendar year. The "**Interim Break Point**" shall be calculated by dividing the Breakpoint by 12 and multiplying by the number of calendar months which the Tenant shall lease the Premises in the then current Lease Year. The amount payable at such times shall be the Percentage Rent rate set out in **Paragraph 1** times the Gross Sales for the Lease Year to the end of the calendar month being reported in excess of the Interim Break Point, less any amounts of Percentage Rent previously paid for in the Lease Year.

5.3 <u>Monthly Statements</u>: Within fifteen (15) days after the end of each month following the Rent Commencement Date, Tenant will furnish to Landlord a statement in writing certified by Tenant to be correct, showing Gross Sales during such month.

5.4 <u>Books and Records/Audit Rights</u>: Each statement of Gross Sales furnished by Tenant will be certified as correct by Tenant and will show the computations of Gross Sales for Tenant and each of its subtenants, licensees and concessionaires separately. The business of Tenant and any subtenant, licensee or concessionaire on the Premises shall be operated so that a duplicate dated sales slip, dated invoice or dated cash register receipt, serially numbered, shall be issued with each transaction, whether for cash, credit or exchange and Tenant shall utilize, or cause to be utilized, cash registers that record the cumulative dollar amount of all transactions and that may not be reset or such other devices for recording sales transactions as Landlord may in its sole discretion approve. Tenant will keep and maintain on the Premises or at its headquarters elsewhere in the State in which the Shopping Center is located full, complete and appropriate books of account and records of the Gross Sales and business relating to the Premises in accordance with sound accounting practice, which books and records will be available for inspection by Landlord, its auditors or other authorized representatives during normal business hours. If at any time during the term hereof, said books and records prove inadequate in the reasonable judgment of Landlord to record Gross Sales in the detail required in the Lease, Tenant will, upon the request of Landlord, procure and maintain such books and records as will be of a character and form adequate for said purposes. Copies of all sales and other excise tax reports that Tenant, its subtenants and concessionaires may be required to furnish to any governmental agency will at all reasonable times be open for inspection by Landlord at the offices of such agency. Landlord will have the right to audit and examine the books and records of Tenant, its subtenants, licensees and concessionaires as are necessary for a proper determination of the amount of Gross Sales and all such books and records will be held available for such purpose.

5.5 <u>Retention of Records/Cost of Audit</u>: Tenant, its subtenants, its licensees and concessionaires will preserve records on which any statement of Gross Sales is based for a period of three (3) years after such statement is rendered. Landlord will pay the costs of the audit unless the audit discloses that Tenant has understated Gross Sales by two percent (2%) or more, in which case Tenant will pay all of Landlord's costs of the audit together with all Additional Rent shown to be due from Tenant to Landlord. If any audit discloses that Tenant has understated Gross Sales by five percent (5%) or more, or if any

8

two (2) out of three (3) consecutive annual audits understate Gross Sales by three percent (3%) or more, Landlord may terminate this Lease and in addition to Landlord's remedies for Tenant's breach of its obligations under this Lease, Tenant will remain liable for the deficiency and costs of audit as provided herein. If at any time Tenant causes an audit of Tenant's business to be made by a certified public accountant or a public accountant, Tenant will, without cost or expense to Landlord, cause such accountant to furnish to Landlord within thirty (30) days after completion of such audit, with a copy of said audit and with a certificate of Gross Sales for the period covered by such audit.

5.6    Yearly Statement/Adjustment: Within thirty (30) days after the end of each Lease Year, Tenant will furnish to Landlord a statement in writing certified to be correct showing the total Gross Sales by months made in, on or from the Premises during the preceding Lease Year at which time an adjustment will be made between Landlord and Tenant so that the total Percentage Rent paid for each Lease Year will be a sum equal to the percentage set forth in **Paragraph 1**.

5.7    Sales Tax: In addition to the Base Rent and Percentage Rent, Tenant agrees to pay Landlord monthly all sales or use taxes or excise taxes imposed or levied by the State in which the Shopping Center is located or any other governmental body or agency against any Rent or any other charge or payment required hereunder to be made by Tenant to Landlord, but only if any such taxes are charged.

5.8    Additional Rent: All sums of money as shall become due and payable by Tenant to Landlord under this Lease, including, without limitation, sales tax and Tenant's Percentage Share of Operating Expenses, shall be Additional Rent which Tenant shall be obligated to pay. Landlord shall have the same remedies for default in the payment of additional rent as are available to Landlord in the case of a default in the payment of Base Rent and Percentage Rent. All charges to Tenant by Landlord accruing under this Lease, shall be considered as "**Additional Rent**" and be collectible in the same manner as all other components of Rent hereunder. Base Rent, Percentage Rent, Additional Rent and all other sums payable by Tenant to Landlord hereunder shall be collectively referred to herein as "**Rent**."

5.9    Tenant's Efforts: It is acknowledged by the parties hereto that part consideration for the leasing of the Premises to Tenant is payment of Percentage Rent based on Tenant's sales from the Premises. The parties therefore agree that in the event, during the entire Term hereof, either Tenant or any person, firm, or corporation who or which controls or is controlled by Tenant, shall directly or indirectly, either individually or as a partner or stockholder or otherwise, own, operate, or become financially interested in any similar or competing business within a radius of five (5) miles from the outside boundary of the Shopping Center (which Tenant acknowledges is a reasonable area), except those businesses of Tenant presently in operation then, in such event, the sales of any such business within the restricted radius which would be Gross Sales as if the sales had been conducted from the Premises, shall be included in the Gross Sales of Tenant, and the Percentage Rent hereunder shall be computed upon the aggregate of the Gross Sales from the Premises and such other business and shall be paid by Tenant to Landlord as Percentage Rent.

5.10   Taxes Payable by Tenant: Tenant shall be directly responsible for taxes upon, measured by or reasonably attributable to the cost or value of Tenant's equipment, furniture, fixtures and other personal property located in the Premises or by the cost or value of any leasehold improvements made in or to the Premises by or for Tenant other than the initial improvements to be installed at Landlord's expense regardless of whether title to such improvements is in Tenant or Landlord.

5.11   Late Fee / Default Interest. Any installment of Rent not paid when due and payable shall bear interest at eighteen percent (18%) or the highest rate permitted by law per annum from the date due until paid and shall be subject to a late charge in the amount equal to five percent (5%) of the amount due, if payment is later than five (5) business day after the payment is due. In the event any check, bank draft or negotiable instrument given for any payment under this Lease shall be dishonored at any time for any reason whatsoever not attributable to Landlord, Landlord shall be entitled, in addition to any other remedy that may be available, to an administrative charge of Two Hundred Fifty Dollars ($250.00). No late fee, default interest or the like chargeable by Landlord hereunder shall exceed those charges permitted by the applicable Legal Requirements.

9

5.12    First Month's Rent. The Base Rent installment due for the first full calendar month and the Security Deposit, if applicable, shall be delivered to Landlord by Tenant with the delivery of this Agreement to Landlord for execution.

## 6.    OPERATING EXPENSES:

6.1    Operating Expenses Rent: In addition to Base Rent and Percentage Rent, Tenant shall pay Tenant's Percentage Share, as specified in **Paragraph 1**, of the Operating Expenses paid or incurred by Landlord in such year ("**Operating Expense Rent**"). In addition to Operating Expenses Rent, Tenant shall also pay to Landlord an administrative charge equal to fifteen percent (15%) of the Operating Expenses Rent, but excluding Insurance premiums, to be paid concurrently and in the same manner with Tenant's payment of Operating Expense Rent. If the Shopping Center consists of more than one building, the Landlord reserves the right to contract for services and/or utilities on a building wide or Shopping Center wide basis. In such instance, Tenant's Percentage Share for such services, utilities or other costs shall be calculated based upon the Net Rentable Area of the building in which the Premises is located compared to the Net Rentable Area of the Shopping Center or vice versa.

Notwithstanding anything contained herein to the contrary, for the first partial calendar year and the first full calendar year of the Term, Tenant's Operating Expense Rent shall not exceed Six Dollars and Fifty Cents ($6.50) per RSF. Thereafter, beginning with the second full calendar year during the term and continuing thereafter throughout the term and any renewal thereof, Tenant's Percentage Share of Controllable CAM Charges (as hereinafter defined) for the current full calendar year shall not increase more than seven percent (7%) over Tenant's Percentage Share of Controllable CAM Charges for the preceding full calendar year. Said increase shall be computed without taking into account Tenant's first year cap of $6.50 per RSF. As used herein, the term "**Controllable CAM Charges**" shall mean all Operating Expenses other than the cost of repairs and replacements to the Common Areas due to extreme weather, insurance, property taxes, Shopping Center security and utility service for the Common Areas for which Tenant shall always pay its full share without cap of any kind.

6.2    Payment: During December of each calendar year or as soon thereafter as practicable, Landlord shall provide Tenant with a written notice of its estimate of Operating Expenses Rent for the ensuing calendar year. On or before the first day of each month during the ensuing calendar year, Tenant will pay to Landlord 1/12th of such estimated amounts, provided that if such notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after such notice is given. If at any time or times it appears to Landlord that the amounts payable for Operating Expenses Rent for the current calendar year will vary from its estimate by more than ten percent (10%), Landlord, by written notice to Tenant, will revise its estimate for such year, and subsequent payments by Tenant for such year will be in an amount so that by the end of such year Tenant will have paid a total sum equal to such revised estimate.

6.3    Statement: Within one hundred twenty (120) days after the close of each calendar year or as soon after such 120-day period as practicable, Landlord will deliver to Tenant a statement of amounts of Operating Expense Rent payable under this Lease for such calendar year. If such statement shows an amount owing by Tenant that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of the statement. If the total of the estimated monthly installments paid by Tenant during any calendar year exceeds the actual expense adjustment amount due from Tenant for such calendar year and provided Tenant is not in default hereunder, such excess shall, at Landlord's option, be either credited against payments next due hereunder or refunded by Landlord to Tenant, or if such adjustment occurs at the expiration of the Term, Landlord shall refund Tenant's overpayment within thirty (30) days after Tenant vacates the Premises in full accordance with this Lease.

6.4    Gross Up. Notwithstanding any provision of this Paragraph to the contrary, if the building in which the Premises is located (in the event that Operating Expense Rent is determined by the Net Rentable Area of such building as provided above) or the Shopping Center (as applicable) is less than ninety-five percent (95%) leased and/or occupied during any calendar year, an adjustment shall be made so that Operating Expense Rent shall be computed for such year as though ninety-five percent (95%) of the building or Shopping Center, as appropriate, had been leased and occupied during the entire Lease Year.

10

6.5 <u>Proration</u>: If for any reason other than the default of Tenant, this Lease terminates on a day other than the last day of a calendar year, the amount of Operating Expenses Rent payable by Tenant applicable to the calendar year in which such termination occurs will be prorated on the basis which the number of days from the commencement of such calendar year to and including such termination date bears to 365.

6.6 <u>Audit Rights</u>: Tenant has the right, exercisable no more than once each Lease Year on reasonable notice and at a time reasonably acceptable to Landlord, to cause an audit to be performed by a certified public accountant, working on a non-contingency fee basis, at Tenant's sole cost and expense, of Landlord's operations and/or books and records pertaining to Operating Expense Rent for the preceding calendar year. In the event Landlord has overstated Operating Expense Rent, within thirty (30) days after demand therefore by Tenant accompanied by Tenant's commercially sufficient verification of such overcharges and paid invoices delivered and accepted by Landlord, Landlord will reimburse Tenant for all overcharges, and if Landlord has overstated Operating Expenses Rent by more than five percent (5%), and provided Tenant is not in default hereunder, Landlord will reimburse Tenant for the reasonable out-of-pocket costs of such audit and verification incurred by Tenant.

## 7. USE OF PREMISES:

7.1 <u>Quiet Enjoyment</u>: Tenant shall, and may peacefully have, hold, and enjoy the Premises, subject to the other terms hereof, provided that Tenant timely pays the Rent within any applicable notice and grace period, and timely performs all of Tenant's covenants and agreements herein contained. This covenant and all other covenants of Landlord shall be binding upon Landlord and its successors only with respect to breaches occurring during its or their respective periods of ownership of Landlord's interest hereunder.

7.2 <u>Use Restrictions</u>: Tenant will use and occupy the Premises for the Permitted Use specified in **Paragraph 1** and for no other use or purpose. Tenant shall comply with the Rules and Regulations set forth in **Schedule 6** hereto, except during the "construction phase" not to exceed sixteen (16) weeks where the rules and regulations of **Schedule 3** shall apply. Furthermore, Tenant shall not suffer or permit the Premises or any part of them to be used in any manner, or suffer or permit anything to be done in or brought into or kept in the Premises, which would in any way: (a) violate any Legal Requirements; (b) cause injury to the Shopping Center or any part thereof; (c) constitute a public or private nuisance; (d) alter the appearance of the exterior of the Shopping Center or of any portion of the interior other than the Premises pursuant to the provisions of this Lease; (e) involve the use, generation, storage or disposal of Hazardous Substances, or (f) use any portion of the Premises for purposes which will increase the existing rate of insurance upon the Shopping Center, or cause cancellation of insurance policies covering the Shopping Center. If Landlord's rates increase because of Tenant's activities, Tenant shall pay the difference to Landlord within ten (10) days of demand.

In addition Tenant agrees to use and maintain the Premises in compliance with all Legal Requirements from time to time in force which shall affect (a) Tenant's use of the Premises, (b) the manner or conduct of Tenant's business or operation of Tenant's installations, equipment or other property therein, (c) any cause or condition created by or at the instance of Tenant, and Tenant shall pay all the costs, expenses, fines, penalties and damages which may be imposed upon Landlord by reason of or arising out of Tenant's failure to fully and promptly comply with and observe such laws or which Landlord may incur as a result of Tenant's breach of the above covenants. Tenant shall give prompt notice to Landlord of any notice Tenant receives of the violation of any Legal Requirements with respect to the Premises or the use or occupancy thereof. If Landlord shall be required under this Lease or pursuant to any Legal Requirements to take measures to comply with such Legal Requirements affecting the Premises, Landlord may, at Landlord's option, elect to terminate this Lease by giving not less than thirty (30) days' notice thereof to Tenant unless Tenant shall give evidence satisfactory to Landlord within fifteen (15) days after the giving by Landlord of such notice of termination, that Tenant has commenced steps reasonably calculated to comply with Laws and Regulations at Tenant's sole cost and expense. Furthermore, all personal property placed or moved into the Premises shall be at the risk of Tenant or other owner and Landlord shall not be liable for any damage to personal property, or to Tenant, arising from the bursting or leaking of water pipes or otherwise from any act or omission of any cotenant or occupant of the Shopping Center or of any other person.

7.3 <u>Continuous Operation</u>: Tenant will not leave the Premises unoccupied or vacant and will continuously conduct and carry on in the Premises the type of business for which the

11

Premises are leased. Tenant will keep in stock in the Premises a full and ample line of merchandise for the purposes of carrying on the business permitted under this Lease. Tenant will maintain an adequate sales force to properly serve all customers and operate Tenant's business in an efficient and diligent manner. Tenant agrees to be continuously open for business during the hours set forth below, except when Tenant is prevented from doing so by strikes, lockouts or other causes beyond the reasonable control of Tenant. Tenant will also have its window displays, exterior advertising displays adequately illuminated during the hours set forth in **Paragraph 1**. Landlord may at any time and from time to time modify the Shopping Center hours and/or designate additional Shopping Center hours. Landlord, in its sole discretion, shall have the right to reduce or eliminate operating hours on any or all of the following holidays: New Year's Eve, New Year's Day, Easter Sunday, Thanksgiving Eve, Thanksgiving Day, Christmas Eve, Christmas Day, Labor Day, Memorial Day, and the Fourth of July. If Tenant shall request Landlord's approval of the opening of the Premises for business for periods exceeding those specified above and Landlord shall approve such request, Tenant shall pay for any additional costs incurred by Landlord in connection with Tenant's opening the Premises for business during such additional hours, including but not limited to, any additional amounts of Landlord's costs for heating, ventilating and air-conditioning the Common Areas and the Premises, and additional utilities furnished to the Premises by Landlord.

7.4 <u>Trade Name; Tenant's Name</u>: Tenant shall have the right to change its trade name under this Lease from time to time and at any time to any trade name used by substantially all of Tenant's retail stores in the United States subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall have the right to refer to Tenant's trade name in any marketing or advertising programs or special promotions for the Shopping Center.

7.5 <u>Prohibited Uses</u>: In addition, and not by way of limitation of the restrictions on Tenant's use of the Premises set forth herein, Tenant shall not use or permit the use of the Premises in any manner that violates any of the uses listed on **Schedule 7** labeled "Prohibited Uses" and "Existing Exclusives" applicable to the Shopping Center

7.6 <u>Restaurant Operations</u>: Tenant shall provide its own janitorial service for the Premises. All of Tenant's refuse and other waste materials, segregated by category of waste in accordance with such reasonable regulations as Landlord may from time to time adopt, shall be removed by Tenant from the Premises for the disposal by Landlord's trash collectors or in accordance with such other arrangements as Tenant shall make consistent with procedures in effect as of the date hereof (provided such alternate procedures are approved, in advance by Landlord). All kitchen ventilating equipment shall be operated and maintained by Tenant per applicable code to prevent the emission of obnoxious or offensive odors and smoke (other than Tenant's normal and reasonable cooking odors and smoke) from the Premises. Tenant shall maintain in good operating condition and repair the filter and exhaust elements of the heat, ventilating and air conditioning equipment. Tenant shall cause to be installed in the Premises a grease trap and shall maintain, in good operating condition and repair, said grease trap and other equipment installed in the Premises for kitchen waste disposal. If Landlord determines in its commercially reasonable judgment that such equipment is not being properly maintained, Landlord shall notify Tenant in writing of the same specifying the equipment that is not being maintained and Tenant shall commence to maintain said equipment to good operating order; provided, however, that if Tenant does not commence the required maintenance and/or repair within ten (10) days after its receipt (or refusal) of Landlord's notice then Landlord may retain the services of a maintenance company to perform such maintenance and Tenant shall immediately reimburse Landlord, as Additional Rent, the reasonable costs so incurred by Landlord upon demand. Tenant shall also maintain all sanitary waste lines and facilities exclusively serving the Premises and beyond the Premises to the point of intersection with common waste lines, and Landlord shall maintain such lines from the point of intersection to the sewer main. Tenant shall conduct its business on the Premises in a commercially reasonable and first-class manner to insure the maximum in cleanliness and health standards as required by law. If the Premises may be used for the sale of alcoholic beverages, Tenant's liability insurance shall include dram shop or liquor liability coverage.

## 8. PARKING:

8.1 <u>Tenant's Parking Rights</u>: Within the Common Areas, Landlord will provide parking areas with necessary access for the non-exclusive use by Tenant and its customers, employees and invitees. Only automobiles and pickup trucks will be permitted on the

12

parking areas. Landlord reserves the right to establish parking charges with appropriate provisions for parking ticket validation by Tenant. Tenant shall have the right to four (4) designated short term parking spaces for take-out sales in front of the Premises on the location depicted on **Schedule 2**. Tenant shall pay for all costs and expenses associated with the signage designating those reserved parking spaces. Landlord shall not be obligated to enforce the exclusive parking spaces and shall not be liable for any use of the parking spaces by the public or other tenants.

8.2    Landlord's Control Over Parking: Tenant and its authorized representatives will park their cars only in areas specifically designated for that purpose by Landlord. Within five (5) days after written request by Landlord, Tenant will furnish to Landlord the license numbers assigned to its cars and the cars of all of its authorized representatives. If Tenant or its authorized representatives fail to park their cars in the designated parking areas, Landlord may charge Tenant, as and for liquidated damages Thirty Dollars ($30) per each day or partial day for each car parked in area other than those designated. Tenant will not park or permit the parking of any vehicles adjacent to loading areas so as to interfere in any way with the use of such areas. Landlord shall have the right, in Landlord's sole discretion, to designate parking spaces for the exclusive use of a particular tenant or particular tenants. Landlord will have the right to institute reasonable procedures and/or methods to enforce the terms of this Paragraph.

8.3    Parking Ratio: Landlord's sole obligation regarding parking within the Shopping Center shall be to use commercially reasonable efforts to maintain ninety percent (90%) of current parking spaces (large enough for standard size American automobiles) or as required by applicable governmental code.

9.    **SIGNS:**

9.1    Exterior Signage: Subject to Tenant: (i) complying with all applicable Legal Require-ments, (ii) obtaining all necessary approvals, permits and consents from the applicable governmental authorities, and (iii) obtaining Landlord's prior reasonable approval to the plans and specifications, Tenant shall have the right to install its standard signage package on the exterior of the Premises ("**Exterior Signage**") as soon as practically possible after the Commencement Date. The cost of design, fabrication, installation, removal and governmental approvals (collectively, "**Signage Costs**") for the Exterior Signage shall be at Tenant's sole cost and expense. Landlord shall review and approve the plans and specifications for the Exterior Signage prior to submission to any governmental authority and shall also have the right to approve any changes to the plans and specifications. The Exterior Signage shall not create any structural issues for the Shopping Center and shall be of a design, color scheme and type consistent with the appearance of the Shopping Center as determined by Landlord and all signs, decorations and advertising media shall conform to the sign criteria attached as **Schedule 9**. Landlord may designate a uniform type of sign for the Shopping Center to be installed and paid for by Tenant. Landlord shall reasonably cooperate with Tenant in connection with Tenant obtaining any necessary permits, approvals and consents for the Exterior Signage; however, Tenant shall reimburse Landlord for any reasonable costs incurred by Landlord in connection with such cooperation. Tenant shall be responsible for maintaining, repairing and insuring the Exterior Signage throughout the Term and any Tenant shall, at its sole cost and expense, also be responsible for removing the Exterior Signage upon termination of the Term and restoring any damage caused by the removal of the same. If Tenant fails to timely remove the Exterior Signage, Landlord shall have the right, but not the obligation to remove the same, restore any damage caused thereby, and charge Tenant, as Additional Rent hereunder, the cost of the removal and the restoration plus a ten percent (10%) administrative fee. Tenant's inability to obtain the necessary permits, approvals or consents for the Exterior Signage shall not entitle Tenant to terminate this Lease, seek a reduction in Rent or obtain any other concessions from Landlord. The parties acknowledge that the Tenant's ability to install the Exterior Signage is at Tenant's sole risk. The obligations of Tenant under this Paragraph of the Lease shall survive any expiration or termination hereof. Subject to governmental approval, Tenant may display professionally-prepared "Opening Soon" and "Grand Opening" banners on the Premises from time to time after the execution of the Lease, but in no event to exceed one hundred twenty (120) days from the opening of the Premises for business.

9.2    Exterior Appearance/Signage Criteria: In addition, Tenant shall not, without Landlord's prior written consent make any changes to or paint the store front; or install any exterior lighting, decorations or paintings; or erect or install any other signs, banners, window or door lettering, placards, decorations or advertising media of any type visible from the

13

exterior or interior of the Premises. All signs, decorations and advertising media shall conform to the sign criteria attached as **Schedule 9**. Such written consent will be obtained as per **Paragraph 9.1** above. Landlord may designate a uniform type of sign for the Shopping Center to be installed and paid for by Tenant. For all Tenant signs, at the end of the Term or upon termination of Tenant's right to possess the Premises, or upon the removal or alteration of a sign for any reason, Tenant shall repair, paint, and/or replace the building fascia surface where signs are attached.

10. **ASSIGNMENT, SUBLETTING AND ENCUMBRANCE**:

10.1 <u>Prohibition</u>: Tenant shall not assign this Lease or sublet any portion of the Premises without prior written consent of the Landlord, which consent shall not be unreasonably withheld, provided Tenant is not in default under the Lease at the time of such request. The parties agree that it shall be reasonable for Landlord, among other things to withhold consent if (i) Landlord is not satisfied with the financial condition, identity, reputation or business character of the proposed assignee or sublessee, (ii) if Landlord or its agents have shown any space in the Shopping Center to or attempted to negotiate lease terms with such proposed assignee or sublessee regarding other available space in the Shopping Center within the preceding six months, or (iii) if such proposed assignee or the sublessee desires to change the Permitted Use or if the intended use would violate the list of Permitted Uses/Existing Exclusives set forth on **Schedule 7** attached hereto. Any change in the majority ownership, interest or control of Tenant, if Tenant is a corporation, partnership, limited liability company or other similar type entity, shall constitute an assignment for purposes of this Paragraph. Notwithstanding any consent by Landlord, Tenant and Guarantor(s), if any, shall remain jointly and severally liable (along with each approved assignee and sublessee, which shall automatically become liable for all obligations of Tenant hereunder with respect to that portion of the Premises so transferred), and Landlord shall be permitted to enforce the provisions of this Lease directly against Tenant, Guarantor, if applicable, or any assignee or sublessee without proceeding in any way against any other party. In the event of an assignment, contemporaneously with the granting of Landlord's consent, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties and obligations of Tenant hereunder and such assignee shall be jointly and severally liable therefore along with Tenant. No usage of the Premises different from the Permitted Use shall be permitted, and all other Terms and provisions of the Lease shall continue to apply after such assignment or sublease. Notwithstanding the foregoing, Tenant will be released from liability under this Lease in the event that the assignee, sublessee or Permitted Transferee (as defined below) meets all of the following criteria: (a) the assignee, sublessee or Permitted Transferee operates five (5) or more locations under the same intended trade name, (b) those store locations average more than Three Hundred Dollars ($300.00) per square foot in Gross Sales, and (c) assignee, sublessee or Permitted Transferee has a net worth on the date of the transfer of Fifty Million Dollars ($50,000,000.00) ("**Release Criteria**"). Landlord may, in its sole discretion, opt to release tenant from assignment should the net worth not exceed stated amount, but only upon review and approval of financials from the newly assignee.

Furthermore, Tenant shall not permit any leasehold, inventory or other financing that may encumber Tenant's rights under this Lease or any personal property or FF&E of Tenant located in the Premises, without first obtaining the prior written consent of Landlord. Landlord may condition such consent upon the lender of tenant entering into an agreement with Landlord regarding conditions for removal of such personal property and/or FF&E and other reasonable Landlord protections.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall be permitted to assign this Lease, or sublease the Premises or any portion thereof, or transfer ownership interests in Tenant, without Landlord's consent being required to any of the following (each, a "**Permitted Transferee**"): (i) subsidiary of Tenant, (ii) a successor by virtue of a merger or consolidation, or (iii) a purchaser of all or substantially all of the assets or ownership of Tenant; so long as in each instance: (i) Tenant is not in default under the terms of the Lease, (ii) such transfer is not intended as a subterfuge to avoid the obligations of this Paragraph, and (iii) the Permitted Transferee assumes the obligations of Tenant under this Lease in writing. Nothing herein shall be deemed to release Tenant from liability under the Lease following any assignment or sublease to a Permitted Transferee, unless the Permitted Transferee meets the Release Criteria.

10.2 <u>Consent Process</u>: If Tenant requests Landlord's consent to an assignment of this Lease or subletting of all or part of the Premises, Landlord may, at its option: (i) approve or disapprove such sublease or assignment (subject to **Paragraph 10.1** above regarding

14

liability under this Lease); or (ii) if Landlord should fail to notify Tenant in writing of its decision within a 30-day period after Landlord is notified in writing of the proposed assignment or sublease, Landlord shall be deemed to have refused consent to such assignment or subleasing. If Landlord consents to any assignment or sublease, Tenant shall pay to Landlord, on demand as additional Rent, an administrative fee of One Thousand Dollars ($1,000.00) and will reimburse Landlord for all reasonable attorneys' fees and costs associated with Landlord's consent to the assignment or sublease.

10.3    No Profit:  All cash or other consideration received by Tenant as the proceeds of any assignment or sublease of Tenant's interest in this Lease and/or the Premises, whether consented to by Landlord or not, shall be paid to Landlord, notwithstanding the fact that such proceeds exceed the Rent due hereunder, unless retention of such funds is in violation of any Governmental Requirements or Landlord agrees to the contrary in writing, and Tenant hereby assigns all rights it might have or ever acquire in any such proceeds to Landlord.  This covenant and assignment shall benefit Landlord and its successors in ownership of the Shopping Center and shall bind Tenant and Tenant's heirs, executors, administrators, personal representatives, successors and assigns.    Any assignee, sublessee or purchaser of Tenant's interest in this Lease, by occupying the Premises and/or assuming Tenant's obligations hereunder, shall be deemed to have assumed liability to Landlord for all amounts paid to persons other than Landlord in consideration of any such sale, assignment or subletting, in violation of the provisions hereof.

## 11.    MAINTENANCE, REPAIRS, ALTERATIONS:

11.1    Tenant's Obligations:    At Tenant's sole cost, Tenant will comply with all Legal Requirements.  The commencement or pendency of any state or federal court abatement proceeding affecting the use of the Premises shall, at the option of the Landlord, be deemed a breach thereof.  Tenant has agreed to accept the Premises in its "AS IS" condition without any representation or warranty of any kind.  Upon entry into the Premises, Tenant acknowledges that the Premises are in good order and repair.  Tenant shall, at its own expense and at all times, maintain the Premises in good and safe condition, including plate glass, electrical wiring, plumbing and HVAC installations and any other systems or equipment upon the Premises and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted.  As part of its air conditioning maintenance obligation, Tenant shall enter into an annual contract with an air conditioning repair firm which is fully licensed to repair air conditioning units in the State of California.  No later than thirty (30) days prior to the Commencement Date and annually thereafter, Tenant shall deliver to Landlord a copy of the air conditioning maintenance contract and proof that the annual premium for such contract has been paid.  Such air conditioning maintenance firm shall (i) regularly service the air conditioning unit(s), changing belts, filters and other parts as required, (ii) perform emergency and extraordinary repairs on the air conditioning units, and (iii) keep a detailed record of all services performed at the Premises and prepare a yearly report to be furnished to Landlord promptly at the end of each calendar year.

In addition, Tenant, at Tenant's expense, shall be responsible for all repairs required to the Premises, except those set forth in **Paragraph 11.5** that are the responsibility of Landlord, the cost of which are included in Operating Expenses.

11.2    Limitations:    Tenant may not make any improvements or alterations to the Premises without the prior written consent of Landlord.  Notwithstanding the foregoing, Tenant may make any improvements or alterations to the Premises if they are nonstructural, do not affect any building system, cost less than Five Thousand Dollars ($5,000) (in the aggregate), cannot be seen from the exterior of the Premises, and otherwise comply with all Legal Requirements and the following provisions of this Paragraph.  Prior to the commencement of any repair, improvement, or alteration, Tenant shall give Landlord at least two (2) business days written notice in order that Landlord may post appropriate notices to avoid any liability for liens.  All repairs, improvements or alterations will be made by a licensed and insured contractor consented to by Landlord and performed in a good and workmanlike manner.  All materials used shall be of a quality comparable to or better than those in the Premises and shall be in accordance with plans and specifications approved by Landlord.

Tenant will not place or suffer to be placed or maintained on the exterior of the Premises or in any part of the Shopping Center any sign, advertising matter or any other thing of any kind, and will not place or maintain any decoration, letter or advertising matter on the glass of any window or door of the Premises or interior sign visible from outside the

15

Premises without first obtaining Landlord's prior written approval. Tenant will, at its sole cost and expense, maintain such sign, decoration, lettering, advertising matter or other thing as may be permitted hereunder in good condition and repair at all times. Under no circumstances shall Tenant be permitted to place hand-lettered advertising on the exterior of the Premises or any glass of any window or door of the Premises.

Tenant will not paint or decorate any part of the exterior of the Premises, or any part of the interior visible from the exterior thereof, without first obtaining Landlord's written approval. Tenant will install and maintain at all times, subject to the other provisions of this Paragraph, displays of merchandise in the windows (if any) of the Premises. All articles, and the arrangement, style, color and general appearance thereof, in the interior of the Premises including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and standards of the improvements within the Shopping Center, as determined by Landlord. Landlord reserves the right to require Tenant to correct any nonconformity at Tenant's sole cost.

11.3    Liens: Tenant will pay all costs of construction done by it or caused to be done by it on the Premises as permitted by this Lease. Tenant will keep the Shopping Center free and clear of all construction, mechanic's, materialman's, laborer's and supplier's liens, resulting from construction done by or for Tenant. The interest of Landlord in the Premises and the Shopping Center shall not be subject to liens for improvements made by Tenant. Any lien filed by any contractor, materialman, laborer or supplier performing work for Tenant shall attach only to Tenant's interest in the Premises. Tenant agrees to indemnify, defend and hold harmless Landlord from and against any and all costs and liabilities (including attorneys' fees and expenses) and any and all construction, mechanic's, materialman's, laborer's or supplier's liens arising out of or pertaining to any improvements or construction done by Tenant. All persons and entities contracting or otherwise dealing with Tenant relative to the Premises or the Shopping Center are hereby placed on notice of the provisions of this Paragraph, and Tenant shall further notify in writing such persons or entities of the provisions of this Paragraph prior to commencement of any Tenant work in the Premises. If any construction, mechanic's, materialman's, laborer's or supplier's lien is ever claimed, fixed or asserted against the Premises or any other portion of the Shopping Center in connection with any such Tenant work, Tenant shall, within ten (10) days after receipt by Tenant of notice of such lien, discharge same as a lien either by payment or by posting of any bond as permitted by law. If Tenant shall fail to discharge any such lien, whether valid or not, within ten (10) days after receipt of notice from Landlord, Landlord shall have the right, but not the obligation, to discharge such lien on behalf of Tenant and all costs and expenses incurred by Landlord associated with the discharge of the lien, including, without limitation, attorneys' fees, shall constitute Additional Rent hereunder and shall be immediately due and payable by Tenant.

11.4    Surrender of Premises: On the last day of the Term hereof or on any earlier termination, Tenant shall surrender the Premises to Landlord in the same condition as when received, ordinary wear, tear and casualty excepted, and clear and free of debris. Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, furnishings and equipment. Alterations made by Tenant as part of Tenant's work are considered Landlord approved Alterations and Tenant shall have no obligation to demolish or remove such Alterations. Any of Tenant's property remaining in the Premises after the expiration or earlier termination of this Lease shall be deemed abandoned by Tenant, and Landlord, in addition to all other rights and remedies it may have, shall have the right to keep in place and use all of such property in the Premises and/or remove any or all of such property from the Premises, which may then be disposed of, or stored at the cost of and for the account of Tenant. Landlord shall not be responsible for the care or safekeeping of any such property and Tenant waives any claim against Landlord relating thereto. The provisions of this subparagraph shall survive the expiration or earlier termination of this Lease.

11.5    Landlord Repairs. Landlord will maintain the roof (exclusive of flashing around the rooftop air conditioning unit), foundations, and exterior walls of the Premises (except those exterior walls which contain an entrance to or exit from the Premises) and utility lines (other than those exclusively serving the Premises) outside the exterior walls of the Premises, the Common Areas and Parking Facilities; provided that in each case Landlord shall have received prior written notice of the necessity of such repairs from Tenant. Notwithstanding the foregoing, if any such repair is required by reason of Tenant's failure to comply with any of Tenant's obligations in this Lease or the negligence of Tenant or any of Tenant's agents, concessionaires, officers, employees, licensees, customers, burglar or vandal, or other person using the Premises with or without the

16

consent of Tenant or anyone authorized by Tenant, or the result of Tenant's acts or the installation of its equipment and property, Tenant shall, at its expense, promptly make such repairs. Tenant shall promptly give Landlord written notice of any damage to the Premises requiring repair by Landlord. Landlord shall not be liable for any damages resulting from its failure to make repairs. In no event shall Landlord be liable for any damages resulting from any such damage. Except as expressly set out in this Lease, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof, or any plumbing, heating, electrical, air conditioning, or other mechanical installation therein, or serving same. Tenant hereby grants to Landlord such licenses and easements in and over the Premises or any portion or portions thereof as shall be reasonably appropriate for the installation or maintenance of mains, conduits, pipes, or other facilities to serve the Shopping Center or any part thereof. Landlord will have the right to enter the Premises at any reasonable time to inspect the condition thereof, to make necessary repairs or improvements.

11.6     <u>Trash</u>: Tenant shall keep any garbage, trash, rubbish or other refuse in containers (safe from rodents and other vermin) within the interior of the Premises, and shall deposit such trash, on a daily basis, in designated receptacles provided by Landlord or Landlord's trash removal agent, or trash receptacle or receptacles to be provided by Tenant at Landlord's direction and pursuant to Landlord's specifications, hereinafter collectively referred to as the "trash receptacles". Landlord shall arrange for the collection of trash from the trash receptacles, and Tenant shall pay a portion of the costs thereof as provided in this Subparagraph. At Landlord's option, Tenant's share of trash removal expense ("**Trash Removal Charge**") shall be calculated by (i) multiplying such Landlord's trash removal costs by Tenant's Percentage Share (multiplied by 3 if Tenant uses the Premises for restaurant, nightclub, or food service operations—the cost of trash removal for restaurants, nightclubs, and food service operations being greater than that for retail operations, Landlord will allocate such costs between these types of tenants so as to take such increased costs into account; for this purpose, the cost of trash removal for restaurants, nightclubs and food service operations is stipulated to be 3 times greater than the cost for retail operations), or (ii) estimating the tonnage of trash generated by Tenant. Tenant's Trash Removal Charge shall be payable to Landlord as Additional Rent (either as a portion of Tenant's Percentage Share of Operating Expenses or as a separate assessment, as determined by Landlord). In addition, Tenant shall comply with all laws, ordinances, regulations and rules regarding recycling of trash, including any rules and regulations of Landlord with respect thereto. Tenant shall pay the costs associated with recycling in conformity with Tenant's share of trash removal set forth above. Tenant shall, at its own cost and expense, construct a dedicated dumpster area within the Shopping Center's existing dumpster area for Tenant's exclusive use. Tenant will maintain its dumpster area at its own cost and expense. The location of Tenant's dumpster area is shown on **Schedule 2**.

**12.**     **ENTRY AND INSPECTION**: Tenant shall permit Landlord or Landlord's agents to enter upon the Premises at reasonable times upon verbal notice for the purpose of inspecting the same, performing any services required of Landlord hereunder and showing the Premises to potential and existing mortgagees and purchasers and prospective tenants of other space in the Shopping Center. Notwithstanding the foregoing, Landlord is not required to give notice to Tenant if Landlord must enter the Premises because of an emergency or for the provision of janitorial services. Tenant will permit Landlord at any time within one hundred eighty (180) days prior to the expiration of this Lease, to place upon the Premises any usual "To Let" or "For Lease" signs, and permit potential tenants to inspect the Premises.

**13.**     **INDEMNIFICATION**:

13.1     Tenant agrees to and shall indemnify, defend and hold Landlord harmless from and against any and all claims, demands, losses, damages, costs and expenses (including attorneys' fees and expenses) or death of or injury to any person or damage to any property whatsoever arising out of Tenant's acts or omissions, or relating to Tenant's breach or default under this Lease, including, but not limited to, Tenant's use or occupancy of the Premises or caused by Tenant or its agents, employees or invitees unless caused by the gross negligence of Landlord. Landlord shall not be liable to Tenant for any damage by or from any act or negligence of any co-tenant or other occupant of the Shopping Center or by any owner or occupant of adjoining or contiguous property. Tenant agrees to pay for all damage to the Shopping Center as well as all damage to tenants or occupants thereof caused by misuse or neglect of said Premises, its apparatus or appurtenances or the Common Areas or the Shopping Center, by Tenant or Tenant's employees, agents and invitees. The provisions of this **Paragraph 13.1** shall survive the expiration or earlier termination of this Lease.

17

13.2  Release:  Tenant and Guarantor, for themselves and their heirs legal representatives, successors and assigns (the "**Releasing Parties**"), does hereby fully and forever release, remise, acquit and discharge LNR Partners, LLC, ProEquity Asset Management Corporation, Landlord and all its property management agent(s), and their respective partners, managers, members, officers, directors, employees, agents, attorneys, affiliates, subsidiaries, parents, heirs, legal representatives, successors and assigns (the "**Released Parties**"), and each of them, of and from any and all claims, demands, debts, obligations, liabilities, bonds, notes, guaranties, controversies, agreements, actions, causes of action, suits, damages (including direct, special, consequential, remote, foreseeable, unforeseeable, and punitive damages), legal fees and other responsibilities of any nature or kind whatsoever, at law, in equity, or otherwise, liquidated or unliquidated, known or unknown, sounding in tort, in contract, or under any other legal theory, or arising under statute or under any other law or regulation, and whether contingent or matured (specifically including, without limitation, damage and liabilities allegedly arising as a result of the Released Parties' own negligence, gross negligence, willful misconduct, misfeasance, malfeasance or fault of any nature or kind) which the Releasing Parties, or any of them, now have or has or could have against or involving the released parties, or any of them, heretofore having arisen, or arising hereafter, out of or in any way in connection with any act or omission or alleged act or omission of any of the Released Parties in connection with the Lease, the termination of the Lease, publication of any information relating to any dispute with Tenant (if any), threats of legal action to obtain possession of the Premises or otherwise, and the negotiation and execution of this Lease. The provisions of this **Paragraph 13.2** shall survive the termination of this Lease.

14.  **TENANT'S INSURANCE:**  At all times during the term of this Lease, Tenant shall, at its sole expense, procure and maintain the following types of insurance coverage:

14.1  Commercial General Liability:  Commercial general liability insurance, including bodily injury and property damage liability, products and completed operations, personal and advertising injury liability, and fire damage liability against any and all damages and liability, including attorneys' fees and expenses, on account of or arising out of injuries to or the death of any person or damage to property, however occasioned, in, on or about the Premises in amounts not less than Two Million Dollars ($2,000,000) per occurrence, Three Million Dollars ($3,000,000) annual aggregate, and Five Hundred Thousand Dollars ($500,000) in fire damage liability;

14.2  Plate Glass:  Insurance on all plate or tempered glass in or enclosing the Premises, for the replacement cost of such glass;

14.3  Personal Property:  Insurance on an "all risks" basis covering 100% of the replacement cost value of property at the Premises including, without limitation, leasehold improvements, trade fixtures, merchandise, furnishings, equipment, goods and inventory;

14.4  Boiler & Machinery:  Where applicable, insurance covering central heating, air conditioning and ventilating systems, refrigeration equipment, machinery and electrical equipment, boilers and other high pressure piping and machinery, and other similar apparatus installed in the Premises, including business income loss;

14.5  Business Income:  (a) Business interruption insurance for a period of not less than twelve (12) months from the date of fire or casualty; and (b) Loss of rents insurance to cover rental loss of Landlord for a period of not less than twelve (12) months from the date of fire or casualty caused by Tenant or Tenant's invitees, contractors, agents or employees, naming Landlord as loss payee;

14.6  Employer's Liability/Workers' Compensation:  Employer's liability insurance with limits not less than One Million Dollars ($1,000,000), and workers' compensation insurance providing statutory state benefits for all persons employed by Tenant in connection with the Premises as required by applicable law;

14.7  Sprinkler Leakage:  Insurance covering damage from leakage of sprinkler systems now or hereafter installed in the Premises in an amount not less than the current replacement cost covering Tenant's leasehold improvements, trade fixtures, merchandise, furnishings, equipment, goods and inventory; and

14.8  Other Insurance:  Such other insurance and in such amounts as may be required by Landlord against other insurable hazards as at the time are commonly insured against by prudent owners of comparable shopping centers in the area in which the Shopping Center is located.

18

14.9 <u>Form of Insurance/Companies</u>: All insurance provided for in **Paragraph 14** hereof shall be in a form satisfactory to Landlord and carried with insurance companies reasonably acceptable to Landlord that are licensed or authorized to do business in the State in which the Shopping Center is located, are in good standing with the Department of Insurance in the State in which the Shopping Center is located and have a current rating issued by A.M. Best Company of not less than A-:VII, and/or whose claim paying ability is rated no lower than A by Standard & Poor's Ratings Service and A2 by Moody's Investors Service. Insurance coverage shall be written as primary policy coverage and not contributing with or excess of any coverage, which Landlord may carry, and LNR Partners, LLC, ProEquity Asset Management Corporation, Landlord, and Landlord's managing agent shall be named as Additional Insureds with respect to Commercial General Liability and Automobile Liability, including any Umbrella or Excess policies. Tenant shall furnish Landlord at the inception of this Lease (i) a Certificate of Insurance evidencing that all such insurance is in effect and that Landlord will be given at least thirty (30) days prior written notice of cancellation or non-renewal, and (ii) proof that premiums have been paid by Tenant. Not later than fifteen (15) days prior to the expiration of any insurance policy, evidence of renewals or replacements of such policy shall be delivered to Landlord, together with proof of payment of the associated premiums. In the event Tenant shall fail to procure any contract of insurance required under the terms hereof or any renewal of or replacement for any contract of insurance that is expiring or has been canceled, Landlord may, but shall not be obligated to, procure such insurance on behalf of Tenant and the cost thereof shall be payable to Landlord as additional Rent within ten (10) days following written demand therefor.

14.10 <u>Subrogation</u>: Landlord and Tenant shall each obtain from their respective insurers under all policies of property insurance maintained by either of them at any time during the term hereof insuring or covering the Premises, a waiver of all rights of subrogation which the insurer of one party might otherwise have, if at all, against the other party.

## 15. LANDLORD'S INSURANCE:

15.1 <u>All Risk</u>: Landlord (or its principals naming Landlord as an additional insured) shall, as part of the Operating Expenses, maintain fire and extended coverage insurance on the Shopping Center and the Premises (which may include vandalism and malicious mischief coverage) and such endorsements as Landlord may require or is otherwise reasonably consistent with other similarly situated shopping centers) in an amount not less than the full replacement value thereof (which may be exclusive of foundations), or in such amounts as any mortgagee of Landlord shall require, with such deductibles as shall be determined by Landlord from time to time. Landlord (or its principals naming Landlord as an additional insured) reserves the right to self-insure the Shopping Center. Landlord (or its principals naming Landlord as an additional insured) also reserves the right to provide the insurance required hereunder as part of a blanket policy. All insurance obtained by Landlord in connection with the Shopping Center shall be passed through to the tenants of the Shopping Center, including Tenant, as part of the Operating Expenses, and payments for losses thereunder shall be made solely to Landlord or Landlord's mortgagee as their interests shall appear. In the event of self-insurance, the premium cost equivalency of such policy or policies shall be a part of the Operating Expenses. In the event of blanket insurance, Landlord shall reasonably allocate the portion of the blanket premium to the Operating Expenses for the Shopping Center.

15.2 <u>Liability</u>: Landlord shall, as part of the Operating Expenses, maintain a policy or policies of commercial general liability insurance with respect to the Common Areas and the activities thereon in such amounts as Landlord or any mortgagee of Landlord may require. In the event of self-insurance (as referenced above), the premium cost equivalency of such policy or policies shall be part of the Operating Expenses.

15.3 <u>Other</u>: Landlord may purchase insurance for windstorm, flood, plate glass, sign, automobile, sinkhole, business income, Rent loss, liquor liability, terrorism, earthquake and such other insurance that Landlord or any mortgagee of Landlord may require in their sole discretion and with such deductibles as Landlord may desire. The costs of all such insurance shall be part of the Operating Expenses. Landlord may hereafter raise or lower such coverage in such amounts as may from time to time be prudent to Landlord within its sole discretion or as Landlord's mortgagee may require.

## 16. UTILITIES AND SERVICES:

16.1 <u>Standards</u>: Landlord will provide, at points in or near the Premises, the facilities necessary to enable Tenant to obtain for the Premises water, electricity, telephone and

19

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 27 of 113

sanitary sewer service. Tenant shall not at any time over burden or exceed the capacity of the mains, feeders, ducts, conduits, or other facilities by which such utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment which shall require additional utility facilities or utility facilities of a greater capacity than the facilities provided by Landlord, such installation shall be subject to Landlord's prior written approval of Tenant's plans and specifications therefor. If Landlord approves such installation, Tenant will pay directly for such expenses.

Commencing on the date that Landlord delivers the Premises to Tenant, Tenant shall pay for all utilities to the Premises. Tenant shall pay directly to the appropriate utility company all charges for utility services supplied to Tenant for which there is a separate meter and/or submeter to the Premises. Tenant shall pay to Landlord its share of all charges for utility services supplied to the Premises for which there is no separate meter or submeter upon billing by Landlord of Tenant's share, as reasonably determined by Landlord based upon estimated actual usage.

Landlord may, in its reasonable discretion, at any time and from time to time, contract, or require Tenant to contract, for utility services (including generation, transmission and delivery of the utility service) with a utility service provider(s) ("USP") of Landlord's choosing. Tenant shall fully cooperate with Landlord and any USP selected by Landlord. Tenant shall permit Landlord and the USP to have reasonable access to the Premises and the utility equipment serving the Premises, including lines, feeders, risers, wiring, pipes and meters. Tenant shall either pay, or reimburse Landlord for, all costs associated with any change of utility service, including the cost of any new utility equipment, within twenty (20) days after Landlord's written demand for payment or reimbursement. Under no circumstances shall Landlord be responsible or liable for any loss, damage or expense that Tenant may incur as a result of any change of utility service, including any change that makes the utility supplied less suitable for Tenant's needs, or for any failure, interference or defect in any utility service. No such change, failure, interference or defect shall constitute an actual or constructive eviction of Tenant, entitle Tenant to any abatement of rent, or relieve Tenant from any of Tenant's obligations under this Lease. If Tenant wishes to use the services of a USP instead of the public utility or Landlord-selected USP which is then serving the Center, no such USP shall be permitted to provide service to Tenant, or to install its lines or other equipment within the Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld

16.2   <u>Temporary Interruption</u>:  Landlord reserves the right, without any liability to Tenant and without affecting Tenant's covenants and obligations hereunder, to stop or interrupt or reduce any of the services listed in this Paragraph or to stop or interrupt or reduce any other services, required of Landlord under this Lease, whenever and for so long as may be necessary, by reason of (i) accidents, emergencies, strikes or the occurrence of any of the other events of force majeure, (ii) the making of repairs or changes which Landlord is required by law or is permitted by this Lease to make or in good faith deems necessary, (iii) difficulty or excessive expense in securing proper supplies of fuel, steam, water, electricity, or (iv) any other cause beyond Landlord's reasonable control, whether similar or dissimilar to the foregoing. Landlord does not warrant that the services provided for in this Lease will be free from interruption or stoppage resulting from the above causes, and specifically no reduction, interruption or stoppage of any such services for any reason, shall ever be construed as an eviction of Tenant nor shall the same cause any abatement of the Rent payable hereunder or in any manner or for any purpose relieve Tenant from any of Tenant's obligations hereunder, and in any event, Landlord shall not be liable for any loss, cost or damage, direct or consequential, of any nature arising in connection with interruption or stoppage of any of such services or for any damage to persons or property resulting therefrom; provided, however, Landlord agrees to use reasonable diligence to resume the service or to cause the same to be resumed. Furthermore, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this Paragraph. No failure or interruption of any utility or service shall entitle Tenant to terminate this Lease or discontinue making payments of Minimum Annual Rent or Additional Rent; provided, however, notwithstanding anything in this Lease to the contrary, in the event of any interruption in utilities serving the Premises resulting from the gross negligence or willful misconduct of Landlord or its agents, contractors or employees that continues for more than three (3) days after Landlord's receipt of written notice thereof from Tenant, all Minimum Annual Rent and any other amounts payable under this Lease shall equitably abate from the date of Landlord's receipt of such notice until such utility services are fully restored. If

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 28 of 113

Tenant fails to pay when due any charges referred to in this Paragraph 9, Landlord may pay the charge and Tenant shall reimburse Landlord, as Additional Rent, for any amount so paid by Landlord, plus Interest thereon, within ten days after demand therefor.

16.3 <u>Security</u>: Landlord shall have no obligation to provide any security whatsoever for the Premises, the Shopping Center and/or Tenant's business therein. Tenant does hereby acknowledge and agree that it shall provide and be solely responsible for its own security, at Tenant's sole cost and expense, as may be required for the operation of Tenant's business within the Premises and Landlord shall have no liability to any Tenant and its employees, agents or invitees for losses due to theft or burglary, or for damages done by unauthorized persons in the Premises, any parking facility, or the Shopping Center or for any injury, trauma or other harm to any person, and neither shall Landlord be required to insure against any such losses. Tenant shall be responsible for all repairs and replacements of damage and/or destruction of the Premises necessitated by burglary or attempted burglary, or any other illegal or forcible entry into the Premises. Notwithstanding the foregoing, Tenant acknowledges and agrees Landlord may, but will not be required to, adopt and provide security services for the Shopping Center from time to time. Tenant shall cooperate fully in any efforts of Landlord to maintain security in the Shopping Center and shall follow all rules and regulations promulgated by Landlord with respect thereto. However, any security services that are voluntarily undertaken by Landlord may be changed or discontinued from time to time in Landlord's sole and absolute discretion, without liability to any Tenant and its employees, agents or invitees. Tenant or any of its employees, agents or invitees waive any claims it may have against Landlord arising out of any security services provided by Landlord, or the inadequacy or absence thereof, specifically including Landlord's negligence with respect to the providing or failure to provide such services.

16.4 <u>Release of Landlord</u>: Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining, adjacent to or connecting with the Premises or any other part of the Shopping Center, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, and water, gas, sewer or steam pipes or from theft or burglary. To the maximum extent permitted by law, Tenant agrees to use and occupy the Premises and to use such other portions of the Shopping Center as Tenant is herein given the right to use, at Tenant's own risk.

17. **CONDEMNATION:** If the whole or substantially the whole of the Shopping Center or Premises should be taken for any public or quasi-public use, by right of eminent domain or otherwise or should be sold in lieu of condemnation, then this Lease shall terminate as of the date when physical possession of the Shopping Center and/or Premises is taken by the condemning authority. If less than the whole or substantially the whole of the Shopping Center or the Premises is thus taken or sold, Landlord (whether or not the Premises are affected thereby) may, at its option, terminate this Lease by giving written notice thereof to Tenant; in which event this Lease shall terminate as of the date when physical possession of such portion of the Shopping Center or the Premises is taken by condemning authority. If this Lease is terminated upon any such taking or sale, and if the Premises are affected, the Base Rent payable hereunder shall be diminished by an equitable amount, and Landlord shall, to the extent Landlord deems feasible, restore the Shopping Center and, if affected, the Premises to substantially their former condition, but such work shall not exceed the scope of the work done by Landlord in originally constructing the Shopping Center and installing the any work, if constructed by Landlord pursuant to **Schedule 3** in the Premises, nor shall Landlord in any event be required to spend for such work an amount in excess of the amount received by Landlord as compensation for such taking. All amounts awarded upon a taking of any part or all of the Shopping Center or Premises shall belong to Landlord, provided that Tenant shall not be entitled to and expressly waives all claim to any such compensation. All sums which may be payable on account of any condemnation shall belong solely to the Landlord, and Tenant shall not be entitled to any part thereof, provided however, that Tenant shall be entitled to retain any sum awarded to it for its trade fixtures or moving expenses, provided that such Tenant award shall not reduce Landlord's award.

18. **TRADE FIXTURES:** Any and all improvements made to the Premises during the Term hereof shall, unless Landlord requests their removal, belong to the Landlord without compensation, allowance or credit to Tenant, except movable trade fixtures of the Tenant which can be removed without defacing the Premises or any portion of the Shopping Center. Tenant shall be directly responsible for taxes upon, measured by or reasonably attributable to the cost or value of Tenant's equipment, furniture, fixtures and other personal property located in the Premises or by the cost or value of any leasehold improvements made in or to the Premises by or for Tenant other than

21

the initial improvements to be installed at Landlord's expense regardless of whether title to such improvements is in Tenant or Landlord.

**19.   DESTRUCTION OF PREMISES**:

19.1   Termination or Repair.  If the Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give prompt written notice thereof to Landlord if Landlord does not otherwise have actual knowledge thereof.  In case the Shopping Center shall be so damaged that substantial alteration or reconstruction of the Shopping Center shall, in Landlord's sole opinion, be required (whether or not the Premises shall have been damaged by such casualty), or in the event any mortgagee of Landlord's interest in the Shopping Center should require that the insurance proceeds payable as a result of a casualty be applied to the payment of the mortgage debt, or in the event of any material uninsured loss to the Shopping Center, Landlord may, at its option, terminate this Lease by notifying Tenant in writing of such termination within ninety (90) days after the date of such casualty.  If Landlord does not elect to terminate this Lease, Landlord shall commence and proceed with reasonable diligence to restore the Shopping Center and any work constructed by Landlord pursuant to **Schedule 3,** if any; except that Landlord's obligation to restore shall not require Landlord to spend for such work an amount in excess of the insurance proceeds actually received by Landlord as a result of the casualty. Notwithstanding anything to the contrary contained in this Paragraph, Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises when the damage resulting from any casualty contained under this Paragraph occurs during the last twelve (12) months of the Term.

19.2   Abatement of Rent.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such casualty damage or the repair thereof; except that, subject to the previous provisions of this Lease and of the next sentence, Landlord shall allow Tenant a fair diminution of Rent during the time and to the extent the Premises are unfit for occupancy and Tenant fails to open for business in the Premises or damaged portion thereof.  If the Premises or any other portion of the Shopping Center be damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of Tenant's agents, contractors, employees, or invitees, the Rent hereunder shall not be diminished during the repair of such damage, and, additionally, Tenant shall be liable to Landlord for the cost of the repair and restoration of the Shopping Center caused thereby to the extent such cost and expense is not covered by insurance proceeds.

19.3   Last Year of Term.  If any material damage or destruction occurs to the Premises (or the Building materially impairing use of the Premises) during the last year of the Term, Tenant may terminate the Lease upon written notice to Landlord within thirty (30) days after the occurrence of the damage or destruction.

**20.   HAZARDOUS SUBSTANCES**:

20.1   Tenant's Responsibilities:  At its own expense, Tenant will procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for Tenant's use of the Premises.  Tenant will not cause or permit any Hazardous Substance to be brought upon, kept or used in or about the Shopping Center by Tenant, its agents, employees, contractors or invitees without the prior written consent of Landlord except for the routine cleaning supplies that may be deemed Hazardous Substances provided such Hazardous Substances are stored, used and removed in compliance with all Legal Requirements and Environmental Laws.  Tenant will cause any and all Hazardous Substances brought upon the Premises by Tenant to be removed from the Premises and transported solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes.  Tenant will, in all respects, handle, treat, deal with and manage any and all Hazardous Substances in, on, under or about the Premises in total conformity with all applicable Environmental Laws and prudent industry practices regarding management of such Hazardous Substances. Upon expiration or earlier termination of the Term of the Lease, Tenant will cause all Hazardous Substances placed on, under or about the Premises by Tenant or at Tenant's direction to be removed and transported for use, storage or disposal in accordance and compliance with all applicable Environmental Laws.  Tenant will not take any remedial action in response to the presence of any Hazardous Substances in or about the Premises or the Shopping Center, nor enter into any settlement agreement, consent decree or other compromise in respect to any claims relating to any Hazardous Substances in any way connected with the Premises without first notifying Landlord of Tenant's intention to do

22

so and affording Landlord ample opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interests with respect thereto.

20.2 <u>Indemnification</u>: If the Premises or the Shopping Center become contaminated in any manner for which Tenant is legally liable or otherwise become affected by any release or discharge of a Hazardous Substance, Tenant shall immediately notify Landlord of the release or discharge of the Hazardous Substance, and Tenant shall indemnify, defend and hold harmless Landlord from and against any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses (including, without limitation, a decrease in value of the Shopping Center or the Premises, damages caused by loss or restriction of rentable or usable space, or any damages caused by adverse impact on marketing of the space, and any and all sums paid for settlement of claims, attorneys' fees and expenses, consultant fees and expert fees) arising during or after the Term of this Lease and arising as a result of such contamination, release or discharge. This indemnification includes, without limitation, any and all costs incurred because of any investigation of the site or any cleanup, removal or restoration mandated by federal, state or local agency or political subdivision. This provision of this **Paragraph 20.2** shall survive termination of this Lease.

21. **EVENTS OF DEFAULT:** If one or more of the following events ("**Event of Default**") occurs, such occurrence constitutes a breach of this Lease by Tenant:

21.1 <u>Abandonment/Vacation</u>: Tenant abandons or vacates the Premises or removes furniture, fixtures or personal property from the Premises, except in the normal course of business. Tenant waives any right to notice Tenant may have under Section 1951.3 of the California Civil Code, the terms of this **Paragraph 21.1** being deemed such notice to Tenant as required by said Section 1951.3; or

21.2 <u>Rent</u>: Tenant fails to pay any monthly Base Rent or Operating Expenses Rent, if applicable, as and when the same becomes due and payable, and such failure continues for more than five (5) days from the date due; or

21.3 <u>Other Sums</u>: Tenant fails to pay any Additional Rent, other sum or charge payable by Tenant hereunder as and when the same becomes due and payable, and such failure continues for more than fifteen (150) days after Landlord gives written notice thereof to Tenant; or

21.4 <u>Other Provisions</u>: Tenant fails to perform or observe any other agreement, covenant, condition or provision of this Lease to be performed or observed by Tenant as and when performance or observance is due (or immediately if the failure involves a hazardous condition), and such failure continues for more than fifteen (15) days after Landlord gives written notice thereof to Tenant, or if the default does not involve a hazardous condition and cannot be reasonably cured within said fifteen (15) day period and Tenant fails promptly to commence with due diligence and dispatch the curing of such default within said 15-day period or, having so commenced, thereafter fails to prosecute or complete with due diligence and dispatch the curing of such default, provided such cure does not take more than forty-five (45) days in the aggregate; or

21.5 <u>Insolvency</u>: Tenant or Guarantor (a) files or consents by answer or otherwise to the filing against it of a petition for relief or reorganization or arrangement or any other petition in bankruptcy or liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction; (b) makes an assignment for the benefit of its creditors; (c) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers of itself or of any substantial part of its property; or (d) takes action for the purpose of any of the foregoing, and in the case of Guarantor a replacement for Guarantor acceptable to Landlord is not provided within thirty (30) days after the filing or occurrence of any matters in Subparagraph (a)-(d) above; or

21.6 <u>Receiver</u>: A court or governmental authority of competent jurisdiction, without consent by Tenant or Guarantor, as applicable, enters an order appointing a custodian, receiver, trustee or other officer with similar powers with respect to Tenant or Guarantor, as applicable, or with respect to any substantial power of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding up or liquidation of Tenant, or if any such petition is filed against Tenant or Guarantor and such receivership or petition is not dismissed within sixty (60) days; or

23

21.7 <u>Attachments</u>: This Lease or any estate of Tenant hereunder is levied upon under any attachment or execution and such attachment or execution is not vacated within sixty (60) days; or

21.8 <u>Assignment/Sublease</u>: Tenant assigns this Lease or subleases all or any portion of the Premises in violation with the terms and conditions of **Paragraph 10**.

## 22. REMEDIES OF LANDLORD UPON DEFAULT:

22.1 <u>Termination</u>: If an Event of Default occurs, Landlord shall have the right, with or without notice or demand, immediately (after expiration of the applicable grace periods specified herein) to terminate this Lease, and at any time thereafter recover possession of the Leased Premises or any part thereof and expel and remove therefrom Tenant and any other person occupying the same, by any lawful means, and again repossess and enjoy the Leased Premises without prejudice to any of the remedies that Landlord may have under this Lease, or at law or equity by reason of Tenant's default or of such termination.

22.2 <u>Continuation After Default</u>: Even though Tenant has breached this Lease and/or abandoned the Leased Premises, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession under **Paragraph 23.1** hereof, and Landlord may enforce all of its rights and remedies under this Lease, including (but without limitation) the right to recover Rent as it becomes due. Landlord has the remedy described in Section 1951.4 of the California Civil Code (Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations). Acts of maintenance, preservation or efforts to lease the Premises or the appointment of receiver upon application of Landlord to protect Landlord's interest under this Lease shall not constitute an election to terminate Tenant's right to possession.

22.3 <u>Damages Upon Termination</u>: Should Landlord terminate this Lease pursuant to the provisions of **Paragraph 22.1** hereof, Landlord shall have all the rights and remedies of a landlord provided by Section 1951.2 of the California Civil Code. Upon such termination, in addition to any other rights and remedies to which Landlord may be entitled under applicable law, Landlord shall be entitled to recover from Tenant: (i) the worth at the time of award of the unpaid Rent and other amounts which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss that the Tenant proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that the Tenant proves could be reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom. The "worth at the time of award" of the amounts referred to in (i) and (ii) shall be computed with interest at eighteen percent (18%) per annum or the highest lawful rate, whichever is the lower. The "worth at the time of award" of the amount referred to in (iii) shall be computed by discounting such amount at the "discount rate" of the Federal Reserve Bank of San Francisco in effect as of time of award plus one percent (1%) and, where rental value is a material issue, shall be based upon competent appraisal evidence.

22.4 <u>Computation of Rent For Purposes of Default</u>: For purposes of computing unpaid Rent that would have accrued and become payable under this Lease pursuant to the provisions of **Paragraph 22.3** hereof, unpaid Rent shall consist of the sum of:

(a) the unpaid Rent and other amounts due at the time of termination plus interest thereon at the maximum lawful rate per annum from the due date until paid;

(b) the present value of the balance of the Rent for the remainder of the Term after termination less the present value of the fair market value rental of the Premises for said period (both determined by applying a discount rate of the Wall Street Journal Prime Rate); and

(c) any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of things would be likely to result therefrom, including, without limitation, the cost of recovering the Premises.

24

22.5 <u>Landlord's Options</u>: Landlord may, in the alternative, (i) continue this Lease in effect, as long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under the Lease, including the right to recover the Rent as it becomes due under the Lease; or (ii) terminate Tenant's right of possession (but not this Lease) and repossess the Premises pursuant to the laws of the State in which the Shopping Center is located in which event Landlord may, but shall be under no obligation to do so (except to the extent required by the laws of the State in which the Shopping Center is located), relet the Premises for the account of Tenant for such rent and upon such Terms as shall be satisfactory to Landlord. For purpose of such reletting Landlord is authorized by Tenant to decorate or to make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient, at Tenant's expense. Tenant shall also be responsible for Rent for the period that the Premises are vacant and all costs of re-letting, including, without limitation, brokerage commissions and attorneys' fees. Tenant shall be liable for any deficiency of such rental below the Rent and all other payments herein provided for the unexpired balance of the Term of this Lease. If said breach of the Lease continues, Landlord may, at any time thereafter, elect to terminate the Lease; or (iii) exercise any and all other rights and remedies available to Landlord at law or in equity.

23. **SECURITY DEPOSIT:** The Security Deposit set forth in **Paragraph 1**, if any, shall secure the performance of the Tenant's obligations hereunder. Landlord may, but shall not be obligated to, apply all or portions of the Security Deposit on account of Tenant's obligations hereunder. In the event that Landlord applies all or a portion of the Security Deposit to Tenant's obligations hereunder (including, without limitation, amounts which Landlord may be entitled to recover pursuant to the provisions of Sections 1951.2 or 1951.4 of the California Civil Code), Tenant shall be obligated, within ten (10) days of receipt of notice from Landlord, to deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the full amount stated in above. Failure to deposit such cash shall be a default under the terms of this Lease. Provided Tenant is not in default, any balance remaining upon the expiration of the Term, shall be returned to Tenant within a reasonable time. Tenant shall not have the right to apply the Security Deposit in payment of the last month's rent. No interest shall be paid by Landlord on the Security Deposit. In the event of a sale of the Shopping Center, Landlord shall have the right to transfer the Security Deposit to the purchaser, upon such transfer Landlord shall have no further liability with respect thereto, and Tenant agrees to look solely to such purchaser for the return of the Security Deposit. Landlord shall not be required to keep the Security Deposit in a segregated account, and the Security Deposit may be commingled with other funds of Landlord. Tenant hereby waives any rights which it may now or hereafter have under Section 1950.7 of the California Civil Code.

24. **LIEN FOR RENT:** Tenant hereby grants to Landlord a lien and security interest on all furnishings, equipment, fixtures, inventory, accounts receivable, licenses and other personal property of any kind of Tenant now or hereafter placed in or upon the Premises, and such property shall be and remain subject to such lien and security interest of Landlord for payment of all Rent and other sums agreed to be paid by Tenant herein. The provisions of this Paragraph relating to such lien and security interest shall constitute a security agreement under and subject to the laws of the State in which the Shopping Center is located so that Landlord shall have and may enforce a security interest on all property of Tenant now or hereafter placed in or on the Premises, in addition to and cumulative of the Landlord's liens and rights provided by law or by the other Terms and provisions of this Lease. Notwithstanding anything contained herein to the contrary, Landlord's lien rights granted hereunder shall automatically be subordinate to the rights of any equipment or personal property lessor with respect to the equipment or personal property leased by it to Tenant. Tenant agrees to execute such financing statement or statements and other documents as Landlord may now or hereafter request. Landlord may at its election at any time file a copy of this Lease as a financing statement. Notwithstanding the above, Landlord shall neither sell nor withhold from Tenant, Tenant's business records and Landlord's lien rights shall not apply with respect to any property that is leased to Tenant.

25. **LIMITATION ON LANDLORD'S PERSONAL LIABILITY:** Tenant specifically agrees to look solely to Landlord's interest in the Shopping Center for the recovery of any judgment from Landlord, it being agreed that Landlord (and any officers, shareholders, partners, members, managers, directors or employees, affiliates, subsidiaries or parents of Landlord) shall never be personally liable for any such judgment. Landlord shall have the right to transfer and assign, in whole or in part, all its rights and obligations hereunder and in the Shopping Center and/or Premises referred to herein, and in such event and upon such transfer, Landlord shall be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for the performance of such obligations.

25

26. **ATTORNEYS' FEES:** In the event Tenant defaults in the performance of any of the terms, covenants, agreements or conditions contained in this Lease and Landlord places the enforcement of this Lease or the collection of any Rent due or to become due hereunder or recovery of the possession of the Premises in the hands of an attorney, Tenant agrees to pay Landlord reasonable attorneys' fees and costs. If there is any legal action or proceeding between Landlord and Tenant to enforce any provision of this Lease or to protect or establish any right or remedy of either Landlord or Tenant hereunder, the unsuccessful party to such action or proceeding will pay to the prevailing party all costs and expenses, including reasonable attorneys' fees at all tribunal levels (including allocated costs of Landlord's in-house attorney), incurred by such prevailing party in such action or proceeding and in any appearance in connection therewith, and if such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorneys' fees will be determined by the court handling the proceeding and will be included in and as a part of such judgment.

27. **WAIVER:** No failure of Landlord to enforce any term hereof shall be deemed to be a waiver. The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement contained herein or to exercise any option, right, power, or remedy contained in this Lease shall not be construed as a waiver or a relinquishment thereof for the future. No payment by Tenant or receipt by Landlord of a lesser amount than the applicable Rent payment due under this Lease shall be deemed to be other than on account of the earliest rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

28. **SEVERABILITY:** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term hereof, then it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of both parties that in lieu of each clause or provision that is illegal, invalid or unenforceable, there shall be added as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable. The inadvertent failure to attach any exhibit (or schedule or addendum) described in this Lease to the fully executed version hereof shall not render this Lease invalid, incomplete, or ineffective in any way. Upon notice from one party to the other, Landlord and Tenant shall cooperate in good faith to provide any missing information regarding such missing exhibit, and shall both append the missing exhibit to their respective fully executed original of the Lease.

29. **NOTICES:** All notices or other communications required or permitted hereunder must be in writing, and be (i) personally delivered (including by means of professional messenger service), (ii) sent by overnight courier, with request for next business day delivery, or (iii) sent by registered or certified U.S. mail, postage prepaid, return receipt requested, to the addresses set forth in **Paragraph 1**. All notices sent by U.S. mail will be deemed received three (3) days after the date of mailing.

30. **HOLDING OVER:** Any holding over after the expiration or termination of this Lease shall be construed as a tenancy at sufferance at a rental of twice the Base Rent and Operating Expense Rent for the month of the Lease Term preceding the month in which the expiration or termination occurred. In the event Tenant shall be or become a holdover tenant, Tenant shall also indemnify Landlord against all claims for damages against Landlord as a result of Tenant's possession of the Premises, including, without limitation, claims for damages by any tenant to whom Landlord may have leased the Premises, or any portion thereof, for a term commencing after the expiration or termination of this Lease.

31. **TIME:** Time is of the essence with respect to the obligations of any party under this Lease.

32. **HEIRS, ASSIGNS, SUCCESSORS:** This Lease is binding upon and inures to the benefit of the assigns and successors in interest of Landlord and is binding upon and inures to the benefit of Tenant and Tenant's heirs and successors and, to the extent assignment may be approved by Landlord hereunder, Tenant's assigns. Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed. The provisions of this Lease in regard to the payment by Tenant and the acceptance by Landlord of a percentage of Gross Sales of Tenant and others is a reservation for rent for the use of the Premises. Nothing contained in this Lease shall be construed so as to confer upon any other party the rights of a third party beneficiary except rights contained herein for the benefit of a mortgagee of Landlord.

33. **SUBORDINATION:** This Lease is and shall always be subject and subordinate to the lien of any mortgages which are now or shall at any future time be placed upon the Shopping Center, the Premises or Landlord's rights hereunder, and to any renewals, extensions, modifications or

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 34 of 113

consolidations of any such mortgage. This clause shall be self-operative and no further instrument of subordination need be required by any mortgagee. In confirmation of such subordination, however, Tenant, at Landlord's request, shall execute promptly any appropriate certificate or instrument that Landlord may reasonably request.

**34.   ESTOPPEL CERTIFICATE; FINANCIAL STATEMENTS:**

34.1   <u>Content</u>: Tenant shall at any time upon not less than ten (10) days prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing: (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), the amount of any security deposit, and the date to which the Rent and other charges are paid in advance, if any; and (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed. Any such statement may be conclusively relied upon by a prospective purchaser or encumbrancer to the Premises. At Landlord's option, Tenant's failure to deliver such statement within such time shall be a material breach of this Lease or shall be conclusive upon Tenant: (i) that this Lease is in full force and effect, without modification, except as may be represented by Landlord; (ii) that there are no uncured defaults in Landlord's performance; and (iii) that not more than one month's Rent has been paid in advance or such failure may be considered by Landlord as a default by Tenant under this Lease. Any such statement may be conclusively relied upon by a prospective purchaser or encumbrancer to the Premises.

34.2   <u>Financial Statements</u>: Tenant shall furnish Landlord, within ten (10) business days after Landlord's request therefor, its most recent financial statement of Tenant and any Guarantor. Unless: (i) Landlord has reason to believe there has been a material reduction in the financial worth of any of such parties; or (ii) requested by any current or proposed lender, investor or purchaser of Landlord or the Shopping Center, such financial statement(s) shall not be required to be furnished more than twice each calendar year. If Tenant is a publicly traded company and Tenant's financial information is publicly available, this provision shall be deemed complied with by Tenant.

**35.   AUTHORIZATION:**

35.1   <u>Tenant</u>: Tenant represents and warrants that: (i) there are no proceedings pending or, to the knowledge of Tenant, threatened before any court or administrative agency that would materially adversely affect the ability of Tenant to enter into this Lease or the validity or enforceability of this Lease; (ii) there is no provision of any existing mortgage, indenture, contract or agreement binding on Tenant which would conflict with or in any way prevent the execution, delivery or performance of the Terms of this Lease; (iii) if Tenant is a corporation, limited liability company, partnership or other legal entity, the person executing this Lease on behalf of Tenant represent and warrant that this Lease has been authorized and approved by the appropriate officers, members, managers, partners, beneficiaries, shareholders or other beneficial owner(s) of Tenant as may be required by law; (iv) Tenant is in good standing, qualified to do business in the State in which the Shopping Center is located; (v) Tenant has full right, power and lawful authority to execute, deliver and perform its obligations under this Lease, in the manner and upon the Terms contained herein, and to grant the estate herein demised, with no other person needing to join in the execution hereof in order for this Lease to be binding on 'Tenant; and (vi) the financial information provided by Tenant to Landlord materially and accurately depicts the financial condition of Tenant as of the Effective Date of this Lease.

35.2   <u>Landlord</u>: Landlord represents and warrants to Tenant that Landlord has full right, power and lawful authority to execute, deliver and perform its obligations under this Lease, in the manner and upon the Terms contained herein, and to grant the estate herein demised.

**36.   JOINT AND SEVERAL LIABILITY:**   In the event that more than one person or entity executes the Lease as Tenant, all such persons and entities shall be jointly and severally liable for all of Tenant's obligations hereunder.

**37.   FORCE MAJEURE:** Landlord shall be excused for the period of any delay in the performance of any obligations hereunder when prevented from doing so by cause or causes beyond Landlord's absolute control which shall include, without limitation, all labor disputes, civil commotion, civil disorder, riot, civil disturbance, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations, orders, moratoriums or controls, fire or other casualty, inability to obtain any material, services or financing or Acts of God.

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 35 of 113

38. **RECORDING:** Tenant shall not record this Lease, or any memorandum or short form thereof, without the written consent and joinder of Landlord, which may be withheld in Landlord's sole discretion.

39. **BROKERS:** Landlord and Tenant each represent and warrant one to the other that except as the Brokers set forth in **Paragraph 1**, neither of them has employed any broker in connection with the negotiations of the Terms of this Lease or the execution thereof. Landlord and Tenant hereby agree to indemnify and to hold each other harmless against any loss, expense or liability with respect to any claims for commissions, finder's fees or brokerage fees arising from or out of any breach of the foregoing representation and warranty. Landlord shall be responsible for paying any commission due Landlord's Broker in connection with this transaction pursuant to a separate written agreement between them. Landlord's Broker shall be responsible for any payment due to Tenant's Broker pursuant to a separate written agreement between Landlord's Broker and Tenant's Broker.

40. **ENTIRE AGREEMENT:** The foregoing, together with all Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties.

41. **GOVERNING LAW:** This Lease shall be construed in accordance with the laws of the State of California. Exclusive venue in any legal proceeding related to or arising out of this Lease shall be in the county and state where the Premises are located, and Tenant submits to personal jurisdiction and venue in such forum.

42. **EFFECT OF DELIVERY OF THIS LEASE: LANDLORD HAS DELIVERED A COPY OF THIS LEASE TO TENANT FOR TENANT'S REVIEW ONLY, AND THE DELIVERY HEREOF DOES NOT CONSTITUTE AN OFFER TO TENANT OR OPTION TO LEASE. THIS LEASE SHALL NOT BE EFFECTIVE UNTIL A FULLY EXECUTED COPY OF THIS LEASE HAS BEEN DELIVERED TO BOTH LANDLORD AND TENANT.**

43. **WAIVER OF THE RIGHT TO TRIAL BY JURY: LANDLORD AND TENANT HEREBY KNOWINGLY AND INTENTIONALLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING THAT LANDLORD OR TENANT MAY HEREINAFTER INSTITUTE AGAINST EACH OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATED TO THIS LEASE OR THE LEASED PREMISES WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE.**

44. **BANKRUPTCY:** Landlord and Tenant understand that, notwithstanding certain provisions to the contrary contained herein, a trustee or debtor in possession under the United States Bankruptcy Code may have certain rights to assume or assign this Lease. Landlord and Tenant further understand that, in any event, Landlord is entitled under the United States Bankruptcy Code to adequate assurances of future performance of the provisions of this Lease. The parties agree that, with respect to any such assumption or assignment, the term "adequate assurance" shall include at least the following:

44.1    In order to assure Landlord that the proposed assignees will have the resources with which to pay all Base Rent, Operating Expense Rent or other sum payable by Tenant pursuant to the provisions of this Lease, any proposed assignee must have, as demonstrated to Landlord's satisfaction, a net worth (as defined in accordance with generally accepted accounting principles consistently applied) of not less than the net worth of Tenant or any Guarantor (whichever is greater) on the date this Lease became effective, increased by seven percent (7%), compounded annually, for each year from the Commencement Date through the date of the proposed assignment. It is understood and agreed that the financial condition and resources of Tenant were a material inducement to Landlord in entering into this Lease.

44.2    Any proposed assignee must have been engaged in the conduct of business for the 5-years prior to any such proposed assignment, which business does not violate the Permitted Use, and such proposed assignee shall continue to engage in the Permitted Use and will not cause Landlord to be in violation or breach of any provision in any other lease, financing agreement, operating agreement or other agreement relating to the Shopping Center. It is understood and agreed that Landlord's asset will be substantially impaired if the trustee in bankruptcy or any assignee of this Lease makes any use of the Premises other than the Permitted Use.

44.3    Any proposed assignee of this Lease must assume and agree to be personally bound by the provisions of this Lease.

28

45. **SURVIVAL**: Anything contained in this Lease to the contrary notwithstanding, the expiration or earlier termination of the Term of the Lease, whether by lapse of time or otherwise, shall not relieve Tenant from Tenant's obligations accruing prior to the expiration or termination of the Term, all of which shall survive the same, whether or not same is expressly stated in the particular paragraph of this Lease, including, without limitation, Tenant's obligations with respect to: (a) the payment of Rent; (b) any provisions of this Lease with respect to indemnities of Landlord made by Tenant; and (c) the removal of all property of Tenant required to be removed hereunder and the repair of all damage to the Premises caused by such removal at the expiration or termination of this Lease to the extent required hereunder.

46. **COUNTERPARTS**: This Lease may be executed in any number of counterparts, which when taken together shall constitute one complete document.

47. **CONFIDENTIALITY**: Tenant agrees, on behalf of Tenant and Tenant's employees, agents, contractors, consultants, partners, affiliates, assignees and subtenants, not to disclose the terms of this Lease or the results of any audit of Landlord's books and records under this Lease to any third party except (i) legal counsel to Tenant, (ii) any assignee of Tenant's interest in this Lease or any subtenant of Tenant relative to the Premises (or any portion thereof), (iii) as required by applicable law or by subpoena or other similar legal process, or (iv) for financial reporting purposes.

48. **DAYS**: Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

49. **OFAC REPRESENTATION**: For purposes hereof, "List" shall mean the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation, and "OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury. Each party represents and warrants to the other that (i) each Person owning a ten percent (10%) or greater interest in such party is (A) not currently identified on the List, and (B) is not a person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States and (ii) each party has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times. Each party shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall use reasonable efforts to notify the other in writing if any of the forgoing representations, warranties or covenants are no longer true or have been breached or if such party has a reasonable basis to believe that they may no longer be true or have been breached. In addition, at the request of a party, the other party shall provide such information as may be requested by the requesting to determine the other party's compliance with the terms hereof.

50. **DISCLAIMERS**:

    50.1    LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMER-CIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, DEMAND, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

    50.2    IT IS UNDERSTOOD AND AGREED BY TENANT THAT LANDLORD AND LANDLORD'S AGENT HAVE MADE NO REPRESENTATIONS OR PROMISES WITH RESPECT TO THE PREMISES OR THE MAKING OR ENTRY INTO THIS LEASE EXCEPT AS IN THIS LEASE EXPRESSLY SET FORTH AND THAT NO CLAIM OR LIABILITY, OR CAUSE FOR TERMINATION SHALL BE ASSERTED BY TENANT AGAINST LANDLORD FOR, AND LANDLORD SHALL NOT BE LIABLE BY REASON OF, BREACH OF ANY REPRESENTATIONS OR PROMISES NOT EXPRESSLY STATED IN THIS LEASE.

    50.3    ACCESSIBILITY DISCLOSURE- THE BUILDING HAS NOT BEEN INSPECTED BY A CERTIFIED ACCESS SPECIALIST. 4

51. **RENEWAL OPTION**: Provided Tenant is not in default as of the date of exercise of the Renewal Option nor at the date of the commencement of the Renewal Option, and Tenant has not

29

done anything nor failed to do anything that, with the passage of time and/or the giving of notice, would constitute a default hereunder, Tenant shall have the right to exercise the Renewal Options specified in **Paragraph 1.20**. During each Renewal Option, all of the terms and conditions of this Lease except for Base Rent shall be as set forth in **Paragraph 1.9**. Tenant shall exercise its Renewal Option(s) by furnishing Landlord written notice not later than nine (9) months before the end of the original Term or the immediately preceding Renewal Option period. If Tenant chooses not to exercise the first Renewal Option, all subsequent Renewal Option(s) shall automatically terminate and be null and void.

52. **EXCLUSIVE USE:** Subject to the terms of any existing leases, so long as Tenant is not in default under this Lease and is operating its business in the Premises for the Permitted Use, Landlord covenants, warrants and represents that from and after the Commencement Date of this Lease and during the Term Landlord shall not lease, rent, occupy, use or permit to be occupied or used by any person or entity other than Tenant, any part of the Shopping Center owned by Landlord, nor shall any person or entity other than Tenant occupying a premises for any of the following uses: (i) a restaurant or bar with a sports theme or concept as a "Sports Bar" (defined below) or (ii) a restaurant or bar which features bone-in or boneless chicken wings as a primary menu item, serves bone-in or boneless chicken wings with two (2) or more types of sauces, or serves bone-in or boneless chicken wings as an entrée (collectively, the **"Exclusive Use"**), which Exclusive Use conducted by any such other tenant or occupant shall be incidental to a primary use (which is not the same as the Exclusive Uses) being conducted in such tenant's or occupant's premises and shall not be the primary use of such tenant's or occupant's premises. Landlord shall include a provision in all future leases in the Shopping Center prohibiting the use of such leased space for the purposes described in this Paragraph. A **"Sports Bar"** is defined as a restaurant and/or bar, which has (i) three (3) or more televisions, (ii) any projection programming or broadcasting, or (iii) any screens that exceed 37" diagonal. Competing businesses prohibited by the foregoing exclusive shall include, without limitation, Champps, Hooters, Wing Stop, Wings & Rings, Paradox Grill, Raisin' Cains, and Quaker Steak and Lube**.** Tenant acknowledges that The Vine Cinema, a current tenant of the Shopping Center, engages in the sale, rental and service of merchandise that falls within the scope of Tenant's Exclusive Uses and Tenant expressly acknowledges and agrees that such use and occupancy by The Vine Cinema, its successors and assigns shall not constitute a violation of Tenant's Exclusive Uses. Tenant further acknowledges that this exclusivity provision shall not be applicable to the extent that any of the above prohibited uses are permitted under existing permitted use language, without further consent from Landlord, under an existing lease for another tenant of the Shopping Center.

In the event of a violation of the foregoing exclusive, Tenant shall be required to provide Landlord with written notice of the violation, whereupon Landlord shall be given six (6) months to cure. In the event of a willful violation of Landlord by granting another tenant in the Shopping Center the right to violate Tenant's Exclusive Use, Tenant's sole and exclusive remedy shall be for Tenant shall provide written notice to Landlord of its intent to reduce Base Rent by one-half (1/2) until the violation is cured after said 6-month period. Tenant may pay said reduced Base Rent for a period of one year; provided that Operating Expense Rent and Percentage Rent (based on the Breakpoint determined using the full Base Rent) will continue to be due. After the expiration of the one-year period, provided that such violation is still uncured, within thirty (30) days after the end of said 1-year period, Tenant shall have the one time right to terminate this Lease upon six (6) month's prior written notice or Tenant must resume paying full Base Rent and all other charges under this Lease.

53. **ROOF IMPROVEMENTS; SATELLITE DISH:** Subject to complying with all applicable Legal Requirements and Tenant obtaining all necessary approvals, permits and consents from the applicable governmental authorities, Tenant shall have the right to occupy and use a portion of the roof of the Building in a location to be reasonably agreed upon by Landlord and Tenant (the **"Roof Space"**) to install a telecommunications satellite dish and related conduit connecting the satellite dish to the Premises (collectively the **"Roof Improvements"**). The installation and use of the Roof Improvements by Tenant shall not negatively impact other Shopping Center tenants' rights of quiet enjoyment or interfere with the delivery of any services (including telecommunications services) to or from such other tenants' demised premises. If such installation and/or use of the Roof Improvements by Tenant so interferes with any other tenant in the Shopping Center, Landlord reserves the right to require Tenant to relocate the Roof Improvements to another part of the Building, change the frequency of the satellite dish or remove the same from the Roof Space, all of which shall be at Tenant's sole cost and expense. Tenant shall not install more than six (6) satellite dishes in the Roof Space. No additional Rent shall be due in connection with Tenant's installation and use of the Roof Improvements, provided that Tenant's use of the Roof Improvements is for Tenant's sole and exclusive use and not for use by any third party. Tenant shall be solely responsible for the cost of and shall be responsible for obtaining any required governmental approvals (including but not limited to change in zoning, if necessary) for the Roof Improvements and installation, use and maintenance thereof. In addition

30

Tenant shall be responsible for maintaining, repairing, insuring, removing and providing utility service to the Roof Improvements. The failure of Tenant to obtain any necessary approvals, licenses or permits to use and/or install any Roof Improvements shall not entitle Tenant to any Rent reduction or enable Tenant to terminate this Lease; the installation of the Roof Improvements is at Tenant's sole risk, expenses and cost. In connection with Tenant's installation of the Roof Improvements, Tenant shall not penetrate the roof or roof membrane or make any structural modifications to the Building; any such penetration or structural modifications shall be performed by Landlord at Tenant's cost, as determined by Landlord in its sole discretion. Tenant agrees to indemnify and hold Landlord harmless from and against any costs, damages or expenses related to Tenant's installation, use, repair, maintenance or removal of the Roof Improvements including any adverse impact to or voiding of any of Landlord's roof warranties. Upon completion of any Roof Improvements, Tenant shall provide Landlord with as-built plans and operating manuals for the same. Upon termination the Lease, Landlord may require Tenant to remove the Roof Improvements upon written notice to Tenant or Tenant may elect to remove the same. If Tenant removes the Roof Improvements or any portion thereof, it shall repair the applicable portion(s) of the Roof Space to the condition existing prior to the installation thereof. If Tenant fails to timely remove the Roof Improvements at the expiration of the Lease Term or any early termination thereof, Landlord shall have the right, but not the obligation to remove the same, restore any damage caused thereby, and charge Tenant, as Additional Rent hereunder, the cost of the removal and the restoration plus a fifteen percent (15%) administrative fee. The provisions of this Paragraph shall survive the termination or early expiration of the Lease.

54. **GUARANTOR:** As a material inducement for and as a condition precedent to Landlord to enter into this Lease, Guarantor shall execute the Guaranty in the form attached hereto as **Schedule** 4.

[Remainder of page intentionally blank.]

31

IN WITNESS WHEREOF, Landlord and Tenant have executed this Retail Lease as of the day and year first above written.

**LANDLORD:**                                              **TENANT:**

GCCFC 2005-GG5 LIVERMORE RETAIL           TEE IT UP 1, LLC,
LIMITED PARTNERSHIP,                                  a California limited liability company
a Delaware limited partnership

By: GCCFC 2005-GG5 LIVERMORE RETAIL       By: _Tejpal Singh_
    GP, LLC, a Delaware limited liability       Name: _TEJPAL SINGH_
    company, Its General Partner                   Title: _Senior Partner_

      By: LNR Partners California
          Manager, LLC, a California
          limited liability company,
          Its Manager

          By: _____
              Steven D. Ferreira,
              Vice President

**SCHEDULE 1**

**LEGAL DESCRIPTION**

That certain land located in the City of Livermore, County of Alameda, State of California, as more particularly described below:

PARCEL ONE:

A PORTION OF LOT ELEVEN (11) IN BLOCK FIVE (5), AS CONTAINED IN THAT "MAP OF THE TOWN OF LIVERMORE, 97-5-1-1, MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT A POINT 54.85 FEET WEST FROM THE INTERSECTION OF THE NORTHERN LINE OF WEST FIRST STREET AND THE WESTERN LINE OF SOUTH "N" STREET; THENCE WEST ALONG SAID NORTHERN LINE OF WEST FIRST STREET, 25.15 FEET; THENCE AT RIGHT ANGLES NORTH, FOR A DISTANCE OF 70.0 FEET; THENCE AT RIGHT ANGLES EAST, FOR A DISTANCE OF 25.15 FEET; THENCE AT RIGHT ANGLES SOUTH, FOR A DISTANCE OF 70.0 FEET TO THE POINT OF BEGINNING.

PARCEL TWO:

LOTS 1 AND 12 AND THE NORTHEASTERN 35 FEET OF LOTS 2 AND 11 IN BLOCK 5, AS SAID LOTS AND BLOCK ARE SHOWN ON THE "MAP OF THE TOWN OF LIVERMORE", FILED NOVEMBER 4, 1869, IN BOOK 5 OF MAPS, AT PAGE 9, IN THE OFFICE OF THE COUNTY RECORDER OF ALAMEDA COUNTY.

EXCEPTING THEREFROM, A PORTION OF LOT ELEVEN (11) IN BLOCK FIVE (5), AS CONTAINED IN THAT MAP OF THE TOWN OF LIVERMORE, 97-5-1-1, MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT A POINT 54.85 FEET WEST FROM THE INTERSECTION OF THE NORTHERN LINE OF WEST FIRST STREET AND THE WESTERN LINE OF SOUTH "N" STREET; THENCE WEST ALONG SAID NORTHERN LINE OF WEST FIRST STREET, 25.15 FEET; THENCE AT RIGHT ANGLES NORTH, FOR A DISTANCE OF 70.0 FEET; THENCE AT RIGHT ANGLES EAST, FOR A DISTANCE OF 25.15 FEET; THENCE AT RIGHT ANGLES SOUTH, FOR A DISTANCE OF 70.0 FEET TO THE POINT OF BEGINNING.

PARCEL THREE:

A PORTION OF BLOCK 5, AS SHOWN ON THE MAP OF THE TOWN OF LIVERMORE, RECORDED IN BOOK 5 OF MAPS, AT PAGE 9 THEREOF, RECORDS OF ALAMEDA COUNTY, CALIFORNIA, SAID BLOCK BEING BOUNDED BY SOUTH "N" STREET, WEST FIRST STREET, SOUTH "O" STREET AND SOUTHERN PACIFIC RAILWAY COMPANY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF SAID BLOCK 5, AND THENCE EASTERLY ALONG THE SOUTHERLY LINE OF SAID BLOCK 5, NORTH 69° 30' EAST, TWENTY-FIVE AND 2/10 (25.2) FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID SOUTHERLY LINE, NORTH 69° 30' EAST, ONE HUNDRED EIGHTY-NINE AND 8/10 (189.8) FEET, MORE OR LESS, TO A POINT ON SAID SOUTHERLY LINE, DISTANT THEREON SOUTH 69° 30' WEST, EIGHTY-FIVE AND 00/100 (85.00) FEET FROM THE SOUTHEASTERLY CORNER OF SAID BLOCK 5; THENCE LEAVING SAID SOUTHERLY LINE, AT RIGHT ANGLES THERETO, NORTH 20° 30' WEST, TWO HUNDRED FORTY-FOUR AND 1/10 (244.1) FEET, MORE OR LESS, TO A POINT ON THE NORTHERN LINE OF SAID LOT 5, DISTANT THEREON SOUTH 69° 30' WEST, EIGHTY-FIVE AND 0/10 (85.0) FEET FROM THE NORTHEASTERLY CORNER OF SAID BLOCK 5; THENCE WESTERLY ALONG SAID NORTHERLY LINE, SOUTH 69° 30' WEST, ONE HUNDRED THIRTY-EIGHT AND 5/10 (138.5) FEET, MORE OR LESS, TO AN INTERSECTION THEREOF WITH A LINE DRAWN PARALLEL WITH THE WESTERLY LINE OF SAID BLOCK 5, AND DISTANT EASTERLY ALONG SAID NORTHERLY LINE, NORTH 69° 30' EAST, SEVENTY-SIX AND 5/10 (76.5) FEET; THENCE LEAVING SAID NORTHERLY LINE AND RUNNING SOUTHERLY ALONG SAID PARALLEL LINE, SOUTH 20° 30' EAST, ONE HUNDRED SEVENTY-SIX AND 6/10 (176.6) FEET, MORE OR LESS; THENCE LEAVING SAID PARALLEL LINE, AT RIGHT ANGLES, SOUTH 69° 30' WEST, FIFTY-ONE AND 3/10 (51.3) FEET; THENCE SOUTH 20° 30' EAST, SIXTY-SEVEN AND 5/10 (67.5) FEET TO THE TRUE POINT OF BEGINNING.

33

PARCEL FOUR:

A PORTION OF BLOCK 5, AS SHOWN ON THE MAP OF THE TOWN OF LIVERMORE, RECORDED IN BLOCK 5 OF MAPS, AT PAGE 9 THEREOF, RECORDS OF ALAMEDA COUNTY, CALIFORNIA, SAID BLOCK BEING BOUNDED BY SOUTH "N" STREET, WEST FIRST STREET, SOUTH "O" STREET AND SOUTHERN PACIFIC RAILWAY COMPANY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF SAID BLOCK 5; THENCE ALONG THE SOUTHWESTERN LINE OF SAID BLOCK 5, NORTH 20° 30' WEST, 250 FEET TO THE NORTHWESTERN CORNER OF SAID BLOCK 5; THENCE ALONG THE NORTHWESTERN LINE OF SAID BLOCK 5, NORTH 69° 30' EAST, 76.5 FEET; THENCE LEAVING SAID LINE, PARALLEL WITH THE SAID SOUTHWESTERN LINE OF BLOCK 5, SOUTH 20° 30' EAST, 176.6 FEET, MORE OR LESS; THENCE LEAVING SAID PARALLEL LINE, SOUTH 69° 30' WEST, 51.3 FEET; THENCE PARALLEL WITH SAID SOUTHWESTERN LINE OF BLOCK 5, SOUTH 20° 30' EAST, 67.5 FEET TO A POINT ON THE SOUTHERLY LINE OF SAID BLOCK 5; THENCE ALONG SAID LINE, SOUTH 69° 30' WEST, 25.2 FEET TO THE POINT OF BEGINNING.

APN:  097-0005-001-10 (Parcels One and Two), 097-0005-001-11 (Parcel Three) and 097-0005-001-12 (Parcel Four)

## SCHEDULE 2

## SITE PLAN



35

## SCHEDULE 2-A

## OUTDOOR SEATING AREA



36

## CONSTRUCTION RIDER

  This Construction Rider Work Letter Agreement ("**Work Letter**") is a part of that certain Retail Lease (the "**Lease**"), dated June 13, 2013, between TEE IT UP 1 LLC, a California limited liability company, as "**Tenant**", and GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, a Delaware limited partnership, as "**Landlord**", relating to the Premises more fully identified in the Lease. Capitalized terms used herein, unless otherwise defined in this Work Letter, shall have the respective meanings ascribed to them in the Lease. For and in consideration of the agreement to lease the Premises and the mutual covenants contained herein and in the Lease, Landlord and Tenant hereby agree as follows:

  1. **Improvements**. Landlord will deliver the Premises in its "as-is" condition and except for the Allowance set forth below, Landlord shall not be obligated to make or pay for any alterations or improvements to the Premises, the Building or the Shopping Center. In accordance with and subject to the provisions of this Work Letter, Tenant shall, at Tenant's expense (subject to the Allowance, as hereinafter defined), construct and install certain improvements to the Premises described in this Work Letter (collectively, the "**Work**"). Unless otherwise agreed to by Landlord in writing, Tenant shall use Building Grade construction methods and materials as determined by Landlord (in its sole discretion) in connection with all Work. "**Building Grade**" shall mean: (i) the type, brand and/or quality of materials Landlord reasonably designates from time to time to be the minimum quality to be used in the Building or, as the case may be, the exclusive type, grade, or quality of material to be used in the Building; and (ii) the standard method of construction and installation technique to be used in the Building, as Landlord reasonably determines.

  2. **Cost of the Work**.

    A. Tenant shall receive from Landlord an allowance (the "**Allowance**") of $272,000.00 (calculated based upon $40 per RSF of the Premises) to be used solely as a contribution towards Tenant's cost of the Work. To the extent that the total cost of the Work exceeds the Allowance, Tenant shall pay the full amount of such excess ("**Tenant's Costs**") to the applicable contractors, subcontractors, and material suppliers. Tenant shall not be entitled to any credit or payment for any unused portion of the Allowance. Tenant hereby grants to Landlord an offset and deduction against the Allowance for all costs, payments and expenses that Tenant is obligated to pay to Landlord pursuant to this Lease or otherwise due and owing to Landlord.

    B. The Allowance will be paid as follows: (i) fifty percent (50%) paid to Tenant within fifteen (15) days following Landlord's receipt of Five Hundred Thousand Dollars ($500,000.00) or more worth of paid invoices for Work, together with partial releases of lien from any contractor, subcontractor, or material supplier; and (ii) fifty percent (50%) following Substantial Completion of the Work (as defined in paragraph 5(a) of this Work Letter). For the final Allowance payment, Tenant shall submit to Landlord a request for payment of the Allowance ("**Allowance Request**"), which shall be accompanied by (A) a certificate of Tenant's architect certifying to Landlord and Tenant that Substantial Completion has occurred, (B) final releases of lien from any contractor, subcontractor, or material supplier, (C) a Certificate of Occupancy (or its equivalent under the law of the County and State where the Premises are located) for the Premises issued by the applicable government authority, (D) a notarized affidavit from Tenant's general contractor that all amounts due for work done and materials furnished in completing the Work have been paid (or will be paid out of the disbursement); and (E) as-built drawings, test and balance reports, a copy of all warranties regarding any item for which Landlord is responsible to repair pursuant to the Lease, if any, (and Tenant shall use all reasonable efforts to have such warranties be transferable to Landlord or issued in favor of Tenant and Landlord, jointly), and copies of all brochures and maintenance manuals. The Allowance shall be paid to Tenant by Landlord within thirty (30) business days after Landlord's receipt of the Allowance Request.

    C. Landlord, following receipt of notice from Tenant, will provide, without cost to Tenant, all reasonable regular business hour and overtime use of the freight elevators (if any) and delivery docks used in the construction of the Premises to accommodate Tenant's needs in connection with the Work. ]

  3. **Plans and Specifications**.

    A. The Work shall be completed in accordance with detailed architectural and engineering working drawings and material specifications (the "**Plans and Specifications**") which shall be prepared at Tenant's expense (subject to the Allowance) and shall be in a form and content as necessary to allow Tenant's contractor(s) to obtain all required building permits and approvals. The Plans and Specifications shall reflect all of the Work and shall include the following:

Case: 23-40085 Doc# 120-1 Filed: 05/17/23 Entered: 05/17/23 14:42:42 Page 45 of 113

| | |
|---|---|
| (i) | dimensioned architectural plan; |
| (ii) | electric/telephone outlet diagram; |
| (iii) | reflective ceiling plan with light switches; |
| (iv) | mechanical plan (including fire protection); |
| (v) | electric power circuitry diagram; |
| (vi) | schematic plumbing riser diagram (if any); |
| (vii) | all color and finish selections; |
| (viii) | all special equipment and fixture specifications; and |
| (ix) | life safety specifications. |

B.　　Tenant shall utilize a certified and licensed architect as space planner architect ("**Tenant's Architect**") in preparation of items (1) through (3), (7) and (8) as provided in subparagraph (a) of this Section. In all events, items (4), (5) and, if necessary, item (6) must be prepared by certified and licensed engineer(s) approved by Landlord in Landlord's reasonable discretion ("**Engineers**"). The total charge for preparation of building standard engineering drawings and specifications by Engineers shall be paid by Tenant.

C.　　Tenant shall cause the Plans and Specifications to be prepared, at Tenant's expense, and submitted to Landlord for approval. Landlord shall then have a period of not more than ten (10) business days following such submittal (or, in the event of modifications, such re-submittal) in which to review and approve the Plans and Specifications or state any objections to same in writing. Landlord's approval (except as to structural elements of the Building and Building systems, for which approval shall be in Landlord's absolute discretion) shall not be unreasonably withheld, and any objections shall be reasonable in nature and stated in sufficient detail so as to allow necessary modification by Tenant. Tenant shall make necessary modifications to the Plans and Specifications and resubmit same to Landlord within seven (7) business days. Once accepted by Landlord in final form, the Plans and Specifications may be modified only with Landlord's written approval, which will not be unreasonably withheld or delayed, and Tenant shall be liable for any additional costs incurred as a result of any such change.

4.　　**Contractor(s); Permits; Bond**.

A.　　Tenant shall use its own contractor(s) and shall obtain all building permits necessary to complete all of the Work. Tenant shall bear the cost of all building permits. Landlord shall not be liable in any way for any injury, loss, damage, or delay which may be caused by or arise from entry into the Premises by Tenant, its employees, or contractor(s), during the performance of the Work. Tenant's contract with its general contractor shall include (among other things) the requirement that the general contractor abide by the construction rules and regulations set forth on Exhibit A, attached to and made a part of this Work Letter.

B.　　Tenant's general contractor and all subcontractors shall be licensed as required by the County and State where the Premises are located. Landlord shall have the right to disapprove of Tenant's general contractor or any subcontractor if Landlord reasonably believes that such contractor is: (i) not licensed as required by any governmental agency; (ii) not technically qualified or sufficiently staffed to do the Work; and/or (iii) not financially capable of undertaking or completing the Work. Tenant shall cause its general contractor to furnish Landlord with an original certificate of insurance for hazard and liability coverage pursuant to subsection (d), below. All subcontractors shall be insured in such amounts as Landlord deems commercially reasonable. Tenant (or, at Tenant's option, its general contractor) shall furnish Landlord with the names and addresses of its subcontractors.

C.　　Tenant shall advise its contractor(s), subcontractor(s), and material supplier(s) that no interest of Landlord in the Premises, the Building, or the Project shall be subject to liens to secure payment of any amount due for work performed or materials installed in the Premises on Tenant's behalf and Tenant's contract with its general contractor shall include a true and correct copy of **Paragraph 11.3** of the Lease.

D.　　Tenant's general contractor shall maintain at all times during the course of the Work, the following types of insurance:

A.　　workers' compensation insurance to cover full liability under workers' compensation laws of the State where the Premises are located with employers' liability coverage in limits not less than $1,000,000.00;

38

B.   comprehensive general liability insurance on an "occurrence" basis for the hazards of operations, elevators and escalators, independent contractors, products and completed operations (for two (2) years after the date of acceptance of the work by Landlord and Tenant), and contractual liability specifically covering the indemnification provision in the construction contract, such comprehensive general liability to include broad form property damage and afford coverage for explosion, collapse and underground hazards, and "personal injury" liability insurance and an endorsement providing that the insurance afforded under the contractor's policy is primary insurance as respects Landlord and Tenant and that any other insurance maintained by Landlord or Tenant is excess and non-contributing with the insurance required hereunder, provided that such insurance may be written through primary or umbrella insurance policies with a minimum policy limit of $5,000,000.00;

C.   comprehensive automobile liability insurance covering all owned, non-owned, and hired automobiles, such insurance required to be in limits not less than that stated in subparagraph (2), above; and

D.   Landlord and Tenant are to be included as an additional insured for insurance coverages required in subparagraphs (2) and (3), above.

As evidence of all required coverages, Tenant shall provide to Landlord, a certificate of insurance, setting forth the nature of the coverage, the limits of liability, the name of the insurance carrier, policy number, and the date of expiration. Each carrier shall agree to furnish at least ten (10) days prior written notice to Landlord of any cancellation or material change in coverage.

E.   If requested by Landlord, Tenant shall require its contractor(s) to provide performance and payment bond(s) acceptable to Landlord covering the total value of the Work. The cost of procuring such bonds shall be borne by Tenant.

5.   **Construction of the Improvements**.

A.   Tenant shall cause Substantial Completion of the Work, in accordance with the Plans and Specifications. Tenant shall cause construction to commence no later than twenty (20) days following Landlord's delivery of the Premises to Tenant for construction of Work. Once Tenant has commenced construction, Tenant shall cause the construction to be diligently prosecuted to completion. "**Substantial Completion**" or "**Substantially Completed**" shall mean the earlier of the date that (i) a Certificate of Occupancy or its equivalent has been obtained for the entire Premises and that the Work is sufficiently complete so as to allow Tenant to occupy the Premises for the Permitted Use, or (ii) Tenant occupies the Premises and begins conducting business operations for its Permitted Use. If required by the laws of the State and County where the Premises are located, and in accordance with such laws, Tenant, with Landlord's cooperation, shall cause a Notice of Commencement (or its equivalent) to be filed in the Public Records of the County where the Premises are located and posted at the job site prior to commencing construction of the Work.

B.   Tenant's contractors shall, at Tenant's expense, apply for and obtain all necessary building permits, inspections, and approvals necessary and appropriate to complete the Work in accordance with the Plans and Specifications and as necessary to obtain a Certificate of Occupancy (or its equivalent) for the Premises. Tenant shall arrange a meeting prior to the commencement of construction between Landlord and Tenant's contractors for the purpose of organizing and coordinating the completion of the Work. All of the Work shall be completed in a good and workmanlike manner using Building Grade materials and methods, and shall be in conformity with all applicable building codes, and in accordance with Landlord's construction rules and regulations pertaining to contractors set forth in Exhibit "A" hereto.

C.   The Commencement Date and the Rent Commencement Date shall be the date set forth in the Lease, regardless of whether Tenant has achieved Substantial Completion of all or any portion of the Premises.

D.   Any damage to the Building caused by Tenant, its contractors, subcontractors, or agents shall be repaired by Tenant, at Tenant's expense, in a good and workmanlike manner. If any repaired area does not match the original surface, then the entire surface shall be redone at Tenant's expense to match the original surface. Tenant agrees to indemnify and hold harmless Landlord, its agents, and employees from and against any and all costs, expenses, damage, loss, or liability, including, but not limited to, reasonable attorneys' fees and costs (at all tribunal levels), which arise out of, is occasioned by, or is in any way attributable to the Work, except to the extent caused by the gross

39

negligence or willful misconduct of Landlord. Tenant, at its expense, shall be responsible for the maintenance, repair, and replacement of any and all items constructed by Tenant as part of the Work. Moreover, to the extent reasonably needed by Landlord for its repair obligations set forth in the Lease, Tenant will use all reasonable efforts to assign or extend to Landlord the benefit of any manufacturer's warranties with respect to the mechanical, electrical, life/safety, and plumbing systems, and for any other items constructed by Tenant.

      E.    Landlord or Landlord's representatives may, at any time, review and inspect the construction activities and performance of the Work by Tenant's contractor and any subcontractor(s). Tenant agrees to cooperate with Landlord to facilitate such inspections and shall notify Landlord prior to any and all governmental or regulatory inspections of the Work so that Landlord or Landlord's representatives can be present for such inspections.

      6.    **Window Coverings**. Building Grade window coverings are required by Landlord. The use of this Building Grade window treatment is essential to maintain the exterior appearance of the Building, therefore, no other window treatment shall be permitted by Landlord. No window coverings, blinds, curtains or treatments shall be permitted without the express written consent of Landlord which consent Landlord may withhold in its sole discretion.

      7.    **Representatives**. Landlord and Tenant hereby appoint the following person(s) as their respective representatives, to act on their behalf in connection with all matters covered by this Work Letter

| Landlord Representative | Tenant Representative |
|---|---|
| Michael Turner | Hardy Samra |

All inquiries, requests, instructions, authorizations and other communications with respect to the matters covered by this Work Letter shall be made to Landlord's Representative or Tenant's Representative as the case may be. Authorization made by Tenant's Representative shall be binding upon Tenant, and Tenant shall be responsible for all activities and costs authorized by Tenant's Representative. Either party may change its representative under this Work Letter at any time by written notice to the other party.

      8.    **Miscellaneous**.

      A.    This Work Letter shall be subject to the governing law, jurisdiction, and venue provisions set forth in the Lease.

      B.    This Work Letter may not be amended except by a written instrument signed by Landlord and Tenant.

      C.    Notices under this Work Letter shall be given in the same manner as under the Lease, except that such notices shall be directed to the parties set forth in Paragraph 7 of this Work Letter.

      D.    The headings set forth herein are for convenience only and form no substantive or binding part of this Work Letter.

      E.    This Work Letter sets forth the entire agreement of Tenant and Landlord regarding the Work.

      F.    Any failure of Tenant to comply with the requirements of this Work Letter shall constitute a default by Tenant under the Lease and Landlord may pursue all remedies available to Landlord under the Lease, at law or in equity.

      G.    Whenever the term "Working Drawings" is used in this Agreement, such term shall be deemed to refer to the plans and specifications approved by Landlord.

      9.    **Exculpation of Landlord**. Notwithstanding anything to the contrary contained in this Work Letter, it is expressly understood and agreed by and between the parties hereto that:

      A.    The recourse of Tenant or its successors or assigns against Landlord with respect to the alleged breach by or on the part of Landlord of any representation, warranty, covenant, undertaking or agreement contained in this Work Letter or the Lease (collectively, "**Landlord's Work Letter Undertakings**") shall extend only to Landlord's interest in the real estate, of which the Premises demised under the Lease are a part (hereinafter, "**Landlord's Real Estate**") and not to any other assets of Landlord or its affiliated entities; and

      B.    Except to the extent of Landlord's interest in Landlord's Real Estate, no personal liability or personal responsibility of any sort with respect to any of Landlord's Work Letter Undertakings

40

or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against, Landlord, or against any of its respective directors, officers, employees, agents, affiliated entities, managers, members, shareholders, beneficiaries, trustees or representatives.

10. **Tenant Delays**. Any of the following occurrences is deemed to be a "**Tenant Delay**": (i) the failure of Tenant to furnish all or any plans, drawings, specifications, finish details or the other information required under this Work Agreement, (ii) Tenant requires special work or materials, finishes, or installations other than the Building Grade materials, or Tenant requires special construction staging or phasing, and such requirements delay Substantial Completion, or (iii) any other act or omission of Tenant or its contractors that causes a material delay in Substantial Completion.

11. **Attorney's Fees**. This Work Letter shall be subject to the terms and conditions of **Paragraph 26** of the Lease, regarding attorney's fees.

12. **Lease Provisions.** The terms and provisions of the Lease, insofar as they are applicable to this Work Letter, are hereby incorporated herein by reference. All amounts payable by Tenant to Landlord hereunder shall be deemed to be additional Rent under the Lease and, upon any default in the payment of same, Landlord shall have all of the rights and remedies provided for in the Lease.

41

**CONSTRUCTION RULES AND REGULATIONS**

Landlord hereby sets forth the following rules and regulations governing the Work to be done by the general contractor employed by Tenant (the "**General Contractor**"), its employees and any and all subcontractors employed by the General Contractor, and Tenant hereby agrees that the General Contractor shall comply with these rules and regulations and any changes thereto which may reasonably be made by Landlord. Tenant further agrees to see to it that any and all subcontractors employed by the General Contractor comply with the same.

1.        Permits:  All permits and licenses necessary for the prosecution of the Work shall be secured and paid for by the General Contractor prior to commencement of the Work.  It is the responsibility of the General Contractor to forward an original Certificate of Occupancy to Landlord prior to the release of any retainage held by Landlord.

2.        Work Area:  Before commencing any of the Work, the General Contractor shall erect construction barriers acceptable to Landlord between the area where the General Contractor's Work is being conducted (the "**Work Area**") and any public areas in the Building and will keep the Work Area closed from public view until completion and occupancy by Tenant.  The General Contractor shall perform all construction activities and all storage of materials inside the Work Area.

3.        Keys and Locks:  The General Contractor shall provide Landlord with keys to all locks installed on or in the Work Area.  Landlord shall be provided access to the Work Area at all times.

4.        Common Areas:  The General Contractor shall carefully protect all walls, carpets, ceiling tiles, floors, furniture and fixtures in the Common Areas (as defined in the Lease) or areas open to the public and shall pay for repair or replacement of all damaged property therein (whether caused by General Contractor or its agents or subcontractors) upon demand by Landlord.  The General Contractor will not perform any construction activities or store any materials in any Common Areas or public areas. Alterations to multi-tenant corridors (e.g., door cut-in) shall either be complete within the first week of construction or a visual barrier (approved by Landlord) shall be erected at General Contractor's expense. The General Contractor will keep the Common Areas and vacant spaces of the Building free of construction material, dirt and debris at all times.

5.        Intentionally Deleted.

6.        Water and Electricity During Construction:   Sources of water and electricity (in reasonable quantities for lighting, portable power tools, drinking water, water for testing and other such common uses during construction) will be made available to the General Contractor by the Landlord without cost to the General Contractor. The General Contractor shall make all connections or furnish any necessary extensions to or from such sources, and shall be responsible for promptly removing same upon completion of the Work.

7.        Sanitary Facilities:  Sanitary Facilities will be furnished to the General Contractor by Landlord.  The General Contractor shall use only those facilities specifically provided or designated by the Landlord.  Charges associated with clean-up or damage of any kind shall be the responsibility of the General Contractor.

8.        Dusty Work:  The General Contractor shall notify Landlord prior to the commencement of any extremely dusty work (e.g., sheet rock cutting, sanding, extensive brooming, etc.) and Contractor shall arrange for additional filtering capacity on the affected HVAC equipment.  Failure to make such prior notification will result in the General Contractor absorbing any costs associated with returning any HVAC equipment damaged by dust to its original condition.

9.        Work Approval:  All drawings, change orders and materials must be approved by Landlord prior to the start of construction.  Materials unacceptable to the Landlord shall not be used.

10.       Disposition of Materials:  Any and all unused construction materials shall be disposed of by the General Contractor in the same manner as waste or unwanted material, except as may otherwise be directed by Landlord.  General Contractor shall not use the building trash compactor.  The placement of a container or vehicle in which to empty trash must be scheduled through the management office.  The General Contractor is responsible for keeping the area around the trash container clean at all times.

11.       Clean-up:  The General Contractor shall at all times on a day-to-day basis keep the Work Area and other areas of the Building or site free from accumulations of waste material, debris or rubbish caused by or incidental to the Work.  Upon completion of the Work, the General Contractor shall promptly remove from the Work Area, the Building and the site, all tools, scaffolding, surplus materials,

42

trash and debris, and shall leave the site, the Building and Work Area "broom clean". Any debris, rubbish, materials or equipment left outside the Work Area or left anywhere on the Premises, shall be disposed of by Landlord, and the General Contractor shall be responsible for promptly reimbursing Landlord for the cost thereof.

12.     Working Hours:  The General Contractor understands that the work will be done in a Shopping Center that is occupied and that the safety, comfort and quiet enjoyment of the tenants and invitees in the Shopping Center is the highest priority.  As such, certain operations must be performed outside the hours of 10:00 a.m. to 6:00 p.m. to prevent the disturbance or interruption of normal business operations, unless otherwise approved by Landlord, in its reasonable discretion.  These operations include, but are not limited to:

A.     Drilling or cutting of the concrete floor slab;

B.     Drilling or cutting of any concrete structural member;

C.     Sanding, chiseling or leveling of the concrete structure;

D.     Delivery of drywall or large quantities of building materials;

E.     Nailing carpet tack strip;

F.     Testing the Fire Alarm System; and

G.     Any work which generates noise or vibration which may be disruptive to Building occupants.

The General Contractor must obtain prior approval from Landlord to perform work after normal Building hours of operation.  The General Contractor and subcontractors will be required to show identification to security and sign-in prior to admittance into the Building after hours.

13.     Workman Conduct:  No loud or abusive language or actions or the playing of music which can be heard outside the Work Area will be tolerated.  It will be the responsibility of the General Contractor to enforce this regulation on a day-to-day basis and/or in response to specific complaints from other tenants or from Landlord.

14.     Electrical Panel Changes:  All additional electrical circuits added to or removed from existing electrical panels or any new circuits added to new electrical panels must be appropriately marked as to the area and/or equipment serviced by the circuit(s) in question as provided for in specifications.  All electrical panels which have covers removed for any reason (e.g., so as to allow the addition of new circuits) or any new electrical panels which are installed shall be left at the end of each day with all panel covers properly in place and all panel doors securely closed.  **Under no circumstances will power serving other tenants' premises or other areas of the Shopping Center be shut off without the specific advance approval of Landlord.**  All electrical work will require as-built drawings to be submitted to the management office upon completion of work.  The Electrical Contractor must have one or more licensed electrician on the job at all times during construction.

15.     Intentionally Deleted.

16.     Welding/Cutting Torch Use:  No welding or cutting torch is to be used in the Building without the prior approval of Landlord.  If such approval is granted by Landlord, the General Contractor must have a fire extinguisher present in the Work Area at all times when the equipment is being used.  Additionally, the General Contractor must perform any such work after-hours because of the fumes which may be associated with such welding/cutting torch usage.

17.     Spraying of Varnishes/Lacquer in the Building:  No varnishes/lacquers are to be sprayed in the Building without the prior approval of the Landlord. Because of their combustible nature, this type of work should normally be done off-site.  Anyone found spraying these compounds in or around the Building without the approval of the Landlord will be required to cease such work.

18.     Draining of Sprinkler Lines:  Any work which will involve the draining of a sprinkler line or otherwise affect the Building's sprinkler system must be approved in advance by Landlord.  In all instances where this is done, the system may not be left inoperable overnight.  De-energizing of the fire pump related to drainage of the sprinkler lines will be done only by Landlord's personnel.

19.     Deliveries:  All delivery vehicles are governed by a one (1) hour parking limitation.  Deliveries of drywall and other oversized material must be scheduled for delivery on weekends through the management office.

43

20.     Parking:     Landlord does not provide parking for the General Contractor or subcontractors. Neither Landlord nor the parking garage operator (if different from Landlord) will not be responsible for damages or thefts to any vehicles parked in the parking lot.

21.     Posting of Rules and Regulations:  A copy of these rules and regulations, acknowledged and accepted by the General Contractor, must be posted on the Job Site in a location clearly visible to all workers.  It is the General Contractor's responsibility to instruct its employees and all subcontractors to familiarize themselves with these rules and to enforce compliance with these rules at all times.

22.     Life Safety System:  The General Contractor shall be held responsible for maintaining the integrity of the Building's life safety system in areas under its construction supervision and within its control.

Should a General Contractor's Work, including welding, the use of a cutting torch, or any other activity, interfere with the fire alarm system wiring or otherwise trigger or affect the fire alarm system, the General Contractor must contact Landlord prior to commencing such activity.

The General Contractor shall take any and all reasonable steps to prevent accidental triggering of the fire and smoke detection devices within or adjacent to the Work Area.  Such steps shall not include disconnecting any such devices, but rather shall involve the installation of dust barriers around smoke detectors, etc.

In the event Landlord receives a charge from any governmental or quasi- governmental agency related to the connection, disconnection, testing or use of any Life Safety System by General Contractor or Tenant, Tenant and/ or General Contractor shall be responsible for paying the same to Landlord within 10 days after written demand therefore.

23.     Light Bulbs and Ballasts:  The General Contractor is responsible for ensuring that all light fixtures in the Work Area are working properly and are fully lit upon job completion.  This includes replacement of bulbs and ballasts as required in light fixtures that are replaced, added or repositioned.

24.     Providing of Licenses:  General Contractor will supply to the management office a copy of the General Contractor's License, Certificate of Insurance, and a Letter of Competency.  All subcontractors must supply the same information to the management office.

25.     Non-Compliance:  Non-compliance with these regulations will result in the possible barring of the General Contractor from current or future activities in the Building.  Any costs incurred by Landlord in cleaning the Building or Work Area or repairing damage resulting from the General Contractor's activities (including the activities of any of the General Contractor's employees or subcontractors) will be billed to the General Contractor or set off against future payments to the General Contractor.

**GUARANTY OF LEASE**

ANNEXED TO AND FORMING A PART OF THE RETAIL LEASE, DATED JUNE 13, 2013, BETWEEN GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, a Delaware limited partnership ("**Landlord**") and TEE IT UP 1 LLC, a California limited liability company ("**Tenant**").

The undersigned, Tejpal Singh & Hardy Samra ("**Guarantor**"), whose address is 6362 Clark Ave  Dublin, CA, in consideration of the leasing of the Premises described in the annexed Lease to the above named Tenant, does hereby covenant and agree as follows:

I. If Tenant shall default in the performance of any of the covenants and obligations of said Lease on Tenant's part to be performed (including payment of all amounts due thereunder), then Guarantor will on demand perform the covenants and obligations of the Lease on Tenant's part to be performed and will on demand pay to Landlord any and all sums due to Landlord, including all damages and expenses that may arise in consequence of Tenant's default, and Guarantor does hereby waive all requirements of notice of the acceptance of this Guaranty and all requirements of notice of breach or nonperformance by Tenant.

II. This Guaranty is a guaranty of payment, and not of collection, for any sum of money owing from Tenant to Landlord.

III. Guarantor hereby waives:

A. any right to require that any prior action be brought against Tenant;

B. any right to require that resort be had to any security or to any other credit in favor of Tenant; and

C. all suretyship defenses generally, and the right to petition for the marshaling of assets.

IV. This Guaranty shall remain and continue in full force and effect:

A. as to any renewal, extension, holdover, modification or amendment of the Lease (including any expansion of the Premises and any increase in Tenant's obligations to Landlord) and this Guaranty shall remain and continue in full force and effect as to the Lease even though Tenant may have subleased all or any portion of the Premises or assigned all or any portion of Tenant's interest in the Lease. Guarantor waives notice of any and all such renewals, extensions, holdovers, modifications, amendments, subleases or assignments;

B. even though Landlord may have waived one or more defaults by Tenant, extended the time of performance by Tenant, released, returned or misapplied other collateral given as additional security (including other guaranties) or released Tenant from the performance of its obligation under the Lease;

C. notwithstanding the institution by or against Tenant of bankruptcy, reorganization, readjustment, receivership or insolvency proceeding of any nature, or the disaffirmance of the Lease in any such proceedings or otherwise; and

D.    until such time as Landlord has executed and delivered to Guarantor an instrument specifically releasing Guarantor, Guarantor may not be released by any actions or oral statements of Landlord or by implication.

V.    If the Lease shall be terminated due to a default by Tenant, Guarantor shall (without in any way limiting its liability under any other provision of this Guaranty), at the request of and within the complete discretion of Landlord, enter into a new Lease with Landlord on the same terms and conditions as contained in the Lease immediately prior to its termination, commencing on the termination date of said Lease and ending on the expiration date of said Lease; this provision shall not, however, vest Guarantor with any right to demand or require such a new Lease from Landlord.  Landlord shall have sole and absolute discretion as to whether or not such a new lease shall be required.

VI.    Guarantor shall submit to Landlord annually, or at such other times as Landlord shall request, financial statements and such other financial information as Landlord shall require, which shall be audited by a certified public accountant if required by Landlord.

VII.    If Guarantor is a corporation, Guarantor represents and warrants that this Guaranty has been duly authorized by all necessary corporate action on Guarantor's part, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantor's valid and legally binding agreement in accordance with its Terms.

VIII.    This Guaranty shall be applicable to and inure to the benefit of Landlord, its successors and assigns and shall be binding upon the heirs, representatives, successors and assigns of Guarantor.

IX.    Guarantor may, at Landlord's option, be joined in any action or proceeding commenced by Landlord against Tenant in connection with and based upon any covenants and obligations in the Lease and/or this Guaranty, and Guarantor waives any demand by Landlord and/or prior action by Landlord of any nature whatsoever against Guarantor.

X.    If this Guaranty is signed by more than one party, their obligations shall be joint and several and the release of one of such Guarantors shall not release any other such Guarantors.

XI.    The liability of Guarantor is co-extensive with that of Tenant and also joint and several; an action may be brought against Guarantor and carried to final judgment either with or without making Tenant a party thereto.

XII.    Until all of 'Tenant's obligations under said Lease are fully performed, Guarantor (1) waives any rights that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligation of Guarantor under this Guaranty, and (2) subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Landlord under said Lease.

XIII.    This Guaranty and the Lease shall be governed by, interpreted under the laws of, and enforced in the courts of the State in which the Premises are located.

XIV.    Guarantor hereby waives the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty and any plea or claim of lack of personal jurisdiction or improper venue in any action, suit or proceeding brought to enforce this Guaranty or any of the obligations arising hereunder. Guarantor specifically authorizes any such action to be instituted and prosecuted in any Circuit Court in the State in which the Premises are located or United States District Court of the State in which the Premises are located, at the election of Landlord, where venue would lie and be proper.  Guarantor irrevocably appoints Tenant as its agent for service of process.

XV.     Guarantor will pay to Landlord all of Landlord's expenses incurred in enforcing this Guaranty, including, but not limited to, attorneys' fees and costs incurred by Landlord prior to trial, at the trial level and at all levels of appeal and in connection with any bankruptcy or administrative proceedings.

XVI.    Any notices required hereunder shall be sent via nationally recognized overnight courier service to the address set forth on page 1 hereof and shall be deemed received on the first business day said courier service attempts to deliver the same to the addressee.  Either Guarantor or Landlord may change its address for notices hereunder by providing the other party with five (5) business days' notice of such change in address in the manner notices are to be sent under the Lease.

XVII. LANDLORD AND GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENTS CONTEMPLATED HEREBY TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO TO THE FULLEST EXTENT PERMITTED BY LAW, WHETHER NOW OR HEREINAFTER ENACTED, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LANDLORD'S ACCEPTANCE OF THIS GUARANTY.

*[Remainder of page intentionally blank.  Signatures on page to follow]*

IN WITNESS WHEREOF, the undersigned has executed this Guaranty this 22 day of August, 2013.

GUARANTOR:

By: _____

Name: TEJPAL SINGH

Social Security/FEI Number: 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

Date: 8/22/13

GUARANTOR:

By: _____

Name: HARDY SAMRA

Social Security/FEI Number: 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

Date: 8/22/13

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

On 08/22/2013, before me, WILFREDO AYOS GOMEZ, Notary Public, personally appeared TEJPAL SINGH, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]

WILFREDO AYOS GOMEZ
Commission # 1948080
Notary Public - California
Alameda County
My Comm. Expires Sep 10, 2015

Notary Public _____

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

On 08/22/2013, before me, WILFREDO AYOS GOMEZ, Notary Public, personally appeared HARDY SAMRA, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that

he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]                                              _____
                                                    Notary Public

WILFREDO AYOS GOMEZ
Commission # 1948080
Notary Public - California
Alameda County
My Comm. Expires Sep 10, 2015

## SCHEDULE 5

## TENANT ACCEPTANCE LETTER

This declaration is hereby attached to and made part of the Retail Lease, dated June 13, 2013 (the "**Lease**") entered into by and between GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, a Delaware limited partnership, as "**Landlord**," and TEE IT UP 1, LLC, a California limited liability company, as "**Tenant**." The undersigned, as Tenant, hereby confirms as of the _____ day of _____, _____ the following:

1. Tenant has accepted possession of the Premises on _____, _____ and is currently able to occupy the same.

2. The Commencement Date as defined in the Lease is ____ _____, _____.

3. The Rent Commencement Date, as defined in the Lease, is _____.

4. The Expiration Date of the Lease is _____.

5. All alterations and improvements required to be performed by Landlord pursuant to the terms of the Lease to prepare the entire Premises for Tenant's initial occupancy have been satisfactorily completed, except for the following:

_____

6. As of the date hereof, Landlord has fulfilled all of its obligations under the Lease.

7. The Lease is in full force and effect and has not been modified, altered, or amended, except pursuant to any instruments described above, if any.

8. There are no offsets or credits against Base Rent or Additional Rent, nor has any Base Rent or Additional Rent been prepaid except as provided pursuant to the Terms of the Lease.

9. Tenant has no notice of any prior assignment, hypothecation, or pledge of the Lease or any Rent due under the Lease.

TENANT:

TEE IT UP 1, LLC,
a California limited liability company

By: _____

Name: _____

Title: _____

48

## SCHEDULE 6

## RULES AND REGULATIONS

1.     In the event of any conflict between the terms of these rules and regulations and the express provisions of the Lease, the express, applicable provisions of the Lease shall control. Landlord reserves the right, without the approval of Tenant, to rescind, add to and amend any rules or regulations, to add new reasonable rules or regulations and to waive any rules or regulations with respect to any tenant or tenants. Tenant shall provide a copy of these rules and regulations to each of its employees to facilitate compliance with these standards.

2.     The sidewalks, walks, plaza entries, corridors, ramps, staircases and elevators of the Shopping Center shall not be obstructed, and shall not be used by Tenant, or the employees, agents, servants, visitors or invitees of Tenant, for any purpose other than ingress and egress to and from the Premises. No skateboards, roller skates, roller blades or similar items shall be used in or about the Shopping Center.

3.     No freight, furniture or other large or bulky merchandise or equipment of any description will be received into the Shopping Center or carried into the elevators, if any, except in such a manner, during such hours and using such elevators and passageways as may be approved or designated by Landlord, and then only upon having been scheduled in advance. Any hand trucks, carryalls, or similar equipment used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as Landlord shall reasonably require. Although Landlord or its personnel may participate or assist in the supervision of such movement, Tenant assumes financial responsibility for all risks as to damage to articles moved and injury to persons or public engaged or not engaged in such movement, including any equipment, property or personnel of Landlord damaged or injured in connection with carrying out this service for Tenant.

4.     Landlord shall have the right to prescribe the weight, position and manner of installation of safes or other heavy equipment which shall, if considered necessary by Landlord, be installed in a manner which shall insure satisfactory weight distribution. All damage done to the Shopping Center by reason of a safe or any other article of Tenant's equipment being on the Premises shall be repaired at the expense of Tenant. The time, routing and manner of moving safes or other heavy equipment shall be subject to prior approval by Landlord.

5.     Only persons authorized by Landlord will be permitted to furnish newspapers, ice, drinking water, towels, barbering, shoe shining, janitorial services, floor polishing and other similar services and concessions in the Shopping Center, and only at hours and under regulations fixed by Landlord.

6.     Tenant, or the employees, agents, servants, visitors or invitees of Tenant, shall not at any time place, leave or discard any rubbish, paper, articles or object of any kind whatsoever outside the doors of the Premises or in the corridors or passageways of the Shopping Center.

7.     Tenant shall not place, or cause or allow to be placed, any sign, placard, picture, advertisement, notice or lettering whatsoever, in, about or on the exterior of the Premises or Shopping Center, except in and at such places as may be designated by Landlord and consented to by Landlord in writing. Any such sign, placard, advertisement, picture, notice or lettering so placed without such consent may be removed by Landlord without notice to and at the expense of Tenant. All lettering and graphics on doors and windows shall conform to the building standard prescribed by Landlord.

8.     Tenant shall not place, or cause or allow to be placed, any satellite dish, communications equipment, computer or microwave receiving equipment, antennae or other similar equipment about or on the exterior of the Premises or Shopping Center, except the roof. Any such equipment so placed may be removed by Landlord without notice to and at the expense of Tenant.

9.     Canvassing, soliciting or peddling in the Shopping Center is prohibited and Tenant shall cooperate reasonably to prevent same.

10.     Landlord shall have the right to exclude any person from the Shopping Center, and any person in the Shopping Center will be subject to identification by employees and agents of Landlord. If Tenant desires additional security service for the Premises, Tenant shall have the right (with advance written consent of Landlord) to obtain such additional service at Tenant's sole cost and expense. Tenant shall keep doors to unattended areas locked and shall otherwise exercise reasonable precautions to protect property from theft, loss or damage. Landlord shall not be responsible for the theft, loss or damage of any property or for any error with regard to the exclusion from or admission to the Shopping Center of any person. In case of invasion, mob, riot or public incitement, the Landlord reserves the right to prevent

49

access to the Shopping Center during the continuance of same by taking measures for the safety of the tenants and protection of the Shopping Center and property or persons therein.

11. Only workmen employed, designated or approved by Landlord may be employed for repairs, installations, alterations, painting, material moving and other similar work that may be done in or on the Shopping Center.

12. Tenant shall not bring or permit to be brought or kept in or on the Premises or Shopping Center any inflammable, combustible, corrosive, caustic, poisonous, or explosive substance, or firearms, or cause or permit any odors to permeate in or emanate from the Premises, or permit or suffer the Shopping Center to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Shopping Center by reason of light, radiation, magnetism, noise, odors and/or vibrations.

13. Tenant shall not mark, paint, drill into, or in any way deface any part of the Shopping Center or the Premises. No boring, driving of nails or screws, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Tenant shall not install any resilient tile or similar floor covering in the Premises, except with the prior approval of Landlord, which approval shall not be unreasonably withheld or delayed.

14. No additional locks or bolts of any kind shall be placed on any door in the Premises and no lock on any door therein shall be changed or altered in any respect. Tenant shall not make duplicate keys. All keys shall be returned to Landlord upon the termination of this Lease and Tenant shall give to Landlord the explanations of the combinations of all safes, vaults and combination locks remaining with the Premises. Landlord may at all times keep a pass key to the Premises. All entrance doors to the Premises shall be left closed at all times and left locked when the Premises are not in use.

15. Tenant shall give immediate notice to Landlord in case of known theft, unauthorized solicitation or accident in the Premises or in the Shopping Center, or of known defects therein or in any fixtures or equipment, or of any known emergency in the Shopping Center.

16. Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions, except in connection with its own business and not as a service for others without Landlord's prior written permission.

17. No animals or birds shall be brought or kept in or about the Shopping Center, with the exception of guide dogs accompanying visually handicapped persons.

18. No awnings, draperies, shutters or other interior or exterior window coverings that are visible from the exterior of the Premises may be installed by Tenant without Landlord's prior written consent.

19. Tenant shall not place, install or operate within the Premises or any other part of the Shopping Center any engine, stove, or machinery, or conduct mechanical operations therein, without the written consent of Landlord.

20. No portion of the Premises or any other part of the Shopping Center shall at any time be used or occupied as sleeping or lodging quarters.

21. Tenant shall at all times keep the Premises neat and orderly.

22. The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. The expenses of any breakage, stoppage or damage, resulting from the violation of this rule shall be borne by the Tenant who (or whose employees or invitees) shall have caused such damage.

23. All tenant modifications resulting from alterations or physical additions in or to the Premises must conform to all applicable building and fire codes. Tenant shall obtain written approval from the management office prior to commencement of any such modifications and shall deliver as built plans to the management office upon completion.

24. Tenant agrees to place all indoor potted plants requiring water within a container capable of collecting any water overflow, such containers to be approved and/or supplied by Landlord, at Tenant's sole expense. Tenant agrees to use caution so that indoor plants do not damage or soil the Premises.

25. Tenant shall not park (and shall insure that Tenant's employees, agents, and invitees do not park) in any reserved parking space other than those reserved parking spaces, if any, specifically

50

assigned to Tenant. Any vehicle improperly parked, or parked in any unauthorized parking area in the Shopping Center, shall be towed at the vehicle owner's expense and without further or additional notice.

       26.      Persons using the Parking Areas do so at their own risk. Landlord specifically disclaims all liability, except when caused solely by its gross negligence or willful misconduct, for any personal injury incurred by users of the Parking Areas, their agents, employees, family, friends, guests or invitees, or as a result of damage to, theft of, or destruction of any vehicle or any contents thereof, as a result of the operation or parking of vehicles in the Parking Areas.

# SCHEDULE 7

## PROHIBITED USES/EXISTING EXCLUSIVES

Prohibited Uses

No portion of the Premises shall be operated, in whole or in part as (i) a sales office or showroom for automobiles or other vehicles or boats, (ii) a "package" liquor store or an establishment serving alcoholic beverages for on premises consumption (other than in connection with a restaurant), (iii) a funeral parlor or other death industry related business or any medical industry related facility, (iv) a massage parlor or "strip" club or establishment featuring nude or semi-nude live entertainment (but excluding Massage Envy and similar concepts), (v) a discotheque, dance studio or dance hall, (vi) a bingo hall, gambling casino or establishment, (vi) a skating rink, (vii) an offtrack betting establishment, (viii) an adult book or adult video store or peep show (live or otherwise) or store selling or exhibiting pornographic materials or exhibiting or offering x rated, not rated and/or "adult only" inventory for display, sale or rental, (ix) a so-called "flea market", "second hand", "used goods" or "surplus" store, (x) a gun range or gun shop or other establishment selling fire arms or ammunition, (xi) junkyard or stockyard, (xii) a coin operated laundry, central laundry or an on-site dry cleaning plant or facility, (xiii) store selling drug or "head shop" paraphernalia (as opposed to a typical drug store such as CVS or Walgreens), (xiv) a facility offering tattoo or body piercing (other than ear), (xv) warehouse or storage facility ("mini", "self" or otherwise), (xvii) industrial or manufacturing facility, (xviii) fireworks store, (xix) a gymnasium, karate, health spa or exercise studio or similar type business, or (xx) any business or use which emits offensive odors, fumes, dust or vapors, is a public or private nuisance, emits loud noise or sounds which are objectionable, creates fire, explosive or other hazard, or creates risk of environmental damage.

| Tenant | Exclusive Use |
|--------|---------------|
| Fusion 3 SalonSpa | Hair Salon shall be an exclusive use to Tenant and Landlord agrees not to rent space in the Project to any other tenants for purposes of operating a hair salon. |
| Prudential | Tenant shall have the exclusive right to operate a residential real estate brokerage firm within the project precluding any new residential brokerage firm from occupancy during the initial lease term or any renewal period. |
| Vine Cinema | Landlord covenants, warrants and represents that from and after the Commencement Date of this Lease and during the Term Landlord shall not lease, rent, occupy, use or permit to be occupied or used by any person or entity other than Tenant, any part of the Shopping Center owned by Landlord, nor shall any person or entity other than Tenant occupying a premises for the movie theater. |

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 62 of 113

**ADDENDUM**

This Addendum to Lease ("**Addendum**"), dated June 13, 2013, is entered into between GCCFC 2005-GG5 LIVERMORE RETAIL LIMITED PARTNERSHIP, a Delaware limited partnership ("**Landlord**"), and TEE IT UP 1, LLC, a California corporation ("**Tenant**").

RECITALS

A.     The parties have entered into a Lease Agreement, dated June 13, 2013, (the "**Lease**") pertaining to the premises located at 1790 N. First St., Livermore, CA 94550 (the "**Premises**").

B.     Landlord acknowledges that Tenant has agreed to operate a Restaurant at the Premises pursuant to Tenant's Franchise Agreement (the "**Franchise Agreement**") with Buffalo Wild Wings International, Inc. ("**BWW**") under the name "Buffalo Wild Wings Grill & Bar" or other name designated by BWW (the "**Restaurant**").

C.     The parties desire to amend the Lease in accordance with the terms and conditions contained in this Addendum to provide BWW the opportunity to preserve the Premises as a BWW branded restaurant as provided herein.

AGREEMENT

Landlord and Tenant agree to amend the Lease as follows:

1.     <u>Remodeling and Decor</u>.  Landlord agrees that Tenant has the right to remodel, equip, paint and decorate the interior of the Premises and to display such proprietary marks and signs on the interior and exterior of the Premises as Tenant is reasonably required to do pursuant to the Franchise Agreement and any successor Franchise Agreement under which Tenant may operate a Restaurant on the Premises.  Any remodel of the building and/or its signs shall be subject to Landlord's prior and reasonable approval and Tenant, at its sole cost and expense, obtaining all necessary governmental approvals and permits.

2.     <u>Assignment by Tenant</u>.

(a)     Tenant does not have the right to sublease or assign the Lease to any third party without BWW's and Landlord's written approval.

(b)     So long as Tenant is in good standing under the Lease, Tenant has the right to assign all of its right, title and interest in the Lease to BWW, its affiliates or its parent company, during the term of the Lease, including any extensions or renewals, without first obtaining Landlord's consent. No assignment will be effective, however, until BWW or its designated affiliate (the "**BWW Entity**") gives Landlord written notice of its acceptance of the assignment.  BWW will be responsible for the lease obligations incurred after the effective date of the assignment.  Tenant will not be relieved of its obligations under the Lease as the result of the assignment to the BWW Entity.

(c)     If BWW elects to assume the Lease, under this subparagraph or unilaterally assumes the Lease as provided for in subparagraph 3(a) or 4(a), Landlord and Tenant agree that (i) Tenant will remain liable for the responsibilities and obligations, including amounts owed to Landlord, under the Lease; and (ii) BWW will have the right to sublease the Premises to another franchisee with Landlord's prior reasonable approval, provided the franchisee meets BWW's then-current standards and requirements for franchisees and agrees to operate the Restaurant as a Buffalo Wild Wings restaurant pursuant to a Franchise Agreement with BWW.

3.     <u>Default and Notice</u>.

(a)     Landlord shall send BWW copies of all notices of default it gives to Tenant concurrently with giving such notices to Tenant.  If Tenant fails to cure any defaults within the period specified in the Lease, BWW has the right, but not the obligation, to unilaterally assume the Lease if Tenant fails to cure.  BWW shall have 15 days from the date BWW receives such notice of default by Tenant to exercise, by written notice to Landlord and Tenant, its right for BWW or a BWW Entity to assume the Lease.  BWW shall have an additional 15 days from the expiration of Tenant's cure period in which to cure the default or violation.

53

(b)     All notices to BWW must be sent by registered or certified mail, postage prepaid, to the following address:

> Buffalo Wild Wings International, Inc.
> 5500 Wayzata Boulevard, Suite 1600
> Minneapolis, MN 55416
> Attention: General Counsel

BWW may change its address for receiving notices by giving Landlord written notice of the new address. Landlord agrees that it will notify both Tenant and BWW of any change in Landlord's mailing address to which notices should be sent.

4.     <u>Termination, Non-Renewal, Expiration</u>. If the Franchise Agreement is terminated for any reason during the term of the Lease or any extension thereof, BWW has the right, but not the obligation, to unilaterally assume the Lease by giving Landlord written notice. Within 30 days after receipt of such notice, Landlord shall give BWW written notice specifying any defaults of Tenant under the Lease.

5.     <u>Access to Premises Following Expiration or Termination of Lease</u>. Upon the expiration or termination of the Lease, Landlord will allow BWW to enter the Premises at a mutually agreeable time within ten (10) days from the date of expiration or termination, without being guilty of trespass and without incurring any liability to Landlord, except for any damages caused by BWW's willful misconduct or gross negligence, to remove all signs, awnings, and all other items identifying the Premises as a BUFFALO WILD WINGS® Restaurant and to make such other modifications (such as repainting) as are reasonably necessary to protect the BUFFALO WILD WINGS® marks and system. In the event BWW exercises its option to purchase assets of Tenant, Landlord must permit BWW to remove all such assets being purchased by BWW.

6.     <u>Additional Provisions</u>.

(a)     Landlord hereby acknowledges that the provisions of this Addendum are required pursuant to the Franchise Agreement under which Tenant plans to operate its business and the Tenant would not lease the Premises without this Addendum.

(b)     Landlord further acknowledges that Tenant is not an agent or employee of BWW and the Tenant has no authority or power to act for, or to create any liability on behalf of, or to in any way bind BWW or any affiliate of BWW, and that Landlord has entered into this Addendum with full understanding that it creates no duties, obligations or liabilities of or against BWW or any affiliate of BWW, unless and until the Lease is assigned to, and accepted in writing by, BWW or its parent company.

(c)     BWW Entity may elect not to assume or be bound by the terms of any amendment to the Lease executed by Tenant without obtaining BWW's prior written approval, which shall not be unreasonably withheld or delayed.

7.     <u>Modification</u>. No amendment or variation of the terms of this Addendum is valid unless made in writing and signed by the parties and the parties have obtained the written consent of BWW.

8.     <u>Reaffirmation of Lease</u>. Except as amended or modified in this Addendum, all of the terms, conditions and covenants of the Lease remain in full force and effect and are incorporated by reference and made a part of this Addendum as though copied herein in full. In the event of any conflict between the terms of this Addendum and those in the Lease, the terms of this Addendum shall control.

9.     <u>Beneficiary</u>. Landlord and Tenant expressly agree that BWW is a third party beneficiary of this Addendum.

[Signatures on page to follow.]

54

IN WITNESS WHEREOF, the parties have executed this Addendum as of the dates written below.

**LANDLORD:**                                    **TENANT:**

GCCFC 2005-GG5 LIVERMORE RETAIL          TEE IT UP 1, LLC,
LIMITED PARTNERSHIP,                       a California limited liability company
a Delaware limited partnership
                                          By: _~Tejpal Singh~_
By:  GCCFC 2005-GG5 LIVERMORE RETAIL      Name: _TEJPAL SINGH_
     GP, LLC, a Delaware limited liability   Title: _Senior Partner_
     company, Its General Partner

     By:  LNR Partners California
          Manager, LLC, a California
          limited liability company,
          Its Manager

          By: _____
               Steven D. Ferreira,
               Vice President

53

**SCHEDULE 9**

**SIGN CRITERIA**

(Attached.)

NOTE: This complex is now part of the DSP Area.
All signage, whether temporary or permanent, shall
be reviewed based on the guidelines/standards
outlined in this Master Sign Program. No DSP
Committee Review is required for either sign type.
(Per DSP Design Standards and Guidelines - Signage (pg 6-91) and
the DSP Committee 11/18/02)

Vine Center

ITEM 4.3   DR 03-043
1722 First Street
June 19, 2003
ATTACHMENT 1

57

# Types of Signs Allowed

A. Transom Sign
B. Window Graphic
C. Awning Sign
D. Wall Sign
E. Corner Blade Sign
F. Projecting Sign

- Directory Sign A
- Directory Sign B




A. Tenant Signs

Tenant signs are usually located on the storefront above the height of door. (If it is on the storefront above/below the door height it is considered a window sign.)
Typically, tenant signs are carved or fabricated signs. Most are spot lit from above. Sandblasted glass panels with silk screen letters are as effective as self illuminated letters.

| | |
|---|---|
| Signage Type Example  Sign A | May 19 2003 |
| Vine Center, Livermore CA | SZFM Design Studio |

A



B. Window Graphics

Window graphics come in a wide variety of sizes, shapes and materials. They may be something as simple as a etched leaf interwoven in a manner decals on glass. Window graphics may not exceed 10% of each glazed storefront. Aggregate area of total window graphics may not exceed 50 square feet per tenant. No single window's graphic be larger than 16 square feet.

| Signage Type Example – Sign B | May 19, 2003 | B |
| Vine Center - Livermore CA | SZFM Design Studio | |





C Awning Sign

Awning signs are graphics logos or words applied directly onto the awning. See building elevation for details.

| Signage Type Example - Sign C1 & C2 | May 19, 2004 |  |
|---|---|---|
| Vine Center, Livermore CA | SZFM Design Studio | |



C. Awning Signs

Awning signs are graphics logos or words applied directly onto the awning face building elevation for retail.

| | | |
|---|---|---|
| Signage Type Example: Sign C3 | May 19, 2003 | C |
| Vine Center, Livermore CA | SZTM Design Studio | |



D. Wall Signs

Wall signs are new graphics or written three dimensions which have been applied to the building above the storefront. These signs are translatable architecture version of the building where the structure or display window occurs - see building elevation for details.

Signage Type Examples: Sign D1                                    May 19, 2011
Vine Center, Livermore CA                                    SZFM Design Studio

D





D2 Wall Signs

Wall signs are designed to fit into architectural spaces near the storefront. The size and general shape has been predetermined. They are intended to be a locus of interest; they should be imaginative in nature and in high visibility.

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 74 of 113



Corner Blade Sign

A corner blade Sign is one at the corner of a building. The front of this sign should represent the maximum quality at the storefront and storefront elevation for mounting height and dimension requirements.

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 75 of 113



F. Projecting signs

Projecting signs that are typically added to a storefront, representing each building's best features. A sign can contribute towards some of the entry doors. See elevation for details.



Signage Type Examples  Sign F     May 14, 2003

Vine Center, Livermore CA     S/TM Design Studio

**F**



Tenant Signage Location Map

Vine Center - Livermore CA

May 19, 2003

SZFM Design Studio

FIRST STREET (HIGHWAY 84)

67



Sign A - Tenants Sign, allowed inside bays or matte panel of graphics (with cutouts when sign occupies two bays, see also Sheet 15)

Sign B - Window Graphics, (see Sheet 15)

Sign E - Tenant Sign, (see Sheet 21)

| | | | |
|---|---|---|---|

FIRST FLOOR PLAN

| Allowable Sign Types - South Elevation of Theater Building | May 19, 2003 |
|---|---|
| Vine Center, Livermore CA | SZFM Design Studio |

0    8 Feet

1



Sign D - Window Graphics (see Sheet 5)

Sign C - Awning Signs (see Sheet 6)

Sign D1 - Wall Signs (see Sheet 7)

Sign E - Projecting Signs (see Sheet 8)

Allowable Sign Types - South Elevation @ Building 1

Vine Center, Livermore CA

May 19, 2003

SZFM Design Studio

2

0        8 feet



Sign B - Window Graphic, (see Sheet D)

Sign C - Awning Sign, (see Sheet D)

Sign D1 - Wall Sign, (see Sheet D)

Sign E - Projecting Sign, (see Sheet D)

| Allowable Sign Types - South Elevation @ Building 2 | May 19, 2003 |
| Vine Center, Livermore CA | SZ/M Design Studio |

0      8 feet

3



Sign B - Window Graphics (see Sheet 18)

Sign C1 & 2 - Awning Signs (see Sheet 18)

Sign D2 - Wall Sign (see Sheet 18)

Sign E - Corner Blade Sign (see Sheet 18)

Sign F - Projecting Signs (see Sheet 20)

| Allowable Signage Types - South Elevation @ Building 3 | May 19, 2003 | 4 |
| Vine Center, Livermore CA | SZFM Design Studio | |

0      8 feet

71



Sign B - Window sign (see Sheet 18)

Signs T & 2 - Awning signs (see Sheet 19)

Sign DC - Wall Sign. (see Sheet 19)

Sign P - Locate Blade Sign and Current Map for orientation (see Sheet 19)

| Allowable Sign Types - East Elevation of Building 3 | May 19, 2003 | 5 |
|---|---|---|
| Vine Center, Livermore CA | SZFM Design Studio | |

0        5 feet



Sign C - Wall sign, see Sheet 10.

Sign T & U - Awning Signs, see Sheet 11.

Allowable Sign Types - East Elevation of Building 3

Vine Center, Livermore CA

May 19, 2003

SZEM Design Studio

6



Allowable Sign Types - North Elevation at Building 5

May 16, 2003

Vine Center, Livermore CA

SZFM Design Studio

7



Sign A - Tenant Sign, see Sheet 18

Sign B - Window Graphics, see Sheet 19

Sign C - Wall Signs, see Sheet 19

Sign F - Projecting Sign, see Sheet 20

Allowable Sign Type - North Elevation @ Building 2

Vine Center, Livermore CA

0        8 feet

May 19, 2003

SZFM Design Studio

8

Case: 23-40085     Doc# 120-1     Filed: 05/17/23     Entered: 05/17/23 14:42:42     Page 85 of 113



Sign A - Primary Signs (see Sheet 1)

Sign B - Window Graphics (see Sheet 18)

Sign D - Wall Signs (see Sheet 17)

Sign E - Projecting Signs (see Sheet 20)

| Allowable Sign Types - North Elevation @ Building 1 | May 13, 2013 | 9 |
|---|---|---|
| Vine Center, Livermore, CA | SZFM Design Studio | |

0       8 feet

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 86 of 113



Sign B - Window Graphics (see sheet 18)

Sign F - Projecting Signs (see Sheet 20)

| Allowable Sign Types - East Courtyard Elevation B | May 15, 2009 | 10 |
| Vine Center, Livermore CA | SZFM Design Studio | |

0    8 feet



Sign 6 - Window Graphics, per Sheet 13

Sign 1 - Projecting Sign, per Sheet 20

Allowable Sign Types - East Courtyard Elevation A

May 19, 2003

Vine Center, Livermore CA

SZFM Design Studio

0          8 feet

11

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 88 of 113



Sign B - Window Graphics (see Sign 15)

Sign C - Directory Signs (see Sheet 20)

Allowable Sign Types - West Courtyard Elevation

Vine Center Livermore CA

May 29, 2003

SZEM Design Studio

12

0          8 Feet

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 89 of 113



Sign D - Window Graphics, see Sheet 19

Sign E - Projecting Sign, see Sheet 20

Allowable Sign Types - West Courtyard Elevation A    May 19, 2004

Vine Center, Livermore CA    SZFM Design Studio    13

0    8 feet



Allowable Sign Types - Directory Sign A
Vine Center, Livermore CA

May 29, 2003
SZFM Design Studio

14A

0          8 feet



Allowable Sign Types - Directory Sign B

Vine Center, Livermore CA

Shops @ Vine

May 19, 2003

SZFM Design Studio  14B

0          8 feet

Case: 23-40085   Doc# 120-1   Filed: 05/17/23   Entered: 05/17/23 14:42:42   Page 92 of 113



Sign D2: Wall signs - Opaque background with external illuminated sign. See sign options. (Maximum 4" Dia. with multiple tenants, Maximum 8" Dia. with single tenant, only one sign is allowed for single tenant) Maximum letter area of 24" ht. Illuminated Signs not allowed on South side of building for parking lot sales.

| Detail of Sign Types - Type D2 | | May 19, 2003 | |
|---|---|---|---|
| Vine Center, Livermore CA | | SZUM Design Studio | 18 |

Case: 23-40085    Doc# 120-1    Filed: 05/17/23    Entered: 05/17/23 14:42:42    Page 93 of 113



Note 1 - Corner Blade Signs: Signage require to have an aluminum panel from Minimum elevation of SCM.

Detail of Sign Types - Type 1

Vine Center - Livermore CA

May 19, 2003

SZEM Design Studio

19

0        1 feet



Sign I

INSTALL TO MATCH "BUILDING" EXTERIOR

SIGN

3'-5'

6" 1"

Sign I - Projecting Sign. Maximum area 8 sq ft

| Detail of Sign Types- Type I | | May 19, 2003 | 20 |
| --- | --- | --- | --- |
| Vine Center, Livermore CA | 0   2 feet | SZ M Design Studio | |



Sign F (Similar See Sheet 20)

SIGN

4'

ALIGN

8'-0" VI.F.

Sign F - Projecting Sign Maximum Letter Height of 6"

86

# EXHIBIT B

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "*Agreement*") is entered into and effective as of this _2_ day of _MARCH_, 2016, by and between **NO MULLIGANS LLC**, a California limited liability company, **TEE IT UP LLC**, a California limited liability company, and **TEE IT UP 1 LLC**, a California limited liability company (all of the foregoing entities shall be referred to hereinafter severally and collectively as the "*Seller*") (all of the foregoing entities shall be referred to hereinafter severally and collectively as the "*Assignor*"), and **FJC MANAGEMENT, INC.**, a Nevada corporation ("*Assignee*").

**RECITALS**

A.      Assignor and the Assignee are parties to that certain Asset Purchase Agreement dated _27 SEP_ __, 2016, (the "*Purchase Agreement*"), whereby the Assignor is selling to the Assignee and the Assignee is purchasing from Assignor as of the Closing Date all of the Acquired Assets.

B.      Contemporaneously with the transfer of the Acquired Assets pursuant to a Bill of Sale, Assignor wishes to assign its rights and Obligations under the Assigned Contracts and the Assigned Permits, and the Assignee wishes to assume such rights and Obligations of Assignor under the Assigned Contracts and Assigned Permits.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is admitted and acknowledged, the parties agree as follows:

1.      DEFINITIONS. Capitalized terms used in this Agreement and the introductory Recital paragraphs above but not defined herein shall have the meanings ascribed to such terms as are set forth in the Purchase Agreement.

2.      ASSIGNMENT. Assignor hereby transfers and assigns to Assignee all of Assignor's rights in, to and under all of the Assigned Contracts identified on Exhibit A attached hereto and incorporated herein by reference, and all of Assignor's rights in, to and under all of the Assigned Permits identified on Exhibit B attached hereto and incorporated herein by reference. Assignor hereby further assigns to Assignee all of the Assumed Liabilities.

3.      ASSUMPTION. Assignee hereby accepts the foregoing transfer and assignment and agrees to assume from Assignor all of Assignor's rights in, to and under all of the Assigned Contracts and the Assigned Permits, and further Assignee hereby accepts and assumes all of the Assumed Liabilities.

4.      ASSURANCES. Each Party hereby agrees to execute and deliver to the other Party, from time to time, such further instruments, assignments, transfers, conveyances, and assurances as may be required to effect the assignment and assumption evidenced hereby.

5.      COUNTERPARTS. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

6.      GOVERNING LAW. The provisions hereof shall be governed by and construed in accordance with the laws of the State of California without regard to the conflicts of law rules thereof.

7.      CONFLICT. This Agreement is entered into pursuant to and is subject to all of the terms of the Purchase Agreement, and nothing herein shall be deemed to modify any of the representations, warranties, covenants and obligations of the parties thereunder. In the event of any conflict or inconsistency between the terms, provisions and conditions of this Agreement and the Purchase Agreement, the terms, provisions and conditions of the Purchase Agreement shall govern.

[Signature page follows]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date and year first written above.

**ASSIGNOR:**

**SELLER:**

**NO MULLIGANS LLC**,
a California limited liability company

**TEE IT UP LLC**,
a California limited liability company

**TEE IT UP I LLC**,
a California limited liability company

By: T. Tejpal Singh
Its: Member


**ASSIGNEE:**

**FJC Management, Inc.**,
a Nevada limited liability company

By: Pravesh Chopra
Its: President

2

## DISCLOSURE SCHEDULE 1(A)

## ASSIGNED CONTRACTS

### Lease Agreements

(1) Lease Agreement dated October 17, 2008 by and between S&V, LLC, as Landlord, and Tee It Up, LLC, as Tenant, for that certain premises located at 3712 Dublin Blvd., Dublin, CA 94568.

(2) Lease dated January 20, 2010 by and between Solano Mall LP, as Landlord, and Tee It UP LLC, as Tenant, for that certain premises located at 1350 Travis Blvd., Suite 1510-A Solano Mall, Fairfield, CA 94533.

(3) Ground Lease dated on or around June 30, 2010 by and between Nut Tree Retail, LLC, as Landlord, and No Mulligans LLC, as Tenant, for that certain premises located at 1601 E. Monte Vista Ave, Vacaville, CA 95688.

(4) Lease dated May 7, 2012 by and between TRC MM , LLC, as Landlord, and Tee It UP LLC, as Tenant, for that certain premises located at 200 Montgomery Street, San Ramon, CA 94583.

(5) Retail Lease dated by and between GCCFC 2005-GG5 Livermore Retail Limited Partnership, as Landlord, and Tee It Up 1 LLC, as Tenant, for that certain premises located at 1790 1st Street, Livermore, CA 94550.

### Franchise Agreements

(1) Franchise Agreement dated October 11, 2007 by and between Buffalo Wild Wings International, Inc., as Franchisor, and Tee It Up, LLC, as Franchisee, for the Dublin, CA Restaurant.

(2) Franchise Agreement dated May 18, 2009 by and between Buffalo Wild Wings International, Inc., as Franchisor, and Tee It Up, LLC, as Franchisee, for the Fairfield, CA Restaurant.

(3) Franchise Agreement dated June 23, 2010 by and between Buffalo Wild Wings International, Inc., as Franchisor, and No Mulligans, LLC, as Franchisee, for the Vacaville, CA Restaurant.

(4) Franchise Agreement dated February 3, 2012 by and between Buffalo Wild Wings International, Inc., as Franchisor, and Tee It Up, LLC, as Franchisee, for the San Ramon, CA Restaurant.

(5) Franchise Agreement dated January 23, 2013 by and between Buffalo Wild Wings International, Inc., as Franchisor, and Tee It Up 1, LLC, as Franchisee, for the Livermore CA Restaurant.

### Equipment Leases

(1) Buzztime Lease dated on or around November 1, 2015 by and between NTN Buzztime and No Mulligans, LLC.

(2) POS Lease with Wells Fargo Financial Leasing.

2

## ASSIGNED CONTRACTS

**Other Vendor Contracts**

**Dubin**

| Vendor | Account # |
|---|---|
| ASCAP | 500712425 |
| Edward Don | 10794749 |
| Cozzini Bros | 36546 |
| Cintas | 05332-09017 |
| Cintas | 05332-09154 |
| Ecolab | 19991661 |
| Advance Concepts | #3436 |
| Dublin San Ramon Services Districy | 380 |
| Ecolab Pest | BUFF0291-1 |
| Protection One | 50838036 |
| NTN Buzztime | 34284 |
| Hotschedules | BWW-Dublin |
| Impact Paper | BWW3712-56 |
| Hoodz of Southern East Bay | BWW-Dublin |
| Ecolab Food Safety | 2274562 |
| Ambient Temperature | BWW-Dublin |
| NuCo2 | 452389 |
| PGE | 9898050628-5 |
| Comcast | 8.1554E+14 |
| DirectTV | 35716860 |

3

## ASSIGNED CONTRACTS

**Fairfield**

| Vendor | Account # |
|---|---|
| Cintas | 06683-08346 |
| Edward Don | 1099704 |
| Advance Concepts | #3506 |
| Keta Environmental Services | 1203010 |
| Ambient Temerpature Controls | BWW Fairfield |
| Cozzini Bros | 37511 |
| Ecolab Pest | BUFF0292-1 |
| Hotschedules | BWW-Fairfield |
| NTN Buzztime | 11235134 |
| Hoodz of Southern Bay | BWW-Fairfield |
| Impact Paper | BUFFWILDWNG-56 |
| NuCo2 | 452389 |
| Ecolab Food Safety | 2460035 |
| Culligans | 109072 |
| Firemaster | 15363484 |
| Cintas First Aid | 10037618 |
| Commercial Lighting | BUF002 |
| Direct TV | 40730298 |
| PGE | 1395801136-6 |
| AT&T | 7.07423E+13 |

4

## ASSIGNED CONTRACTS

**Vacaville**

| Vendor | Account # |
| --- | --- |
| P& D Appliance | 00-BUF011 |
| Cintas First Aid | 10037619 |
| Cintas | 06683-08350 |
| Ecolab Pest | BUF0298-0001 |
| Advance Concepts | #3540 |
| Impact Paper | BFFWINGS-56 |
| California Landscape | |
| PartsTown | 3540 |
| DarPro | 13937:37:00 |
| Hotschedules | BWW-Vacaville |
| Culligans | 109771 |
| Eward Don | 1106398 |
| Cozzini Bros | 41342 |
| Solano Irrigation District | 09620300-00 |
| Commercial Lighting | BUF002 |
| Ecolab Food Safety Specialities | 2482202 |
| Ecolab | 10174959 |
| NTN Buzztime | 11239663 |
| Hoodz of Southern East Bay | BWW-Vacaville |
| Bay Alarm | 34006243 |
| Bay Alarm | 3400724 |
| Ambient Temperature | BWW Vacaville |
| NuCo2 | 415564 |
| City of VV | 6836 |
| On Demand IT | NOMULL |
| PG &E | 3052621247-4 |
| Direct TV | 68741824 |
| City of VV | 77132 |
| Comcast | 8155300260731203 |

5

## DISCLOSURE SCHEDULE 1(A) *(continued)*

### ASSIGNED CONTRACTS

**San Ramon**

| **Vendor** | **Account #** |
| --- | --- |
| ASCAP | 500751012 |
| Advance Concepts | #3629 |
| Cintas | 05332-09018 |
| Cozzini Bros | 732018 |
| Edward Don | 1119843 |
| Commercial Lighting | BUF002 |
| Impact Paper | BWWWINGS-56 |
| Ecolab Pest | BUFF0334-1 |
| NTN Buzztime | 11283341 |
| Hotschedules | BWW-San Ramon' |
| PartsTown | 3629 |
| Hoodz of Southern Bay | BWW-San Ramon |
| ASCAP | 500751012 |
| Ecolab Food Safety | 265627 |
| On Demand IT | TEEITUP |
| NuCo2 | 452389 |
| Ambient Temperature | BWW San Ramon |
| Dar Pro | 800257 |
| Ecolab | 10287715 |
| PGE | 1911158949-5 |
| Direct TV | 41193568 |
| Waste MGMT | 699-0009124-2216-9 |

6

## DISCLOSURE SCHEDULE 1(A) *(continued)*

### ASSIGNED CONTRACTS

**Livermore**

| Vendor | Account # |
|---|---|
| Cintas | 05332-09019 |
| Edward Don | 1130726 |
| Cozzini Bros | 736590 |
| Advance Concepts | #3676 |
| Culligans | 278689 |
| Hotschedules | BWW Livermore |
| NTN Buzztime | 11296382 |
| Impact Paper | BUFFWLDW-56 |
| Commercial Lighting | BUF002 |
| Cintas First Aid | 10472512 |
| Comcast | 8155400180988386 |
| Direct TV | 41515741 |
| Bay Alarm | 4228324 |
| Ambient Tempaerature | BWW Livermore |
| NuCo2 | 452389 |
| On Demand IT | TEITUP1 |
| PartsTown | 3676 |
| Ecolab Food Safety | 2744423 |
| PGE | 8575387666-4 |

7

## DISCLOSURE SCHEDULE 6(G)

### ASSIGNED PERMITS

Dublin:
BOE: 101201995
ABC: 47-473580
Health Permit:PT0309988
Business License: Pending

Fairfield:
BOE:101201995
ABC:47-489571
Health Permit: 101320
Business License: 10000827

Vacaville:
BOE: 102073018
ABC: 47-508611
Health Permit: 103949
Business License: 023521

San Ramon:
BOE: 101201995
ABC: 47-525118
Health Permit: PT0016545
Business License: 1500016170

Livermore:
BOE: 102485818
ABC-47-536095
Health Permits: PT0313244
Business License: 2002082

4832-8787-6920, v. 3

13

# EXHIBIT C

# FIRST AMENDMENT TO RETAIL LEASE

This First Amendment to Shopping Center Lease dated January 17, 2019, for reference purposes only ("First Amendment"), is entered into by and between GAMC, Limited Company ("Landlord") on the one hand; and FJC Management, Inc. ("Tenant"). Landlord and Tenant may be collectively referred to hereafter as the "Parties."

WHEREAS, Landlord's predecessor-in-interest 2005-GG5 Livermore Retail Limited Partnership ("LRLP") and Tenant's predecessor-in-interest TEE IT UP LLC, a California limited liability company ("TIU"), entered into that certain Retail Lease dated June 13, 2013 (the "Lease") regarding the property commonly known as 1790 N. First Street, Livermore, California 94550 (the "Premises").

WHEREAS, TIU assigned the Lease, without Landlord's consent, on or about March 2, 2016 to Tenant.

WHEREAS, Tenant has failed to timely pay all Rent, and currently owes back Rent in the amount of $85,092.41 through January 17, 2019 (the "Default Amount").

WHEREAS, Landlord has agreed, subject to the full performance of this First Amendment, to allow Tenant to cure its default, and continue the Lease.

**NOW, THEREFORE,** in consideration of the mutual promises herein contained, the parties hereto agree as follows:

**1.     Payment of All Sums Due.** Tenant agrees to cure the Default Amount in the following payments, and said sums shall be considered Additional Rent for all purposes under the Lease:

      (a)      Payment of $17,018.42 on or before February 1, 2019;
      (b)      Payment of $17,018.42on or before March 1, 2019;
      (c)      Payment of $17,018.42 on or before April 1, 2019;
      (d)      Payment of $17,018.42 on or before May 1, 2019; and
      (e)      Payment of $17,018.49 on or before June 1, 2019.

**All other Rent and NNN charges remain due per the terms Lease shall be timely paid in addition to the Additional Rent set forth above.**

**2.     Failure to Timely Pay Rent**. In the event of a failure to pay Rent, as defined in the Lease and this First Amendment, Tenant shall be deemed to have materially defaulted under the Lease if such rental default is not cured within three (3) days of written notice.

**3.     Acknowledgement of Assignment.** Landlord hereby acknowledges FJC Management, Inc., a Nevada corporation as the assignee of TIU, and as "Tenant" under the Lease for all purposes. However, Landlord does not waive, and further expressly reserves, enforcement of any provisions in the Lease regarding unconsented assignment against TIU and/or its guarantors in law or equity.

**4.     Release of All Claims by Tenant.**

Except as provided in Paragraphs 1 through 3 of this Agreement, Tenant agree to release Landlord from liability including its assigns, predecessors and successors in interest, and each of its former and current servants, agents, representatives, directors, employees, officers, and shareholders, as to every claim or counterclaim Tenant ever had, now have, or may ever

hereafter have arising from any matter arising out of the Lease, or otherwise, prior to the effective date of this Agreement.

**5.    Waiver of Unknown Claims.**

Tenant represent that it understands the meaning and effect of, and hereby waives in their entirety all rights and benefits afforded by, Section 1542 of the California Civil Code, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

**6.    Indemnification.**    Tenant expressly warrants that if its lender(s) and/or its franchisor require Tenant obtain their respective consent for Tenant to enter into this Agreement, Tenant has obtained such consent..  Tenant shall defend, indemnify, and otherwise hold Landlord harmless should any party commence an action against Landlord arising out of the Lease due to Tenant's execution of this Agreement.

**7.    Miscellaneous.**

(a)    Attorneys' Fees.  If any party commences any action against any of the parties hereto arising out of or in connection with this agreement, the prevailing party or parties shall be entitled to recover from the losing party or parties' reasonable attorneys' fees and costs of suit.

(b)    Successors.  This agreement shall be binding on and inure to the benefit of the parties and their successors and assigns.

(c)    Entire Agreement.  This agreement, together with the Lease contains all of the agreements of the parties hereto and supersede any previous oral negotiations or discussions. There have been no representations made by, between, or among the parties other than those set forth in this Agreement.

(d)    Counterparts.    This agreement may be executed in one or more counterparts, each one of which shall be an original, but all of which shall constitute one and the same instrument.

-2-

(e)    <u>Signatories</u>.  Each of the signatories hereto warrants and represents that he or she is competent and authorized to enter into this agreement on behalf of the party for whom he or she purports to sign.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed as of this ___ day of January 2019.

| LANDLORD: | TENANT: |
|---|---|
| **GAMC, LIMITED COMPANY** | **FJC MANAGEMENT, LLC** |
| By: | By: |
| Print Name: Glenn Becker | Print Name: PRAVESH Chopra |
| Print Title: President | Print Title: Member |
| Date: 3/13/2019 | Date: 1/22/19 |

-3-

# EXHIBIT D

# SECOND AMENDMENT OF RETAIL LEASE

This Second Amendment of Retail Lease ("Second Amendment") is entered into by and between Vine Center, LLC, as successor to GAMC Limited Company ("Landlord"), and FJC Management, Inc. ("Tenant"), effective February 12, 2021 (the "Effective Date"), each of Landlord and Tenant being a "Party" and, together, the "Parties".

WHEREAS, Landlord's predecessor in interest, 2005-GG5 Livermore Retail Limited Partnership and Tenant's predecessor in interest, Tee It Up, LLC, entered into that certain "Retail Lease" dated June 13, 2013 (the "Lease") regarding the property commonly known as 1790 North First Street, Livermore, California, 94550; and

WHEREAS, the Parties previously entered into a First Amendment to Retail Lease; and

WHEREAS, Tenant has failed to pay all rent when due under the Lease, and there is now owing from Tenant to Landlord the amount of $182, 447.70 in unpaid rent; and

WHEREAS, the Parties wish to resolve the issue of unpaid rent as provided herein.

NOW, WHEREFORE, in consideration of the mutual promises contained herein, the Parties agree as follows:

1.    **Payment from Tenant**.  Before close of business (5:00 p.m.) Eastern Standard Time on February 12, 2021, Tenant shall pay to Landlord, by wire transfer according to instructions to be provided by Landlord, the sum of One Hundred Eight Thousand Four Hundred and Sixty-Two Dollars ($108,462.00).

2.    **Effect of Payment.**  Provided the payment set forth in paragraph 1 is timely made, Landlord shall accept that sum as payment in full of Tenant's rent obligations under the Lease through May 31, 2021.

3.    **Time is of the Essence.**    Time is of the essence with respect to all of Tenant's obligations under this Second Amendment.

4.    **Release of Claims by Tenant.**  Except for obligations expressly created by this Second Amendment, Tenant hereby releases Landlord, and its assigns, predecessors, and successors, and each of their current and former servants, agents, representatives, directors, officers, members , managers, shareholders, and employees, from liability as to any claim, demand, obligation, cause of action, debt, or damage arising out of the Lease or otherwise prior to the Effective Date.

5.    **Waiver of Unknown Claims.** Tenant is aware of California Civil Code section 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW EXISTS IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OF HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Having had the opportunity to discuss the meaning and effect of such section, Tenant hereby waives the protection thereof, and of every other principle of similar effect.

6. **Indemnification.** Tenant warrants that, if its lender(s), franchisor, or any other party requires that Tenant obtain their consent to enter into this Second Amendment, Tenant has obtained such consent. Tenant shall indemnify, defend, and hold harmless Landlord from and against any liability, cost, damage, or expense, including reasonable attorneys' fees and costs, arising from Tenant's execution of this agreement.

7. **No Effect on Remainder of Lease.** Except as expressly amended by this Second Amendment, the Lease shall remain in full force and effect in all respects.

8. **Miscellaneous.**

    a. **Attorneys' Fees.** In any action arising out of this Second Amendment, the prevailing party shall be awarded its attorneys' fees, costs, and other expenses, in addition to whatever other relief to which it may be entitled.

    b. **Entire Agreement.** This Second Amendment contains all of the agreements of the Parties with respect to the Parties' desire to amend the Lease, and supersedes any previous or contemporaneous discussions, negotiations, or representations. Neither Party is entering into this Second Amendment based on any representation or warranty not expressly included in this writing.

    c. **Counterparts.** This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Delivery of signed copies via electronic means, including email, will be deemed delivery of a signed original.

IN WITNESS WHEREOF, THE Parties have caused this Second Amendment to be executed as of this Twelfth day of February, 2021.

VINE CENTER, LLC ("LANDLORD") ("TENANT")

FJC MANAGEMENT, INC.

_____
**Glenn Becker, President**

_____
**Pravesh Chopra, President**